Page 1

1                              STATE OF FLORIDA
                    DIVISION OF ADMINISTRATIVE HEARINGS

2

3    OLIVER JAMES

4    Plaintiff(s),

5    - vs -

6    THE BREAKERS PALM BEACH, INC.

7    Defendant(s).

8    _____/

9

10                  DEPOSITION OF OLIVER JAMES

11                      October 24, 2024

12                        10:10 a.m.

13

14

15

16

17

18

19

20

21

22       REPORTED BY: TRACEY SLYE, COURT STENOGRAPHER

23

24

25       Job No. CS6974724

1                    APPEARANCES OF COUNSEL

2

3     RONALD WEIL, ESQ.

      Weil Law Firm, P.A.

4     201 S Biscayne Blvd

      Miami, FL 33131

5               Counsel for the Plaintiff(s)

6

7     HOLLY GRIFFIN GOODMAN, ESQ.

      Gunster

8     777 S Flagler Dr Ste 500E

      West Palm Beach, FL 33401-6121

9               Counsel for the Defendant(s)

10

11    Also present:

12            Ashley Connell, videographer

13            Kristy Pressly

14

15

16

17

18            E X A M I N A T I O N S

19    Witness                                    Page

20    OLIVER JAMES

21    DIRECT EXAMINATION BY MS. GRIFFIN GOODMAN .........7

22    CROSS EXAMINATION BY MR. WEIL ..................124

23    REDIRECT EXAMINATION BY MS. GRIFFIN GOODMAN .....134

24    RECROSS EXAMINATION BY MR. WEIL ...............137

25    REDIRECT EXAMINATION BY MS. GRIFFIN GOODMAN .....138

Page 3

1   RECROSS EXAMINATION BY MR. WEIL .................138
2   ======================================================
3                     E X H I B I T S
4        DEFENDANT'S MARKED FOR IDENTIFICATION
5   EXHIBIT                DESCRIPTION              PAGE
6
7   EXHIBIT 1                  Emails                30
8   EXHIBIT 2            Video, Breakers 13          36
9   EXHIBIT 3            Video, Breakers 15          37
10  EXHIBIT 4            Video, Breakers 16          38
11  EXHIBIT 5            Video, Breakers 29          47
12  EXHIBIT 6         Video entitled Live at the     59
                           Breakers
13
    EXHIBIT 7            Video, Breakers 401         69
14
    EXHIBIT 8              Text Message              93
15
    EXHIBIT 9              Text Message              96
16
    EXHIBIT 10             Text Message              97
17
    EXHIBIT 11   Complaint of discrimination with   99
18               the Florida Commission on Human
                           Relations
19
    EXHIBIT 12         Transmittal of petition       100
20
21                  (Exhibits retained by counsel)
22
23
24
25

Page 4

1                          CERTIFIED QUESTION

2

3          Page 105, lines 20-22

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

```
 1              THE STENOGRAPHER:  The attorneys

 2    participating in this proceeding acknowledge that

 3    I am not physically present in the proceeding

 4    room and that I will be reporting this proceeding

 5    remotely. They further acknowledge that, in lieu

 6    of an oath administered in person, the witness

 7    will verbally declare his testimony in this

 8    matter is under penalty of perjury. The parties

 9    and their counsel consent to this arrangement and

10    waive any objections to this manner of reporting.

11              Please indicate your agreement by stating your

12    name and your agreement on the record

13              MR. WEIL:  Good morning, Ron Weil on

14         behalf of the claimant, Oliver James.  We

15         agree.

16              MS. GRIFFIN GOODMAN:  Good morning, Holly

17         Griffin Goodman on behalf of the Breakers Palm

18         Beach, Inc., the respondent, and we agree.

19              THE STENOGRAPHER:  Will the witness please state

20    and spell your name for the record?

21              THE WITNESS:  Oliver James, O-L-I-V-E-R, J-A-M-E-S.

22              THE STENOGRAPHER:  Will the witness

23         now please repeat the following declaration for the

24         record.

25              THE STENOGRAPHER:  I declare my
```

1         testimony -- repeat after me.  I declare my

2         testimony --

3              MR. WEIL:  I'm sorry, what are we doing?

4              THE STENOGRAPHER:  This is lieu of me

5         seeing an ID he is going to declare that his

6         testimony is the truth.

7              MR. WEIL:  Okay.  That's fine.

8                    THE WITNESS:  I declare my testimony --

9                    THE STENOGRAPHER:  -- in this matter --

10                    THE WITNESS:  -- in this matter --

11                    THE STENOGRAPHER:  -- is under penalty of

12              perjury.

13                    THE WITNESS:  -- is under penalty of

14               perjury.

15                    THE STENOGRAPHER:  The witness having

16              declared that his testimony in this matter is

17              under penalty of perjury and the parties have

18              stated their agreement for the record, you may

19              proceed.

20              THE VIDEOGRAPHER:  We went on the record

21         officially at 10:14 a.m. on October 24, 2024.

22         Please note that this depo is being conducted

23         virtually.  Quality of recording depends on the

24         quality of camera and internet connection of

25         participants.  What is seen from the witness

1          and heard on screen is what will be recorded.

2              Audio and video recording will continue to

3          take place unless all parties agree to go off

4          record.  This is media unit one of the video

5          recorded deposition of Oliver James taken by

6          counsel for plaintiff in the matter of Oliver

7          James vs. The Breakers Palm Beach, Incorporated

8          filed in the State of Florida, Division of

9          Administrative Hearings.  Case number is

10         24-2523.

11             My name is Ashley Connell representing

12         Veritext.  I'm the videographer and the court

13         reporter is Tracey Slye from Veritext.  I think

14         you guys are good to go.  Thank you.

15             MS. GRIFFIN GOODMAN:  I think it's time to

16         start a deposition.

17                         OLIVER JAMES,

18                      testified as follows:

19                      DIRECT EXAMINATION

20    BY MS. GRIFFIN GOODMAN:

21         Q     Good morning, Mr. James.

22         A     Good morning.

23         Q     So as I mentioned earlier my name is Holly

24    Griffin Goodman.  I'm an attorney.  I represent the

25    Breakers Palm Beach, Inc. in the action that you

1    have filed against them and I am here today to ask

2    you some questions about your claims, the nature of

3    your claims and get to some of the facts here.

4            So I think you've already stated it, but

5    can you please one more time please state your full

6    name for the record?

7        A    Oliver James.

8        Q    And Mr. James, have you ever been deposed

9    before?

10       A    I don't think so.  I don't know what

11   deposed is.  I'm sorry.

12       Q    So this process right here.  Have you ever

13   sat down with a court reporter and had attorneys ask

14   you questions in a formal deposition?

15       A    No.  Not that I know of.

16       Q    Okay.  So then I want to share with you a

17   few ground rules that will help make today go a

18   little bit smoother I think.

19            So we are as we can all see right now

20   taking this deposition remotely by Zoom so we're

21   talking by Zoom.  So I would like for you to please

22   let me know if at any time you can't hear me or if

23   you start having technical difficulties, but if you

24   answer my question, I'm going to assume that you

25   heard my question and you understood my question; is

```
 1    that fair?
 2         A    Yes.
 3         Q    Okay.  And I just want to emphasize I'm
 4    not here to trick you.  I am just trying to get
 5    information from you.  So if you don't understand
 6    one of my questions then I would like for you to
 7    tell me that you don't understand or ask me to
 8    rephrase and I will do my best to try to either
 9    rephrase the question or clarify the information
10    that I'm asking for.
11              If at any time you need a break -- I know
12    earlier you said that this is overwhelming for you.
13    If at any time you think that you might need a break
14    for your comfort or for your needs, please let me
15    know.
16              One thing I will ask is that if we have a
17    question pending, I may ask you to answer the
18    question before we take a break, but once you let me
19    know that you would like to take a break, I'll do my
20    best to find a stopping point to be able to allow
21    you to do that, okay?
22         A    Okay.
23         Q    So we have a court reporter here today.
24    That's Tracey Slye, Ms. Slye.  She's going to be
25    taking down everything that we say.  So to help her
```

1    with that that we need to follow a couple of rules.

2            So first I'll need you to give verbal

3    answers.  It's really natural when you're talking to

4    someone to nod your head yes or shake your head no,

5    but Tracey can't get that down.  So it's really

6    important that you also verbally either say yes or

7    no when you -- when you might be shaking your head

8    and if you do it, we'll prompt you and remind you

9    and ask you to please give a verbal answer.

10           The other thing is that you may know or

11   think you know where my question is going, but I ask

12   that you let me finish my questions before you start

13   to provide an answer so that gives Tracey an

14   opportunity to get both my question and your answer.

15   It gets confusing if we start trying to talk over

16   each other.  Do you understand -- do you understand

17   the rules that I've laid out?

18       A    Yes.

19       Q    Okay.  Great.  And when we first began

20   Ms. Slye had you state an oath.  Do you understand

21   the oath that you swore to tell the truth today?

22       A    Yes.

23       Q    I don't mean to ask any kind of intrusive

24   questions, but I am going to start by asking if you

25   are taking any medications that may impact your

Page 11

1    memory or your ability to answer questions

2    truthfully.  I don't need to know every medication

3    you're taking.  I'm only asking are you taking any

4    medications that may impact your memory or your

5    ability to testify truthfully?

6        A    No.

7        Q    Is there anyone else in the room with you

8    today?

9        A    No.

10       Q    And where are you currently located

11   physically?

12       A    North Carolina.

13       Q    In North Carolina.  Is that your home?

14       A    No.

15       Q    Okay.  Are you in an office or a hotel

16   room?

17       A    A room.

18       Q    Okay.  Do you have any notes or documents

19   in front of you?

20       A    No.

21       Q    And what device are you using?

22       A    IPhone.

23       Q    Okay.  Are there any documents open on

24   your screen?

25       A    No.

Page 12

```
 1        Q     Thank you for confirming that.  Just want
 2   to get a little bit of background information from
 3   you before we dive too deep in.  So can you take me
 4   through your educational history?
 5        A     Should I go now?
 6        Q     I'm sorry?
 7        A     How do I do that?
 8        Q     No, tell me about school.  Did you attend
 9   any kind of school growing up?
10        A     Yes.  I went to an elementary school.
11   Just tell you like I went to elementary and went to
12   middle school and high school and graduated?
13        Q     That's what I was looking for.  So you
14   went through -- you graduated from high school?
15        A     Yes.
16        Q     Okay.  And have you ever been convicted of
17   a crime?
18        A     Yes, ma'am.
19        Q     So it's our understanding that as has been
20   disclosed in this lawsuit that you were convicted of
21   dealing in firearms without a license, sale of a
22   firearm to a known felon and possession of a firearm
23   with an obliterated serial number, does that sound
24   correct?
25        A     Yes, ma'am.
```

Page 13

1    Q    And you served your time for those crimes?

2    A    Yes, ma'am.

3    Q    Okay.  And you haven't been convicted of

4    any other crimes?

5    A    No, ma'am.

6    Q    Just wanted to make sure we knew about the

7    ones that were out there.  So what do you do for

8    work, Mr. James?

9    A    I'm a social media influencer and

10   motivational speaker.

11   Q    Tell me about the motivational speaking,

12   what is the topic that you speak on?

13   A    Most of the time it's on literacy and

14   education.

15   Q    Are those topics close to your heart?

16   A    Yes.

17   Q    And you're a social media influencer.  Do

18   you have one primary social media outlet or are you

19   on multiple?

20   A    Multiple.

21   Q    Okay.  What social media outlets are you?

22   A    I'm on mainly Instagram and TikTok.

23   Q    Okay.  And so you said mainly Instagram

24   and TikTok.  Are there other social media platforms

25   where you have an account?

Page 14

```
 1        A     Yes.  I have a Threads account, YouTube
 2   account and an X account.
 3        Q     Let's start with TikTok.  This is probably
 4   going to sound silly to you, but I'm going to ask
 5   you to tell me how Tik Tok works.  Who can post on
 6   TikTok?
 7        A     I think anybody under the legal age can.
 8        Q     Who can livestream?
 9        A     I think it's anybody who has more than
10   1,000 followers under the legal age.
11        Q     How many followers do you have, do you
12   know?
13        A     Not exactly.  I think it's close to
14   400,000.
15        Q     Do you recall how many followers you had
16   in November of 2023?
17        A     Not exactly but it was more close to
18   300,000.
19        Q     There was a People Magazine article that
20   came out about you at the end of last year; is that
21   right?
22        A     Yes, ma'am.
23        Q     When did you interview for the People
24   Magazine article?
25        A     I don't know, again, exactly the date, but
```

Page 15

1    it was last year.  I'm not 100 percent sure of the

2    date.

3        Q    November, December, what time -- do you

4    remember whether it happened -- strike that.

5            Did you interview with People Magazine

6    before you came to The Breakers?

7        A    I'm not 100 percent sure.

8        Q    If the People Magazine article said that

9    at the time it was published that you had 273,000

10   followers, does that sound about right?

11       A    Yes.

12       Q    Do you make money from TikTok?

13       A    Yes.

14       Q    So how do you get paid from TikTok?

15       A    Well, either they will send you gifts.  I

16   don't really make like money from gifts.  Those are

17   just sent without my like acknowledgment, but the

18   other way we make money is through a post.

19           If you do a certain amount of views on a

20   post, you can make money.  And my main source of

21   money is leads so by people seeing the post they

22   will contact me through the post to hire me for

23   speaking engagements.

24       Q    So tell me the first one you mentioned was

25   gifts.  What is a gift on TikTok?

Page 16

1          A     I think it's just like a tip in a way the

2     best way to explain it.  So it's a virtual tip.

3          Q     So it is money?

4          A     Yes.

5          Q     Okay.  And the gifts come from followers?

6          A     Yes.

7          Q     And then you said you get paid based on

8     views per post.  How much -- well, how often are you

9     paid by TikTok for views on posts?

10         A     My account is maybe once every three to

11    six months.  It's not much.

12         Q     How much on average do you get paid from

13    TikTok for those posts?

14         A     About $5 maybe, 5 to $10.

15         Q     And that's in total each of those, when

16    they pay out every 3 to 6 months you get 5 to $10

17    per time, am I understanding that correctly?

18         A     Yeah, it would be anything between 5 to

19    10, the most maybe $30.

20         Q     And how do you cash out tips when a

21    follower gives you a gift, how do you cash that out?

22         A     It goes into a PayPal account.

23         Q     So those you can transfer instantly?  You

24    don't have to wait for the three to six-month cycle?

25         A     I actually don't know.  It does it

Page 17

1    automatically so I don't know if you can.

2        Q    And how much do you make in a month from

3    tips on TikTok?

4        A    About 60 to $70.

5        Q    And you said the third way that you can

6    make income from TikTok is leads.  So do people

7    contact you via TikTok to be a public speaker?

8        A    Yes.

9        Q    Do you ever do any kind of sponsored post

10   or branded content on TikTok?

11       A    Yes, ma'am.

12       Q    How much do you make from sponsored posts?

13       A    Anywhere from 250 to 1,500.

14       Q    How do those sponsors find you?

15       A    Through leads on TikTok as well.

16       Q    Does your number of followers influence

17   how many companies want you to sponsor them?

18       A    Yes.

19       Q    So you mentioned you're also on Instagram.

20   Do you make money from your Instagram account?

21       A    No, not that I know of.  I haven't yet,

22   ma'am.

23       Q    Do you ever receive like badges from

24   viewers on Instagram?

25       A    No, I don't do much lives on Instagram.

1      Q    You mentioned you have YouTube account.

2   Do you make any ad revenue from your YouTube

3   account?

4      A    No.

5      Q    Do you receive any revenue from YouTube?

6      A    No, ma'am.

7      Q    Do you receive any revenue from your X

8   account?

9      A    No, ma'am.

10      Q    What about Threads, do you receive any

11   revenue from your Threads account?

12      A    No.

13      Q    So as a social media influencer your

14   primary source of social media income is from Tik

15   Tok?

16      A    Yes, ma'am.

17      Q    Thank you.  It's its whole world, social

18   media influencing, so I appreciate you walking me

19   through that.

20      A    You're welcome.

21      Q    Obviously we're here today because you

22   have filed a claim against The Breakers saying that

23   they discriminated against you because of your race.

24           So today I want to go through the timeline

25   and the events, but before we do all of that I'd

Page 19

```
 1    like to understand the nature of your claim against
 2    The Breakers.  So can we start by -- can you please
 3    let me know what action or actions you think The
 4    Breakers took against you because of your race?
 5         A    I don't fully understand how to answer the
 6    question, but -- if I'm answering this right, I just
 7    feel I was improperly kicked off of the property, I
 8    was kicked out.
 9         Q    So the action that The Breakers took that
10    you think was based on your race is having you
11    removed from the property?
12         A    Yes, ma'am.
13         Q    Is there anything else that The Breakers
14    did that you think was discrimination because of
15    your race?
16         A    Say like I was targeted, ma'am.
17         Q    When you say that they targeted you, do
18    you mean you feel as though you were approached
19    because of your race?
20         A    Yes, ma'am.
21         Q    Is there anything else that you mean by
22    targeted?
23         A    No, ma'am.
24         Q    So the actions that you think were
25    discriminatory because of your race are that you
```

Page 20

1  were approached by security and you were removed

2  from the property.  Is there anything else that The

3  Breakers did that you think was because of your

4  race?

5       A    No, ma'am.

6       Q    Thank you.  That will help us frame our

7  discussion so I appreciate you going through that

8  with me and we'll get into more details about it as

9  we go through the questions here today.

10           So let's talk about how you got to The

11 Breakers.  How did you first get connected with the

12 Barbara Bush Foundation?

13      A    I think it was because of social media.

14      Q    Was the literacy day event the first thing

15 that you did with the Barbara Bush Foundation?

16      A    No, ma'am.

17      Q    When did you first come into contact with

18 the Barbara Bush Foundation?

19      A    I'm not 100 percent sure the first

20 contact.  I don't do my paperwork, someone does it

21 for me, but it was a couple of months before.

22      Q    And what was that about, what were you

23 initially talking to the Barbara Bush Foundation

24 about?

25      A    Receiving an award for literacy.  I got an

Page 21

```
 1    award from the Barbara Bush Foundation.
 2         Q    After they gave you that award, did they
 3    contact you about the Palm Beach County Literacy Day
 4    event?
 5         A    Yes, ma'am.
 6         Q    Do you recall who contacted you?
 7         A    No, ma'am.
 8         Q    Do you know how you were nominated for the
 9    award from the Barbara Bush Foundation?
10         A    I don't understand that what means, I'm
11    sorry.
12         Q    Do you know how the Barbara Bush
13    Foundation decided to give you an award?
14         A    No, ma'am.
15         Q    Okay.  Some awards have a call for
16    nominations, but you don't know how they decided to
17    award you?
18         A    No.  I just remember getting an email that
19    the person told me that I have to go receive an
20    award.  That's pretty much all I knew.
21         Q    So after the award the Barbara Bush
22    Foundation contacted you about a speaking engagement
23    in Palm Beach County.  Do you recall when they
24    contacted you?
25         A    No, ma'am.
```

```
                                                  Page 22

  1        Q    Was this a paid speaking engagement?

  2        A    Yes, ma'am.

  3        Q    Do you recall how much they paid you for

  4   the event?

  5        A    I'm not sure the exact amount.

  6        Q    Are you going to be able to see if I pull

  7   up documents, will you be able to look at those on

  8   your phone?

  9        A    I don't know to tell you the truth but you

 10   can try.

 11        Q    Let's do that.  Let's try.  I think that's

 12   the best we can do is we can try and see if it works

 13   out.

 14             Are you able to see the document that I

 15   pulled up, Mr. James?  I can try to zoom in as well

 16   if that might help.

 17        A    Yes, ma'am.

 18        Q    Let me try to see if I can't zoom this in

 19   a little.  And so, Mr. James, what I'm putting in

 20   front of you is I have put together --

 21             MR. WEIL:  Holly, excuse me for a second.

 22        Can you just scroll up for a second?

 23             MS. GRIFFIN GOODMAN:  Sure.

 24             MR. WEIL:  It looks to be a privileged

 25        document.  It looks like an exchange between
```

Page 23

```
 1       Mr. James and Julio Ayala with our firm.  I
 2       would ask that you delete that.  Obviously that
 3       was inadvertently produced and I'm just
 4       noticing it for the first time.  So if that's
 5       the only privileged document in there maybe you
 6       can acknowledge that you will delete that,
 7       please.
 8            MS. GRIFFIN GOODMAN:  I will represent to
 9       you that every email that your office produced
10       to me had at least the forward.  I don't recall
11       whether or not -- there was no substantive
12       discussion other than forwards, let me see, and
13       what the exchange was about and so that's --
14       there were I think five separate emails.  I'll
15       scroll down so you can see the top of every
16       single one, emails about, emails about is the
17       only context that is added.  I'd be happy to
18       delete these versions if your office will agree
19       to produce, reproduce the documents without the
20       sections that you are concerned about because
21       this is what was produced to us in response to
22       our discovery request.
23            MR. WEIL:  Well, if you can just delete
24       it, maybe you can -- we can accomplish the same
25       thing, but maybe there's a technical ability in
```

Page 24

```
 1        your office to just delete that so it doesn't

 2        appear as an exhibit.

 3              MS. GRIFFIN GOODMAN:  I'm not sure, Ron

 4        are you asking me to redact the documents that

 5        your office produced to me?

 6              MR. WEIL:  I'm speaking English, yeah,

 7        yeah.  I'm just asking that before this is

 8        attached to any deposition that those -- that

 9        that be deleted.

10              MS. GRIFFIN GOODMAN:  Okay.  So you're

11        asking for purposes of this deposition that you

12        want us to redact information that you claim is

13        privileged from the documents that you produced

14        to our office?

15              MR. WEIL:  You have total recall.

16              MS. GRIFFIN GOODMAN:  Okay.  I'm not going

17        to do that.  If your office would like to make

18        redactions and reserve these documents then I'm

19        happy to use the versions that your office

20        serves and to delete these documents off of my

21        system, but this is how they were produced to

22        me and I'm not going to make changes to the

23        documents that were produced to me by your

24        office.

25              MR. WEIL:  Suit yourself.  We always do it
```

Page 25

1      the hard way.  Go ahead.  Let's get going.  Do

2      it the hard way.

3           MS. GRIFFIN GOODMAN:  I don't think that

4      commentary is appropriate so I'm going to go

5      ahead and move on.

6           MR. WEIL:  You're not in school now,

7      you're a lawyer.  The bottom line is you're

8      making it more difficult than it needs to be.

9      But that's okay.  That's what I'm getting used

10     to.  Let's keep going.

11          MS. GRIFFIN GOODMAN:  Ron, the bottom line

12     is you're asking me to do your office's job for

13     you and I'm not going to change the documents

14     that you produced to me before creating

15     exhibits for a deposition because I'm going to

16     use them in the format that they were produced

17     to me.  If you would like to produce other

18     versions to me for me to use and substitute, I

19     will do that happily, but I'm not going to make

20     changes to the documents that are in front of

21     me right now.

22          MR. WEIL:  Luckily for you I have a good

23     memory.  You just finished saying it just a

24     half a minute ago.  Thank you.

25

Page 26

BY MS. GRIFFIN GOODMAN:

    Q    Mr. James, down to the first email here in
this string.  Do you recall sending emails to your
counsel in response to our request for some
documents from you?

    A    No, ma'am.

    Q    Is there anyone who was helping you put
together any of the documents that we asked for in
response to our requests for documents?

    A    Yes, ma'am.

    Q    Who was helping you in putting those
documents together?

    A    My partner.

    Q    Can you please provide the name of your
partner?

    A    Ann Pothias (phonetic).

    Q    For Ms. Slye's benefit, can you spell the
last name?

    A    I don't know how to spell it.  I'm sorry,
ma'am.

    Q    Okay.  So Ann is your partner's name, she
was helping you put together documents?

    A    Yes, ma'am.

    Q    Okay.  So the first mail that we received
in the documents that your lawyer produced to us was

Page 27

```
 1      dated October 20th from a Tanya Romeyn, R-O-M-E-Y-N,

 2      asking you if you'd be available to partner for an

 3      event in Palm Beach on November 13th and advising

 4      that they would be able to cover your travel as part

 5      of this speaking engagement.

 6              Do you recall being approached by the

 7      Barbara Bush Foundation in connection with this

 8      literacy day event?

 9      A     Yes, ma'am.

10      Q     Okay.  And you responded pretty quickly

11      and seemed very excited about it.  Were you excited

12      to participate?

13      A     Yes, ma'am.

14      Q     So as part of, after you confirmed the

15      Barbara Bush Foundation gave you some information

16      and they said that they were going to -- this is an

17      email dated October 24, 2023 -- and they told you

18      that the event was on November 14th but they said

19      they could offer you two nights at a hotel called

20      The Breakers.

21              Do you recall them telling you that you

22      would be staying at The Breakers?

23      A     Yes, ma'am.

24      Q     Had you heard about The Breakers before

25      the Barbara Bush Foundation told you that's where
```

Page 28

1    you would be staying?

2        A    No, ma'am.

3        Q    I think I saw in one of the emails that

4    you had shared with them that your sister lives near

5    Palm Beach; is that right?

6        A    Yes, ma'am.

7        Q    Had you ever been to The Breakers?

8        A    No, ma'am.

9        Q    Had you ever been to a resort like The

10   Breakers before?

11       A    Not in America.

12       Q    So where had you been outside of the U S

13   that you would consider to be similar to The

14   Breakers?

15       A    Jamaica or Mexico.

16       Q    Do you remember the names of those

17   resorts?

18       A    No, not off the top of my head.

19       Q    So the Barbara Bush Foundation booked the

20   hotel for you?

21       A    Yes, ma'am.

22       Q    Don't look too closely, it might make us

23   sick.  I'm scrolling a little fast here.  And in an

24   email on November 2nd Lauren Sproull, S-P-R-O-U-L-L,

25   emailed you with some additional details.  It says

Page 29

1    in this email that they would pay an honorarium of

2    $1,200 for your appearance.  Does that sound right

3    to you?

4        A    Yes, ma'am.

5        Q    And they also paid a $300 cash advance for

6    food while you were in Palm Beach?

7        A    Yes, ma'am.

8        Q    They said they would pay for your travel

9    and your lodging including transportation to and

10   from the airport, did that occur as well?

11       A    Yes, ma'am.

12       Q    There is -- here on the email at the last

13   sentence of this first paragraph Ms. Sproull says,

14   you can find all of the details in the attached

15   itinerary.  We did not receive any attachments with

16   the emails.  Do you know if you still have these

17   original emails?

18       A    I don't know, ma'am.

19       Q    You had mentioned that Ann helped you with

20   the request for documents.  Did you send the email

21   describing these emails to your -- let me pull it

22   back up again.  Scratch that.  Let me show it so

23   everybody can see what I'm talking about.

24            Mr. James, here what your lawyer was

25   talking about earlier from Oliver James to Julio

```
 1    Ayala with a description initial email exchange
 2    about the Palm Beach event.  Did you send this
 3    email?
 4         A    I didn't directly but my partner did, yes.
 5         Q    Thank you.
 6              MR. WEIL:  Did you mark that as an
 7         exhibit?
 8              MS. GRIFFIN GOODMAN:  Yes, I will mark the
 9         group of emails as Composite Exhibit No.  1.
10         Would you like us to mark them as confidential,
11         Ron?
12                        (Defendant's Exhibit 1, Emails,
13                         was marked for identification.)
14              MR. WEIL:  Just do what you need to do.
15         We're going to do our work, you do yours.
16    BY MS. GRIFFIN GOODMAN:
17         Q    Mr. James, let's talk about what happened
18    when you arrived in Palm Beach.  When did you first
19    get into Palm Beach; do you recall?
20         A    No, ma'am.
21         Q    Do you recall what time of day it was?
22         A    No, ma'am.
23         Q    How did you get to the Barbara Bush
24    Foundation?
25         A    I took a flight and I want to say a ride,
```

Page 31

```
 1    I got a ride, I don't know what type though.
 2         Q    So a ride share?
 3         A    A ride share, yeah.
 4         Q    So you called either an Uber or a Lyft and
 5    you took you to The Breakers; is that right?
 6         A    I don't know if it was an Uber or Lyft,
 7    but it was a ride share.  I don't know if they
 8    called it.
 9         Q    Was there -- I apologize.  You said you
10    don't know if they called it?
11         A    Yes.
12         Q    Do you recall whether there was a car
13    waiting for you, a car -- did somebody have your
14    name, a car service driver waiting for you?
15         A    I don't remember.
16         Q    Do you recall if the car drove past a
17    guard gate?
18         A    I think so.
19         Q    Okay.  So at The Breakers you think the
20    car might have passed through a guard gate?
21         A    It was dark so I didn't know if there was
22    a gate or not.
23         Q    Was the driver of your car stopped at the
24    entrance to The Breakers?
25         A    I don't remember.
```

Page 32

```
 1        Q    Do you recall whether the driver had to
 2   show an ID to The Breakers security to enter the
 3   property?
 4        A    I don't remember.
 5        Q    Do you recall whether the driver had to
 6   explain to security why they were driving on to the
 7   property?
 8        A    I don't remember.
 9        Q    So the driver dropped you off at the
10   hotel.  Did you check in right away?
11        A    Yes, ma'am.
12        Q    Tell me about the check-in process.
13        A    I walked through the front door, I went to
14   the front desk, I didn't have the amount to cover
15   the stay so they seen that I was booked to stay and
16   already paid for, but they needed a card on file and
17   I didn't have that so they just figured out a way to
18   just let me stay.
19        Q    So you walked up to the front desk.  Was
20   the front desk clerk friendly?
21        A    Yes.
22        Q    Did they welcome you to The Breakers?
23        A    Yes, ma'am.
24        Q    Did they ask you to show your ID?
25        A    Yes, ma'am.
```

1      Q    Did you show them your ID at that time?

2      A    Yes, ma'am, and I don't 100 percent know

3   for sure if they did.  I'm just answering because I

4   think they did.

5      Q    And then I think what you were describing

6   typically when you go to a hotel to check in they

7   make sure that you're who you say you are and they

8   ask for a credit card for hotel incidentals.  If you

9   were to take something from the minibar or charge

10  something at the hotel bar to your room, is that

11  what you mean when you say that you were asked for,

12  to give a credit card?

13     A    I don't think so.  I don't know the reason

14  for it, but I don't think so.

15     Q    But they didn't ask for you to pay for the

16  stay?

17     A    No, ma'am.

18     Q    Okay.  And so it was just for another

19  purpose and they made an exception?

20     A    Yes, ma'am.

21          MR. WEIL:  Object to the form.  Sometimes

22      I will object to form, Mr. James, that just

23      means you still need to answer the question if

24      you understand.

25

Page 34

1    BY MS. GRIFFIN GOODMAN:

2        Q    So after you checked in did you go up to

3    your room?

4        A    Yes, ma'am.

5        Q    Was there anything waiting for you in your

6    room?

7        A    Yes, ma'am.

8        Q    What was in your room?

9        A    A note and chocolate.

10        Q    Do you recall who the note was from?

11        A    No, ma'am.

12        Q    What else did you do after checking in

13    that night when you first got there?

14        A    I worked on social media.

15        Q    Did you do that in your room?

16        A    Yes, ma'am.

17        Q    So you didn't explore the first night, you

18    just went to your room and stayed in for the night?

19        A    I don't remember.

20        Q    So let's talk about the day that you had

21    the incident with security and with the police.

22    What was your plan for the day when you woke up that

23    morning?  Did you have a plan for the day?

24        A    Yes, ma'am.

25        Q    What was your plan?

Page 35

1      A    To find a good location so I could film

2   myself reading.

3      Q    Is this part of what you do as a social

4   media influencer is read on camera?

5      A    Yes, ma'am.

6      Q    Do you recall about what time you left the

7   room, your room?

8      A    No, ma'am.

9      Q    Where did you go when you first left the

10  room?

11     A    I walked around.

12     Q    Were you recording while you walked

13  around?

14     A    Yes, ma'am.

15     Q    Tell me about those videos, were they, was

16  it a continuous shot?

17     A    No, ma'am.

18     Q    So you would take shorter clips while you

19  walked around?

20     A    Yes, ma'am.

21     Q    Were these on your video camera or were

22  you live streaming at the time?

23     A    Video camera.

24     Q    I'm going to show you a video that has

25  been marked or was Bates Stamped Breakers 13 which

Page 36

1    we will call Exhibit 2 to this deposition.  Let me

2    get it all pulled up.

3                         (Defendant's Exhibit 2, Video,

4                         Breakers 13, was marked for

5                         identification.)

6    BY MS. GRIFFIN GOODMAN:

7         Q    Can you see that video or screen,

8    Mr. James?

9         A    Yes, ma'am.

10        Q    Were you recording here; do you recall?

11        A    I don't remember.

12        Q    I'm going to go back and play it one more

13   time from the beginning here.  It looks like you

14   have your phone on some sort of a stand.

15             Did you have some sort of a stand to hold

16   your phone?

17        A    Yes, ma'am.

18        Q    And it was facing -- you're facing out

19   looking at the walls as you're walking around?

20        A    Yes, ma'am.

21        Q    But you don't recall whether you were

22   recording?

23        A    No, ma'am.

24        Q    I'm going to show you the video that was

25   Bates at Breakers 15, Bates Stamp Breakers 15 which

Page 37

```
 1    we will call Exhibit 3.
 2                        (Defendant's Exhibit 3, Video,
 3                        Breakers 15, was marked for
 4                        identification.)
 5            MR. WEIL:  You actually didn't mark
 6        Exhibit 2 so 2 is the video.
 7            MS. GRIFFIN GOODMAN:  I apologize.  I
 8        thought I did say that I was going to mark that
 9        as Exhibit 2.  This was The Breakers 13 as
10        Exhibit 2 and this is the Breakers 15 as
11        Exhibit 3.
12            (Video was played.)
13    BY MS. GRIFFIN GOODMAN:
14        Q    Mr. James, do you see the video?
15        A    Yes, ma'am.
16        Q    Is that you walking down the hallway?
17        A    Yes, ma'am.
18        Q    Do you recall whether you're recording
19    here?
20        A    I don't know.
21        Q    Let me show that again.  I will go
22    backwards a little bit more here.  You have your
23    phone on your stick again, right?
24        A    Yes, ma'am.
25        Q    But you don't know whether you were
```

Page 38

1    recording there?

2         A    I think I am.  I don't remember.

3         Q    I'll show you -- well, let me ask -- let

4    me get this one up and then I'll ask.  This is Bates

5    Breaker 16 that I will mark as Exhibit 4.

6                        (Defendant's Exhibit 4, Video,

7                         Breakers 16, was marked for

8                         identification.)

9    BY MS. GRIFFIN GOODMAN:

10        Q    Do you see the screen, Mr. James?

11        A    Yes, ma'am.

12        Q    So you were walking outside, you're

13   holding the stick up with your phone facing outward.

14   Do you recall whether you were recording here?

15        A    Yes, ma'am.

16        Q    Were you recording here?

17        A    Yes, ma'am.

18        Q    That was a bad question on my part so I

19   wanted to clarify.  Thank you for that.  Do you

20   still have this video?

21             MR. WEIL:  Which video?  Hold on a second.

22        Sorry, it's not clear.  The video that you

23        produced or the one that he was purporting to

24        take?

25             MS. GRIFFIN GOODMAN:  I will clarify.

Page 39

```
1    BY MS. GRIFFIN GOODMAN:

2         Q    You just indicated, Mr. James, that that

3    you believed that you were recording while walking

4    around outside at The Breakers as seen in Exhibit 4.

5              Do you have the video that you took while

6    recording at The Breakers as seen here on Exhibit 4?

7         A    I don't know.  I think I deleted that.

8         Q    When do you think you deleted it?

9         A    Probably when I took it.

10        Q    So, Mr. James, you believe that you most

11   likely deleted it after taking the video?

12        A    Yes.

13        Q    That same day?

14        A    Possibly.  I don't know for sure.

15        Q    Why did you delete the video?

16             MR. WEIL:  Object, objection.  He said he

17        may have deleted it.  Go ahead.  You can

18        answer.

19        A    If I did it's because there is no use for

20   the video.

21   BY MS. GRIFFIN GOODMAN:

22        Q    What do you mean there is no use for the

23   video?

24        A    As a content creator we just take video

25   just to take it and if we don't use it, we delete
```

Page 40

```
 1   it.
 2        Q    Sir, you said that -- were you using an
 3   iPhone that day?
 4        A    Yes, ma'am.
 5        Q    Are you using the same iPhone that you are
 6   using here today?
 7        A    I don't know.
 8        Q    When did you get the phone that you are
 9   using here today?
10        A    I don't remember.
11        Q    Is this your personal cell phone?
12        A    Yes, ma'am.
13        Q    And what kind of iPhone is it, do you know
14   the model?
15        A    No, ma'am.
16        Q    And you don't recall whether between last
17   November and today you got a new cell phone?
18        A    I don't recall.  I got a couple of new
19   phones.  I don't know when I got them.
20        Q    How many cellphones do you have?
21        A    I have one, ma'am.
22        Q    Why would you get a new phone?
23        A    Losing them due to travel.
24        Q    Do you back up your information on your
25   phone through the iCloud?
```

Page 41

1      A    I don't know, ma'am.

2      Q    When you get a new phone, does it have all

3  of your personal contacts and information on it as

4  soon as you turn it on?

5      A    Some of it.

6      Q    Does it transfer over videos and photos as

7  well?

8      A    Yes, ma'am.

9      Q    Do you ever delete a video and then

10  decide, oh, I did want that content and restore it?

11      A    No, ma'am.

12      Q    Have you lost a phone at any time since

13  last November?

14      A    I don't know, ma'am.

15      Q    Who would know when you most recently

16  replaced your phone?

17      A    IPhone?  Apple.

18      Q    Would Ann know?

19      A    I don't know, ma'am.

20      Q    Who is your cell phone provider?

21      A    AT&T.

22      Q    When you replace your phone, do you go

23  through AT&T?

24      A    I went through both before.  Apple and

25  AT&T.

Page 42

```
 1        Q    So it could have been AT&T or it could

 2   have been Apple?

 3        A    Yes, ma'am.

 4        Q    How often do you lose your phone while

 5   traveling?

 6        A    Maybe once a year.

 7        Q    Do you have insurance on it?

 8        A    Yes, ma'am.

 9        Q    Do you know who the insurance is through?

10        A    I think it's For Sure or something like

11   that.  I'm not sure.

12        Q    So you think it's For Sure?

13        A    Yeah, I don't know the name.

14        Q    Assure?

15        A    Something like that.  I cannot -- I can't

16   be 100 percent sure.

17        Q    So you were walking around The Breakers

18   that morning taking some -- filming some of the

19   property potentially for content; is that right?

20        A    Yes, ma'am.

21        Q    And your plan for the day was to find a

22   place to read on camera?

23        A    Yes, ma'am.

24        Q    Where did you set up to film yourself

25   reading on camera?
```

Page 43

```
 1       A     It was an open turf area in the back of
 2   the property.
 3       Q     Why did you choose that location?
 4       A     Because no one was around me.
 5       Q     Did anyone from The Breakers tell you that
 6   you could record on that lawn area?
 7       A     No, ma'am.
 8       Q     Did you ask anyone from The Breakers
 9   whether you could record?
10       A     No, ma'am.
11       Q     So you get to this lawn area and you
12   decide this is where you plan to film.  Walk me
13   through your process when you're getting ready to
14   livestream.  How do you set yourself up?
15       A     Usually with some type of movement, maybe
16   dancing, working out, any type of movement.
17       Q     So I know that you're recognized for your
18   videos on TikTok about your journey in learning to
19   read.
20             Do you ever get nervous reading on camera?
21       A     Yes, ma'am.
22       Q     Do you do anything to get yourself in the
23   right head space or hype yourself up?
24       A     Yes, ma'am.
25       Q     What do you do to hype yourself up?
```

Page 44

```
 1        A    Dance, exercise, talk to myself, sometimes
 2   breathe, listen to music.
 3        Q    You're listening to music.  Do you ever
 4   single out loud while you're dancing?
 5        A    Yes, ma'am.
 6        Q    If you're talking to yourself, what kind
 7   of things do you say to yourself if you're hyping
 8   yourself up before going on a livestream?
 9        A    Positive things.
10        Q    I'm sorry, I didn't catch that.  Can you
11   repeat?
12        A    Positive, positive words.
13        Q    Can you give me some examples?
14        A    You're smart.  You can do this.  Don't be
15   scared.  I love you.  We are smart.  We are
16   together.  We can read.  We learned.  Your past
17   doesn't define you.  You can overcome.  Please, be
18   kind to yourself.
19        Q    When you're trying to hype yourself up and
20   you're making these positive affirmations, are you
21   whispering it yourself?
22        A    Sometimes.
23        Q    Okay.  And sometimes do you say it louder
24   to really get yourself ready?
25        A    Yes, ma'am.
```

Page 45

1           MR. WEIL:  Form of the question.  Are we

2       talking about the incident or are we talking

3       about generally?

4   BY MS. GRIFFIN GOODMAN:

5       Q    I'm sorry, you said yes, ma'am?

6           MR. WEIL:  Object to the form.

7   BY MS. GRIFFIN GOODMAN:

8       Q    I'm sorry, Mr. James, I didn't catch your

9   answer.  Did you say yes, ma'am?

10      A    Are we talking about the incident or are

11  we talking about general?

12      Q    I asked whether sometimes you will talk to

13  yourself more loudly to really get yourself excited

14  and ready?

15          MR. WEIL:  Object to the form.

16      A    Yep.

17  BY MS. GRIFFIN GOODMAN:

18      Q    Do you recall whether you were -- hyping

19  yourself up and having this conversation with

20  yourself on the morning that you were at The

21  Breakers?

22      A    Yes, ma'am.

23      Q    Do you recall what your volume was when

24  you were hyping yourself up the morning at The

25  Breakers on the lawn?

Page 46

```
 1        A    No, ma'am.

 2        Q    Mr. James, I see you're wearing headphones

 3    today.  Were you wearing those headphones or a

 4    similar type of headphones while you were at The

 5    Breakers on the morning of November 13?

 6        A    Yes, ma'am.

 7             MR. WEIL:  Object to the form.

 8    BY MS. GRIFFIN GOODMAN:

 9        Q    Do you know whether it was these exact

10    headphones?

11        A    No, ma'am.  They weren't.

12        Q    What kind of headphones were they?

13        A    I don't remember.

14        Q    Were they noise cancelling?

15        A    No, ma'am, I don't think so.

16        Q    Do you ever film yourself as part of your

17    getting ready process before you start live

18    streaming?

19        A    Yes, ma'am.

20        Q    Do you recall whether you were filming

21    yourself before as part of your getting ready

22    process before live streaming on the morning of the

23    ocean lawn incident?

24        A    Yes, ma'am.

25        Q    And that's on me again because I asked
```

Page 47

1    whether you recalled.  I'm going to just ask one

2    more time to be clear.

3              Were you filming yourself as part of your

4    getting ready process while you -- before you

5    started live streaming while you were at The

6    Breakers on the ocean lawn on the morning of your

7    incident?

8         A    I don't know.

9         Q    Okay.  And that's -- that was on me.  I

10   asked whether you recalled whether you were filming

11   yourself as that process and you said yes, ma'am.

12   So I was trying to clarify whether you were telling

13   me that yes, I do recall or can -- were you filming

14   yourself that morning before you were approached by

15   security?

16        A    I don't know.

17        Q    I'm going to pull up a video marked, it

18   was Bates Stamped Breakers 29 that I will mark as

19   Exhibit 5 for this deposition.

20                        (Defendant's Exhibit 5, Video,

21                        Breakers 29, was marked for

22                        identification.)

23   BY MS. GRIFFIN GOODMAN:

24        Q    This is an overhead surveillance video of

25   the lawn at The Breakers.  Does this look like the

Page 48

1    lawn where you set up to record, Mr. James?

2         A    Yes, ma'am.

3         Q    I'll play some of this video for you

4    Mr. James and I'm going to ask you to walk me

5    through a little bit of what we're seeing as part of

6    your process and so does that look to be you,

7    Mr. James, walking across the lawn?

8         A    Yes, ma'am.

9         Q    What were you doing here while you were

10   walking across the lawn?

11        A    Admiring the beauty of the layout and

12   talking to myself.

13        Q    So was this when you say talking to

14   yourself, was this part of your hyping up process,

15   those positive affirmations; do you recall?

16        A    I don't know.

17        Q    Are you dancing as well a little bit?

18        A    Yes, ma'am.

19        Q    So it looks like the first place that you

20   stopped, you've pulled your phone and the stick has

21   extended.  Did you use a tripod that morning?

22        A    Yes, ma'am.

23        Q    Do you know what you're doing here with

24   your phone?  Is that your phone on the end of the

25   tripod?

```
                                              Page 49

 1       A    I don't know.

 2       Q    When you do film yourself for TikTok

 3  content, do you use your cell phone?

 4       A    Yes, ma'am.

 5       Q    Do you put your cell phone on a tripod?

 6       A    Yes, ma'am.

 7       Q    Okay.  So did you set your phone up on the

 8  tripod in the middle of the ocean lawn on the middle

 9  of November 13th?

10       A    Yes, ma'am.

11       Q    Okay.  So what are you doing here when you

12  walk away from the tripod?

13       A    Positive affirmations and admiring the

14  layout.

15       Q    Do you ever set up test shots to see how

16  the background looks?

17       A    Sometimes.

18       Q    Do you -- were you recording when you did

19  this?

20       A    I don't remember.

21            MR. WEIL:  Form.  Just, Mr. James, between

22       the question and the answer there will be times

23       when I might object to the form of the question

24       so just pause, please, and let me do that

25       before you answer, okay?  Just wait one or two,
```

Page 50

```
 1        three seconds and if there's no objection
 2        please proceed, okay?
 3   BY MS. GRIFFIN GOODMAN:
 4        Q    So while you were in the middle of the
 5   ocean lawn saying your positive affirmations, were
 6   you filming yourself?
 7        A    I don't know.
 8        Q    Why did you move the tripod?
 9             MR. WEIL:  Object to the form.  You can
10        answer.
11        A    I don't know if I moved it because I was
12   looking at like a background, like a good scenery
13   for the background.
14   BY MS. GRIFFIN GOODMAN:
15        Q    So you may have moved it to get a
16   different background for your video?
17        A    Yes, ma'am.
18        Q    How did you know what the scenery or
19   background would look like when you had the camera
20   set up in the middle of the ocean lawn?
21        A    I used my -- the camera.
22        Q    Did you take any photos?
23        A    I don't remember.
24        Q    But ultimately you decided to move your
25   tripod from the middle of the ocean lawn; is that
```

Page 51

```
 1    right?
 2         A    Yes, ma'am.
 3         Q    And you moved to the edge of the green
 4    grassy knoll area; is that correct?
 5         A    Yes, ma'am.
 6         Q    Mr. James, if you look at -- I don't know
 7    if you can see it, let me move this -- can you see
 8    the top of the screen?
 9         A    Yes.
10         Q    Do you see what looks like a Jacuzzi or a
11    pool in -- in your -- in the screen?
12         A    Yes, ma'am.
13         Q    So the grassy area where you were saying
14    your positive affirmations and getting ready to
15    record was near a pool or a Jacuzzi area?
16              MR. WEIL:  Form.  You can answer.
17         A    I can see, yeah, it is.
18    BY MS. GRIFFIN GOODMAN:
19         Q    I'm going to hit play again.  We're about
20    two minutes, 15 seconds into Breakers 0029, which is
21    Exhibit 5 just for the record.
22              So you set -- you moved your tripod and it
23    looked right there, sir, like you pressed your
24    finger into the bottom of your screen, your camera
25    screen, did you see that?
```

Page 52

```
 1        A    I don't see it.
 2        Q    There might be a delay.  What does the
 3   screen look like for you right now?
 4        A    Me walking away.
 5        Q    Okay.
 6        A    Just still on the grass.
 7             MR. WEIL:  I'm going to need to take a
 8        break whenever it's convenient in the next ten
 9        minutes or so.
10             MS. GRIFFIN GOODMAN:  Sure.  We could do
11        that.
12             MR. WEIL:  I think the witness could use
13        it too.
14   BY MS. GRIFFIN GOODMAN:
15        Q    Since we didn't see it I'm going to replay
16   that segment one more time, Mr. James.  If you could
17   watch yourself standing at your phone.  Do you see
18   where it looks like you press your finger into the
19   bottom of your phone?  Did you see the screen move,
20   Mr. James?
21        A    No.  I can't see it.  I only see me in the
22   grass.
23        Q    When the video plays, do you see the
24   movement as well or do you only see when it stops?
25        A    It just skips and I'm just walking like
```

Page 53

1    slow steps.

2          MS. GRIFFIN GOODMAN:  Let's go ahead and

3       take that break and I will see if I can find a

4       way to tighten this up so you can see what I'm

5       asking about.  So let's go ahead and ask, is

6       ten minutes enough, Ron?

7          MR. WEIL:  Yes.  Thank you.

8          THE VIDEOGRAPHER:  We're going off the

9       video record --

10         MR. WEIL:  Don't forget to shut off the

11      pause the mute and the picture on the screen.

12      You should be able to do that.

13         THE VIDEOGRAPHER:  We're going off the

14      video record.  It's 11:25 a.m.

15               (Thereupon, a break was taken)

16         THE VIDEOGRAPHER:  We've back on the video

17      record.  It's 11:37 a.m.

18   BY MS. GRIFFIN GOODMAN:

19      Q    Mr. James, just before we took a break, we

20   were going through surveillance video of your time

21   on the ocean lawn in the morning of November 13.

22   Okay.  Do you see the screen?

23      A    Yes.

24      Q    And do you see yourself on the, on the

25   right-hand edge of the screen standing in front of

Page 54

1    what looks to be your phone on a tripod?

2         A    Yes, ma'am.

3         Q    Okay.  What are you doing in this still?

4         A    I don't know.

5         Q    It looks like your arm is out towards your

6    cell phone, would you agree with that?

7         A    Yes, ma'am.

8         Q    Okay.  I'm going to hit play.  Please

9    watch your screens, let me know if you see yourself.

10   It looks like you might have touched the bottom of

11   your phone.  Did you see that?

12        A    Yes, ma'am.

13        Q    Do you know whether you were recording at

14   this point while you were on the ocean lawn at The

15   Breakers on the morning of November 13, 2023?

16        A    I don't know.  I might have been.  I don't

17   know.

18        Q    I'm going to hit play again and ask you to

19   explain what it is that you were doing at this time

20   as seen in the video.

21        A    It's just frozen.

22        Q    Okay.  Do you recall what you were doing

23   on the ocean lawn just before The Breakers security

24   approached you on the morning of November 13?

25        A    Warming up to read on line.

Page 55

1      Q     What do you mean by warming up?

2      A     Maybe dancing, talking positive to myself.

3      Q     I'll take this down since it doesn't seem

4   to be working as intended.

5            Did you delete any videos that you may

6   have filmed on the ocean lawn on the morning of

7   November 13, 2023?

8      A     I don't know.

9      Q     Is it your regular practice to film

10  yourself warming up before you go live?

11     A     Yes, ma'am.

12     Q     So then is it likely you were recording

13  yourself before security approached on the morning

14  of November 13, 2023?

15           MR. WEIL:  Object to form.  You can

16        answer.

17     A     Yes, ma'am.

18  BY MS. GRIFFIN GOODMAN:

19     Q     When did you decide to go live on the

20  morning of November 13?

21     A     I think I went live right when the

22  security approached me.

23     Q     I'm going to ask you to explain to me how

24  you go live on TikTok.  Can you walk me through step

25  by step what you do to go live?

Page 56

1        A      You go into the app and you push live

2     button and then you push record live like go live.

3        Q      Is there a delay between when you press go

4     live and when the recording starts?

5        A      Yeah, it does like a couple second count.

6        Q      Why did you decide to go live when

7     security approached?

8        A      I kind of been taught to do that.

9        Q      Taught by whom?

10       A      Peers, family members.

11       Q      For what purpose?

12       A      Safety.

13       Q      What happened when security at The

14    Breakers approached you on November 13?

15       A      I'm not sure what happened, but they asked

16    questions.

17       Q      What did security from The Breakers ask

18    you on the morning of November 13?

19       A      I don't remember exactly.

20       Q      Do you remember what the subject area was,

21    what the questions were about?

22       A      Was I by the pool area or was I on the

23    pool deck I think it was.

24       Q      So you were asked if you were near the

25    pool deck?

Page 57

1          A      Yeah, they asked me if I was over by the

2    pool deck.

3          Q      Did they ask you any other questions?

4          A      I think -- I don't know to tell you the

5    truth.

6          Q      Did The Breakers security guard ask if you

7    were staying at the hotel?

8          A      Yes, I think so.

9          Q      Did you answer him?

10         A      Yes.

11         Q      What did you tell him?

12         A      I asked him a question.

13         Q      What did you ask him?

14         A      Why are you asking me?

15         Q      What did he say to you?

16         A      He said because we have a disturbance at

17   the pool deck.

18         Q      Did he tell you The Breakers does not

19   allow the use of tripods?

20         A      Yes.

21         Q      And you were using a tripod?

22         A      Yes, ma'am.

23         Q      Did you tell the security guard at The

24   Breakers who first approached you on the ocean lawn

25   that you were staying at the hotel?

Page 58

1        A      No, ma'am.

2        Q      Why not?

3        A      Because he didn't ask me.

4        Q      The security guard at The Breakers did not

5    ask you whether you were staying at the hotel?

6        A      No, he asked if I was by the pool deck.

7        Q      Just a moment ago you told me that

8    security did ask you if you were staying at the

9    hotel.

10       A      Yes, but not during the time like you're

11   talking about right now.  They asked me that once

12   the police got there.

13       Q      Mr. James, have you watched back any of

14   your videos from your interaction with The Breakers

15   security officer on the ocean lawn?

16       A      Once I think.

17       Q      You told your followers that he had asked

18   whether you were staying at the hotel, didn't you?

19       A      I don't know, probably, yeah.

20       Q      I want to pull up the video that you

21   produced that you had titled Live at The Breakers.

22   I will mark as Exhibit 6.

23                        (Defendant's Exhibit 6, Video

24                         entitled Live at the Breakers,

25                         was marked for identification.)

Page 59

```
 1                    (Video was played.)
 2      BY MS. GRIFFIN GOODMAN:
 3           Q    Let's see if share screen works.
 4      Mr. James, do you recognize what is on the screen?
 5           A    Yes, ma'am.
 6           Q    What are you, what are you looking at?
 7           A    Myself.
 8           Q    I'm going to hit play.  Let me know if you
 9      can hear and see the video.  Did you hear that?
10           A    No, it just broke up.
11           Q    It just broke up.  Okay.  Let me try one
12      more time and we'll see if it works.
13                    (Video was played.)
14      BY MS. GRIFFIN GOODMAN:
15           Q    Were you able to hear any of that,
16      Mr. James?
17           A    No, ma'am.
18           Q    When the security guard first approached
19      you he asked are you a member or a guest at this
20      hotel, didn't he?
21           A    I didn't hear him.
22           Q    And you refused to tell him whether or not
23      you were staying at the hotel; isn't that right?
24           A    I don't know.
25                    MR. WEIL:  Are we stalled or what happened
```

Page 60

```
 1        here?
 2             MS. GRIFFIN GOODMAN:  I'm looking over
 3        notes.
 4                    (Discussion off the record.)
 5   BY MS. GRIFFIN GOODMAN:
 6        Q    Did you tell the security officer that you
 7   were live streaming?
 8        A    I think so.
 9        Q    So he asked you if you were at the pool
10   deck and you asked him why he was asking?
11             MR. WEIL:  Yeah, I think we've covered
12        that.
13        A    Yes.
14             MS. GRIFFIN GOODMAN:   Ron, I'm going to
15        ask you to keep the speaking objections.
16        Actually, I'm going to ask you not to make
17        speaking objections.  You're welcome to object
18        to form.
19             MR. WEIL:  I'm going to ask you not to
20        repeat the same question that was just asked
21        and answered, please.  Thank you.
22             MS. GRIFFIN GOODMAN:  Your objection is
23        noted.
24             MR. WEIL:  Thank you for noting.
25
```

Page 61

 1    BY MS. GRIFFIN GOODMAN:

 2         Q    So that was a yes; is that right,

 3    Mr. James?  I didn't hear your answer.

 4         A    Yes, ma'am.

 5         Q    Okay.  What did the security officer say

 6    after or -- strike that.

 7              What did you say to the security officer

 8    after he noted that he had received a complaint

 9    about a disturbance over at the pool deck?

10         A    I don't know.

11         Q    Did you let the security guard explain to

12    you why he was speaking with you?

13              MR. WEIL:  Object to form.  You can answer

14         if you understand it.

15         A    Can you ask the question again, please?

16    BY MS. GRIFFIN GOODMAN:

17         Q    So did you let the security guard explain

18    why -- you testified previously that you had asked

19    the security guard why he was asking you questions.

20    Did you give him an opportunity to explain?

21              MR. WEIL:  Form of the question.  You can

22         answer.

23         A    I think so.

24    BY MS. GRIFFIN GOODMAN:

25         Q    Still part of Exhibit 6.  I'm at the 42

1    second mark.

2                      (Video was played.)

3    BY MS. GRIFFIN GOODMAN:

4        Q    So he was trying to explain to you and you

5    kept interrupting him; isn't that right, sir?

6        A    I don't know.

7              MR. WEIL:  You can answer.  Form.

8    BY MS. GRIFFIN GOODMAN:

9        Q    Why didn't you put the security guard on

10   your livestream?

11       A    Because I didn't want to bring down

12   another black man doing his job.

13       Q    Did you tell the security officer you

14   weren't going to speak to him or answer his

15   questions?

16       A    Yes.

17       Q    What did you think was going to happen

18   after you told security that you weren't going to

19   answer their questions?

20       A    Police were going to be called.

21       Q    Did you want them to call the police?

22       A    No, ma'am.

23       Q    But you knew that refusing to answer their

24   questions would result in the police being called?

25       A    Yes, ma'am.

Page 63

1        Q     Why didn't you just answer his questions?

2        A     Because I wanted to be treated like

3    everyone else.

4        Q     How do you know that you weren't being

5    treated like anyone else?

6        A     Because there was other people around he

7    could have asked those questions to.

8        Q     Were they filming?

9        A     I don't know.

10       Q     Did you see anyone else filming with a

11   tripod?

12       A     No, ma'am.

13       Q     Do you know what the security officer was

14   told before he approached you?

15       A     No, ma'am.

16       Q     So why do you think that he should have

17   been talking to other people?

18       A     Because I didn't know why he was talking

19   to me.

20       Q     So you didn't want to answer his questions

21   because you didn't feel he had explained to you why

22   he was talking to you?

23             MR. WEIL:  Asked and answered, form.  Keep

24        it up and we'll tell him not to answer

25        repetitively.  Go ahead.  You can answer.

Page 64

1       A    Yes.

2    BY MS. GRIFFIN GOODMAN:

3       Q    Do you know whether The Breakers security

4    regularly asks people whether they're a guest when

5    interacting with them?

6            MR. WEIL:   Form.

7       A    No.

8    BY MS. GRIFFIN GOODMAN:

9       Q    I'm sorry, my audio cut out, can you

10   repeat your answer, Mr. James?

11      A    No, ma'am.

12      Q    Mr. James, I don't want to be insensitive

13   but when we first started the deposition you

14   mentioned that it is triggering to you to have to

15   show your identification, is that true?

16      A    Yes, ma'am.

17      Q    Was it triggering to you to be asked to

18   identify yourself to security?

19      A    Yes, ma'am.

20      Q    How long was your conversation with The

21   Breakers security?

22      A    I don't remember.

23      Q    What happened after the security officer

24   walked away?

25      A    The police came.

1      Q    Did you keep filming with your tripod

2   after the security officer walked away?

3      A    Yes, ma'am.

4      Q    Were you upset?

5      A    Yes, ma'am.

6      Q    Were you using profanity?

7      A    I don't think so.

8      Q    This is still from Exhibit 6.  I am

9   starting at minute mark 3 minutes and 40 seconds.

10                    (Video was played.)

11   BY MS. GRIFFIN GOODMAN:

12      Q    Mr. James, were you using profanity into

13   the camera after security walked away?

14      A    Yes, ma'am.

15      Q    Do you recall yelling out at a guest who

16   was standing nearby during your interaction with

17   security?

18      A    Yes, ma'am.

19      Q    Do you recall yelling out at that guest

20   again after security walked away?

21      A    I don't know.

22      Q    Did you see the police coming towards you

23   down the walkway?

24      A    Yes.

25      Q    What happened when police arrived?

Page 66

1      A    I don't know.

2      Q    You don't recall what happened when the

3   police arrived, Mr. James?

4      A    No.

5      Q    Did a police officer try speaking to you

6   while you were reading on camera?

7      A    Yes, ma'am.

8      Q    Did you pretend you couldn't hear the

9   police officer while he was speaking to you?

10     A    Yes, ma'am.

11     Q    Why did you pretend that you couldn't hear

12  him?

13     A    Because I wanted to just read.

14     Q    Could you hear the police officer though?

15     A    Yes, ma'am.

16     Q    What do you think would happen when you

17  ignored the police officer's directions?

18          MR. WEIL:   Objection to form.

19     A    I could be shot or arrested.

20          MR. WEIL:   Sorry, just object to the form.

21     You can answer.

22     A    Shot or arrested.

23  BY MS. GRIFFIN GOODMAN:

24     Q    Were you arrested?

25     A    No, ma'am.

Page 67

```
 1      Q    Because you did eventually start speaking
 2   with the police officers; is that right?
 3      A    Yes, ma'am.
 4           MR. WEIL:  I just need to take a short --
 5      let me have a minute break.  I just have to
 6      return a phone call, is that okay?
 7           MS. GRIFFIN GOODMAN:  Sure.  It's 12:06 at
 8      least here.  Do we want to take a little bit of
 9      a longer break or is just a few minutes okay
10      for right now?
11           MR. WEIL:  Well, for me it's okay for me.
12      Mr. James, how are you doing?
13      A    Yes.
14           MR. WEIL:  Would you like to take a break
15      or keep going?
16      A    We can take a break.
17           MR. WEIL:  Okay.  Should we use this as a
18      lunch break, is that what we should do or what?
19           MS. GRIFFIN GOODMAN:  Let's do that.
20      Let's give Mr. James a little bit of time
21      there.  30 minutes, 40 minutes?
22           MR. WEIL:  How does that, Oliver, how does
23      that work for you?
24      A    Sounds great.
25           MR. WEIL:  So let's say it's 12:07.  Let's
```

Page 68

1      say like 12:45.  Is that okay?

2           MS. GRIFFIN GOODMAN:  Absolutely.  Let's

3      come back at 12:45.

4           MR. WEIL:  Okay.  Good.  Thank you.

5           THE VIDEOGRAPHER:  Off the video record.

6      It's 12:07 p.m.

7                     (Thereupon, a break was taken)

8           THE VIDEOGRAPHER:  We're back on the video

9      record.  It's 12:50 p.m.

10   BY MS. GRIFFIN GOODMAN:

11      Q    Welcome back, Mr. James.  Thank you.  So

12   where we left off is you were interacting with the

13   Palm Beach police officers who approached you.

14           What did the police officer say to you?

15      A    I think he asked me if I was a guest

16   there.  I'm not 100 percent sure.

17      Q    Did you tell him whether you were a guest?

18      A    I don't remember.  I did tell him.

19      Q    Did the police officer tell you that The

20   Breakers would like for you to leave the property?

21      A    Yes.

22      Q    What did you say to him?

23      A    I don't know completely but I left, I

24   complied.

25      Q    Sorry, can you repeat that?

Page 69

1        A     I don't know completely.  I just remember
2    complying.
3        Q     You remember complying.  Okay.  Did you
4    ask him why you were being asked to leave?
5        A     I think so but I think he said he didn't
6    know and it's not his job.  His job was for me to
7    leave.
8        Q     Were you excited during this conversation
9    or...
10       A     No, I was very scared.
11       Q     Did the officer try to explain to you what
12   was going on?
13       A     I don't think so.  I don't think he knew.
14       Q     I'll pull up what's been Bates Stamped as
15   Breakers' 401 and mark it as Exhibit 7.
16                         (Defendant's Exhibit 7, Video,
17                          Breakers 401, was marked for
18                          identification.)
19   BY MS. GRIFFIN GOODMAN:
20       Q     Let's see if this works.  We're going to
21   try again with the videos and if it doesn't work, at
22   least we tried.
23                         (Video was played.)
24   BY MS. GRIFFIN GOODMAN:
25       Q     Did the officer try to explain to you what

```
                                            Page 70

 1    was going on?

 2         A    Yes.

 3         Q    And you interrupted him a couple of times;

 4    is that right?

 5         A    Yes, ma'am.

 6         Q    Is that just because of your emotional

 7    state at the time?

 8         A    Yes, ma'am.

 9         Q    At the beginning of the clip that we just

10    saw, you were kind of positioning your phone, were

11    you live streaming during your interaction with the

12    police?

13         A    Yes, ma'am.

14         Q    Did you position your phone a few times to

15    try to capture the police officers in view?

16         A    I think so.

17         Q    Why?

18         A    For safety.

19         Q    Your live streaming the video would have

20    caught the audio of what the officers were saying to

21    you; is that right?

22         A    Yes, ma'am.

23         Q    But you wanted them specifically in the

24    video shot?

25         A    Yes, ma'am.
```

Page 71

1    Q    So you asked why you were being asked to
2    leave; is that right?
3    A    I think so.
4    Q    Did anyone from The Breakers try to
5    explain it to you at that time?
6    A    I don't know.
7    Q    Do you recall a security personnel, a
8    female security personnel trying to explain to you
9    why you were being asked to leave?
10   A    I recall her speaking to me.  I don't know
11   what she was trying to speak about.
12   Q    When was the first time that you told the
13   police that you were a guest at the hotel?
14   A    I think at the front desk.
15   Q    So at the time The Breakers asked you to
16   leave the property, you had not yet disclosed that
17   you were a guest staying on site?
18   A    I think that's correct.  I'm not sure.
19   Q    Why did you go to the front desk?
20   A    The police escorted me there.
21   Q    Who suggested that you go to the front
22   desk?
23   A    I think the police did.  We were walking
24   because they were taking me to get my things.
25   Q    How did the police know that you needed to

Page 72

```
 1   get things out of your room?

 2             MR. WEIL:  Form.

 3        A    A conversation came up while we were

 4   walking.  I don't know if I told them I was a guest

 5   or I just told them they had to get my things.

 6   BY MS. GRIFFIN GOODMAN:

 7        Q    So they were escorting you off the

 8   property and at that point you told them that you

 9   needed to get your things out of your room?

10        A    I'm not 100 percent sure.  I don't know.

11        Q    Did you have your room key with you?

12        A    Yes.

13        Q    Did you know where your room was?

14        A    Yes.

15        Q    Did the police ask you for your room

16   number?

17        A    I don't know.

18        Q    Did you tell the police that they could

19   find out your room number at the front desk?

20        A    Probably.

21        Q    Did the police ask you for your name?

22        A    I don't know, but I'm sure they did.

23        Q    Did you tell the police that they could

24   find out your name at the front desk?

25        A    Possibly, yes.
```

Page 73

```
 1        Q    If you had your room key, why didn't you
 2   just ask if you could go straight up to your room to
 3   get your things?
 4        A    Because I didn't want to leave.
 5        Q    What happened when you went to the front
 6   desk?
 7        A    I don't quite remember.
 8        Q    Did the front desk ask you for your ID?
 9        A    I think so.
10        Q    Did you have your ID to provide them?
11        A    I don't know.
12        Q    Did the front desk give you your room
13   number?
14        A    They might have.
15        Q    While you were walking towards the front
16   did you tell the police that due to issues I have
17   personally these things are always an issue?
18        A    Possibly, yes.
19        Q    What issues do you have personally?
20        A    It depends on what issues you're referring
21   to.
22        Q    Good point.  I think that's actually my
23   question to you.  What issues were you referring to?
24        A    Do you -- well, being different.
25        Q    What do you mean by being different?
```

Page 74

1      A    African-American male who can barely read,
2    neuro divergent, suffers from mental -- different
3    mental issues.
4      Q    So when you said due to issues you have
5    personally, these things are always an issue, what
6    things were you referring to?
7      A    Discriminatory things.
8      Q    Like what?
9      A    Being treated unfairly.
10      Q    Anything else?
11      A    Being targeted for being different.
12      Q    Had you had other incidents like this one
13    before?
14      A    Not like this one.
15      Q    Have you experienced other times where you
16    felt that you were being treated unfairly because
17    the ways that you are different?
18      A    Yes, ma'am.
19      Q    Can you give me an example?
20      A    When I was in elementary school I was
21    placed in special education where my teachers would
22    beat me and lock me in closets.
23      Q    Sorry to hear that.
24      A    Me too.
25      Q    Do you have any other examples from your

Page 75

1    adult life?

2         A    They went into my adult life.  They beat

3    me all of the way up until I was an adult, mentally,

4    physically and verbally.

5         Q    Were those the kinds of things that you

6    were referring to when you told the police that

7    because of the issues you have personally these

8    things are always an issue?

9         A    Yes.

10        Q    When you were interacting with the police

11   and The Breakers security, did you ask everyone for

12   their names?

13        A    Yes, I believe so.

14        Q    Did anyone from The Breakers refuse to

15   provide their name?

16        A    Yes.

17        Q    Did you try multiple times to get that

18   person's name?

19        A    I think so.

20        Q    You asked other employees for that

21   person's name?

22        A    Yes.

23        Q    And she tried to move out of the view of

24   the camera; isn't that right?

25        A    Yes.

Page 76

1      Q     And did you follow her with the camera?

2      A     I believe so.

3      Q     Did you tell your followers that you

4    needed to find her name to put her on?

5      A     I don't know.

6      Q     What does it mean to put someone on?

7      A     I'm guessing it would mean to put them on

8    blast.

9      Q     What do you mean by put them on blast?

10     A     To find out and show their true colors.

11     Q     What do you mean by find their true

12   colors?

13     A     Racist, find out if they're racist.

14     Q     Did you tell other employees of The

15   Breakers that the female security officer was

16   racist?

17     A     Yes.

18     Q     Why did you say that?

19     A     Because she racially profiled me.

20     Q     How did she racially profile you?

21     A     Well, she never tried to figure out who I

22   was.  She just assumed she was somebody that she

23   believed I was.

24     Q     Didn't you already refuse to tell a

25   security officer who you were?

Page 77

```
 1        A    Yeah, but I didn't tell her that.
 2        Q    Could he have told her that you refused to
 3   identify yourself?
 4             MR. WEIL:  Form of the question.  You can
 5        answer.
 6        A    I don't know.
 7   BY MS. GRIFFIN GOODMAN:
 8        Q    So you don't know what he called back to
 9   tell her after your interaction with the security
10   officer; is that right?
11        A    Yeah.
12        Q    But you thought she was racist because she
13   didn't personally ask you to identify yourself?
14        A    Yeah.
15        Q    Would you have told her who you were?
16             MR. WEIL:  Object to form.  You can
17        answer.
18        A    Yes.
19   BY MS. GRIFFIN GOODMAN:
20        Q    So at that point you had refused to
21   identify yourself to security and the police, but
22   you're saying you would have told the security
23   supervisor who you were?
24        A    If she asked the right questions, yes.
25        Q    What would be a direct question?
```

Page 78

```
 1       A     One that's not an attack.

 2       Q     What questions did you feel like were an

 3   attack?

 4       A     Questions that didn't apply to me.

 5       Q     A security officer asking you if you're a

 6   guest at the hotel doesn't apply to you?

 7       A     No.

 8       Q     Why not?

 9       A     Because he didn't ask me that at first.

10       Q     So if your video shows that he asked you

11   if you're a member or a guest staying at this hotel,

12   it's wrong?

13            MR. WEIL:  Object to the form.  Give me a

14       second.  I need to object.  Just take that

15       pause before you answer.  Thank you.

16   BY MS. GRIFFIN GOODMAN:

17       Q     I'm sorry, can you repeat your answer,

18   Mr. James?

19       A     Can you repeat the question, please?

20                      (Court stenographer read back

21                       requested portion.)

22            THE WITNESS:  No, ma'am.

23   BY MS. GRIFFIN GOODMAN:

24       Q     What questions did you feel that you were

25   asked that you thought did not apply to you?
```

Page 79

1       A     Questions about the pool deck.

2       Q     When we looked at the security footage

3    earlier you acknowledged that the lawn that you were

4    standing on was next to a pool area; is that right?

5       A      In the security footage.

6       Q     So it was visible to be right next to a

7    pool area; is that right?

8       A      From the security footage, yes.

9       Q     Do you have any reason to believe that the

10   pool area is not right next to the green you were

11   standing on?

12           MR. WEIL:  Oh, boy, we're really getting

13        deep here.  Let's move on here.  I think we got

14        footage and I am objecting and for this record.

15        We don't need to delay this completion by

16        asking obvious repetitive questions.  I'm

17        urging you to move on.  That's my statement.

18           Now, you can keep going, but I think it's

19        obvious you're running out the clock as opposed

20        to asking questions so go ahead, do it your

21        way, but at some point it's not acceptable.  Go

22        ahead.

23   BY MS. GRIFFIN GOODMAN:

24       Q    Mr. James, can you please answer my

25   question?

Page 80

```
 1                    (Court stenographer read back
 2                     requested portion.)
 3              THE WITNESS:  No.
 4      BY MS. GRIFFIN GOODMAN:
 5          Q     Are there any other reasons why you called
 6      the security supervisor racist?
 7          A     No.
 8          Q     Did you tell your followers to find out
 9      who she is?
10          A     Possibly.  I don't remember.
11          Q     Do you tell your followers that she is
12      disgusting?
13          A     Possibly, yeah.
14          Q     If you used those words would it have been
15      for the same reason that she did not personally try
16      to find out who you were?
17          A     I don't understand the question.
18          Q     If you called her disgusting or why did
19      you call her disgusting?
20          A     Because the way I was treated.
21          Q     And what you mean by that?
22          A     I wasn't treated like a guest.
23          Q     How do you know?
24          A     Or a human being.
25          Q     How do you know you weren't --
```

```
                                              Page 81

  1      A    Because she didn't try to find out any --

  2   sorry.  Go ahead.

  3      Q    No, go ahead.  Finish your answer,

  4   Mr. James.

  5      A    She didn't treat me like a human being or

  6   a guest.

  7      Q    Do you know whether it is The Breakers'

  8   practice to remove guests from the property when

  9   they refuse to identify themselves?

 10           MR. WEIL:  We've read the news accounts of

 11           people evicted because of their race.  That may

 12           come in at trial, but maybe he doesn't know

 13           that.  So I'm trying to understand where you

 14           are going, what policies of The Breakers he

 15           knows about but, okay, let's keep beating

 16           around the edges and let's go ahead and finish

 17           this.  Go ahead.

 18           MS. GRIFFIN GOODMAN:  Move to strike.

 19           Thank you, Madam Court Reporter.

 20           MR. WEIL:  -- sitting there.  Go ahead.

 21           MS. GRIFFIN GOODMAN:  However, I am

 22           placing on the record a motion to strike your

 23           inappropriate commentary and Mr. James, do you

 24           need the court reporter to read back the

 25           question?
```

Page 82

```
 1       A    Yes.
 2                      (Court stenographer read back
 3                  requested portion.)
 4            THE WITNESS:  I don't know.
 5    BY MS. GRIFFIN GOODMAN:
 6       Q    The security officer told you that The
 7    Breakers does not allow the use of tripods; is that
 8    correct?
 9       A    Yes, ma'am.
10       Q    Do you know whether it's The Breakers'
11    practice to remove individuals who refuse to stop
12    filming or taking photography when asked to cease?
13       A    I don't know.
14       Q    You said earlier that you were walking
15    around enjoying the beautiful property.  Would you
16    agree that The Breakers is a beautiful property?
17       A    Yes, ma'am.
18       Q    And were you excited to try to get some of
19    the property in your own video?
20       A    Yes, ma'am.
21       Q    Do you think that a lot of people might
22    want to come on to the property to be able to take
23    photos or video?
24       A    I don't know.
25       Q    You thought it was a nice hotel?
```

Page 83

```
 1      A    I thought it was a nice outside part, not
 2   inside.
 3      Q    Okay.  Do you think or do you know how
 4   much the rooms cost to stay there?
 5      A    No, ma'am.
 6      Q    But people come to The Breakers for -- do
 7   you think they come for a vacation, maybe to relax?
 8      A    I don't know.
 9      Q    When you go to resorts in Jamaica or
10   Mexico, do you go on vacation?
11      A    Yes, ma'am.
12      Q    And do you want to relax on vacation?
13      A    No, ma'am.
14      Q    You don't want to relax?  Okay.  Do you
15   think other people might want to relax on vacation?
16          MR. WEIL:  These are really great
17      questions.  I hope you can justify why you're
18      asking them at a later date.  Keep going.
19          THE WITNESS:  Yes, ma'am.
20          MS. GRIFFIN GOODMAN:  Ron, if you don't
21      stop I'm going to have to end the deposition
22      and bring this to the attention of the ALJ.
23      It's really inappropriate.  This is a discovery
24      deposition.  I am entitled to ask questions
25      without interruptions.
```

Page 84

```
 1            MR. WEIL:  I hope you do.  I hope you do.
 2       This is an amateur hour event.  Keep going.
 3            MS. GRIFFIN GOODMAN:  I will.  Thank you.
 4       Madam Court Reporter, did we get James' last
 5       answer?
 6            THE COURT STENOGRAPHER:  The answer was
 7       yes, ma'am.
 8   BY MS. GRIFFIN GOODMAN:
 9       Q    Do you understand that guests might not
10   want to be caught in video footage while they're
11   walking to the pool?
12       A    Yes, ma'am.
13       Q    Do you respect someone's right to not be
14   on camera?
15       A    Yes, ma'am.
16       Q    But when the security supervisor tried to
17   remove herself you tried to follow her; isn't that
18   right?
19       A    Yes, ma'am.
20       Q    Same thing when the police officers try to
21   move off of camera, you followed them?
22       A    Yes, ma'am.
23       Q    Do you think that it might disturb
24   someone's privacy if they got caught in the
25   background of your video?
```

Page 85

1        A     Yes, ma'am.

2        Q     What happened after you left the front

3    desk?

4        A     I was escorted to the room.

5        Q     Did you continue to livestream?

6        A     Yes, ma'am.

7        Q     Did you encourage your viewers to call The

8    Breakers and complain?

9        A     Possibly, yes.

10       Q     Did you tell your viewers and the police

11   that you had paid to be at The Breakers?

12       A     I don't know.

13       Q     Did you pay to be at The Breakers?

14       A     I didn't pay.

15       Q     Do you know whether the Barbara Bush

16   Foundation paid for your stay at The Breakers?

17       A     Yes.

18       Q     Do you know whether The Breakers donated

19   your room to the Barbara Bush Foundation?

20       A     I don't.

21       Q     Did you tell your viewers that The

22   Breakers did not give you a refund?

23       A     I don't know.

24       Q     Were your viewers sending you money while

25   you were live streaming?

Page 86

1        A     I don't know.

2        Q     Who would know?

3        A     I'm not sure.

4        Q     If you were live streaming would your

5    livestream show whether you were receiving money

6    from your viewers?

7        A     No.

8        Q     Does it show when gifts come through?

9        A     It might, yeah.  I'm not 100 percent sure.

10       Q     Did you tell your viewers that The

11   Breakers brought you here to do this?

12       A     I don't know.

13       Q     Did anyone from The Breakers ask you to

14   film on property?

15       A     No.

16       Q     Did anyone at The Breakers authorize you

17   to film with a tripod?

18       A     No, ma'am.

19       Q     What happened after you left the property?

20       A     I was escorted to Starbucks.

21       Q     What does it mean when you encourage your

22   viewers to, quote, run it up?

23       A     The views.

24       Q     What is an algorithm in context of social

25   media?

Page 87

```
 1        A    I don't know.
 2        Q    So when you told the police that you were
 3   doing this because it builds the algorithm, what did
 4   you mean?
 5        A    I don't know.
 6        Q    And when you said it would help it get
 7   further and further, what did you mean?
 8        A    I don't know.
 9        Q    How many viewers were watching your live
10   stream during the ocean lawn incident?
11        A    I don't know.
12        Q    Do you know if it was hundreds, thousands?
13        A    Thousand.
14        Q    How long did you stay at Starbucks?
15        A    I would say about an hour to two hours.
16        Q    Were you live streaming during most of
17   that?
18        A    Yes, ma'am.
19        Q    Where did you go after Starbucks?
20        A    To another hotel.
21        Q    What hotel?
22        A    I don't remember the name of it.  I think
23   it was a Hilton.
24        Q    Did you pay for the Hilton?
25        A    No, ma'am.
```

Page 88

```
 1        Q    Who did?
 2        A    The Breakers.  I mean, the Barbara Bush
 3   Foundation.
 4        Q    Did you speak with the Barbara Bush
 5   Foundation?
 6        A    Yes.
 7        Q    How did you speak with them?
 8        A    I think telephone, phone call.
 9        Q    What did you say to them?
10        A    That I was kicked out of The Breakers.
11        Q    What did they say to you?
12        A    Not much.  They were just saying they were
13   going to get me another hotel.
14        Q    Who did you speak to when you stopped live
15   streaming at Starbucks?
16        A    I don't know.
17        Q    Did you talk to Ann?
18        A    Yes.
19        Q    Did you talk to her by phone?
20        A    Yes.
21        Q    Did you talk to anyone else about what
22   happened at The Breakers while you were at
23   Starbucks?
24        A    Random people from the Starbucks were
25   watching the live.
```

Page 89

1      Q     Did people who know you try to reach out

2    to you by text message?

3      A     I don't know.

4      Q     Did you receive any direct messages

5    through TikTok or your social media profiles about

6    The Breakers incident?

7      A     Messages from like comments.

8      Q     Comments but you did not receive any

9    direct messages?

10     A     I don't know.  If I did, I don't remember.

11     Q     Did you speak to news agencies?

12     A     Yes, ma'am.

13     Q     How did they reach out to you?

14     A     I don't know completely too.  I remember

15   getting a phone call.

16     Q     How would they have gotten your phone

17   number?

18     A     I'm not sure.  I don't remember.

19     Q     Do you put your phone number out on public

20   websites?

21     A     No, but they contacted -- it was so fast.

22   They contacted people so I don't know if they

23   contact Ann, email or me.  I'm not sure.

24     Q     Did you look through your emails to try to

25   find communications with news agencies about The

Page 90

1    Breakers incident before our deposition today?

2        A     No, no.

3        Q     Did you look to see whether you had any

4    direct messages on your social media account from

5    followers or people reaching out to you about The

6    Breakers incident?

7        A     No.

8        Q     Do you ever interact with your followers

9    through direct messages on social media?

10       A     Yes.

11       Q     After you stopped live streaming did you

12   have any other communications with any of the

13   officers who you dealt with during The Breakers

14   ocean lawn incident?

15       A     Yes.

16       Q     Who?

17       A     I don't know.

18       Q     But one of the officers?

19       A     Yes, ma'am.

20       Q     How did you communicate with him?

21       A     He returned back to Starbucks.

22       Q     What did you communicate about?

23       A     The incident.

24       Q     What about it?

25       A     He thought it was a miscommunication and

```
 1    that I shouldn't have been removed.
 2            MR. WEIL:  Holly, I need to take one
 3         minute to answer this emergency.  Give me a
 4         second, please.
 5            MS. GRIFFIN GOODMAN:  We will go off the
 6         record for a moment.
 7            THE VIDEOGRAPHER:  We're going off the
 8         video record.  It's 1:32 p.m.
 9                   (Thereupon, a break was taken)
10            THE VIDEOGRAPHER:  We're back on the
11         record.  It's 1:34 p.m.
12    BY MS. GRIFFIN GOODMAN:
13         Q    Mr. James, before we just went off the
14    record you were discussing your conversation with,
15    you know, one of the police officers after he had
16    returned back to Starbucks and you had said that he
17    had told you he thought it was a miscommunication;
18    is that right?
19         A    Yes, ma'am.
20         Q    Okay.  Was that officer present in your
21    interaction with the initial security guard who
22    approached you from The Breakers?
23         A    Yes, ma'am.
24         Q    He was there when you spoke with the first
25    security officer?
```

Page 92

```
1        A    I don't know.
2        Q    Who was around you when you spoke to the
3   first security officer?
4        A    I don't know.
5        Q    When did the police officer who told you
6   he thought it was a miscommunication, when did you
7   first see him during the incident?
8        A    I don't know.
9        Q    What did -- did he tell you what he
10   thought had been a miscommunication?
11        A    He didn't think what he was called there
12   for was who I was.
13        Q    What does that mean?
14        A    I don't know what he got called there for,
15   but he thought it was something else.  When he got
16   there, he thought it wasn't -- I shouldn't have been
17   removed and I wasn't what they believed I was.
18        Q    Who decides whether or not you get to stay
19   on private property?
20             MR. WEIL:  Oh, God.
21        A    I don't know.
22   BY MS. GRIFFIN GOODMAN:
23        Q    Do you get to decide who comes into your
24   house or your apartment?
25        A    Yes.
```

```
 1        Q    Did you discuss anything else with the
 2   officer after he returned back to Starbucks?
 3        A    We talked about reading.
 4        Q    How long was the conversation?
 5        A    About 15 to 20 minutes.
 6        Q    I'm pulling up text messages that we
 7   received from your lawyer.  We're going to mark this
 8   as, I think we're at 8.  This one is Exhibit 8.
 9                     (Defendant's Exhibit 8, Text
10                     Message, was marked for
11                     identification.)
12   BY MS. GRIFFIN GOODMAN:
13        Q    That is not at all very big, is it?  Let
14   me see if I can -- can you see this text string at
15   all, Mr. James?
16        A    Yes.
17        Q    Do you know who this phone number
18   (301) ███████ belongs to?
19        A    No, ma'am.
20        Q    Do you recall receiving this text message?
21            MR. WEIL:  Is that all of them or are
22        there more below?  Is that the full extent?
23            MS. GRIFFIN GOODMAN:  This one is.
24        There's one more.
25            MR. WEIL:  But this is all -- this is all
```

Page 94

```
 1        of Exhibit 8 what's on the screen?
 2              MS. GRIFFIN GOODMAN:  This is all Exhibit
 3        8 was that's on the screen.  It's phone number
 4        (30) ████████.
 5              MR. WEIL:  You know that from memory or
 6        just reading?
 7              MS. GRIFFIN GOODMAN:  It's on the screen.
 8  BY MS. GRIFFIN GOODMAN:
 9        Q    You don't know who this belongs to, do you
10  recall receiving those messages, Mr. James?
11        A    I don't recall receiving them, but, yeah.
12        Q    Who is Francis Fisher?
13        A    I think she works for the Barbara Bush
14  Foundation.
15        Q    Did she ever call you?
16        A    I think so.
17        Q    Do you remember what you talked to her
18  about?
19        A    I don't remember what we talked about.
20              MR. WEIL:  Sorry, just to clarify, talked
21        with her ever or talked with her on this
22        specific date?  It's not clear.
23  BY MS. GRIFFIN GOODMAN:
24        Q    Mr. James, you were answering.
25        A    I don't know.
```

Page 95

1      Q     So you think you spoke to her after this

2    text message exchange but you don't recall what you

3    talked to her about?

4      A     Correct.

5      Q     This person says they will meet you in the

6    lobby tomorrow at 9 a.m. to head to the event.  Does

7    that help you figure out who these messages are

8    with?

9      A     A little bit.  I talked to a few people.

10     Q     Did you ride over to the Literacy

11   Foundation reading event with anyone?

12     A     Yes.

13     Q     Who did you ride with?

14     A     He works for the Barbara Bush Foundation.

15   I don't know his name.

16     Q     Do you think he's the one who these text

17   messages are with?

18     A     Yes.

19     Q     Did you have any other emails or text

20   messages with anyone from the Barbara Bush

21   Foundation after you left The Breakers?

22     A     I don't know.

23     Q     Did they send you a physical check for

24   your honorarium?

25     A     I don't know.

Page 96

```
 1        Q    I got another set of text messages that
 2   you gave -- that your counsel provided to us with
 3   phone number (703) ████████ marked as Exhibit 9.
 4                         (Defendant's Exhibit 9, Text
 5                         Message, was marked for
 6                         identification.)
 7   BY MS. GRIFFIN GOODMAN:
 8        Q    Do you know who owns this phone number,
 9   Mr. James?
10        A    No, ma'am.
11        Q    And there's this one and there's one more
12   here.  It's two pages here.  I see on the screen
13   when you say I don't have your number saved, they
14   indicate they are Ruby, does that help you narrow
15   down who this phone number belongs to?
16        A    I think so.
17        Q    Who is Ruby?
18        A    I'm not 100 percent sure.
19        Q    Do you know the last time you spoke with
20   Ruby?
21        A    Maybe around this time.
22        Q    One more set of text messages your counsel
23   provided that I will mark as Exhibit 10.
24                         (Defendant's Exhibit 10, Text
25                         Message, was marked for
```

Page 97

1              identification.)

2      BY MS. GRIFFIN GOODMAN:

3          Q      With phone number (561) ███████.

4      Mr. James, do you know who Jade from WPBF is?

5          A      I don't know.

6          Q      She says here, I interviewed you today at

7      the literacy event and provided you some links.

8      Does that help refresh your memory?

9          A      I think she's a reporter.

10          Q      When was the last time you spoke with her?

11          A      Probably this incident.

12          Q      Are these the only three individuals who

13      texted you about The Breakers incident after your

14      livestream?

15          A      I don't know.

16          Q      Do you delete text messages?

17          A      Yes.

18          Q      Did you text with Ann about The Breakers

19      incident?

20          A      Yes, I'm sure.  I don't know.

21          Q      What about your sister, you said she lives

22      not too far from The Breakers property or from Palm

23      Beach.  Did you text with her at all about The

24      Breakers incident?

25          A      I don't know.

Page 98

1      Q    Who took the screen shots I just showed

2    you?

3      A    I'm not sure, ma'am.

4      Q    How did your counsel get the screen shots

5    from text message string, do you recall?

6      A    I'm not 100 percent sure but maybe Ann.

7      Q    Did your search your text messages for

8    communications about The Breakers incident?

9      A    No, ma'am.

10      Q    Did you search for additional videos on

11    your cell phone that you took at The Breakers?

12      A    No, ma'am.

13      Q    You filed a complaint of discrimination in

14    this case with the Florida Commission on Human

15    Relations; isn't that right?

16      A    I think so.

17      Q    Did you fill out this form that is on the

18    screen which is the charge of discrimination that

19    I'll mark as Exhibit 11?

20      A    Yes, ma'am.

21                    (Defendant's Exhibit 11,

22                    Complaint of discrimination with

23                    the Florida Commission on Human

24                    Relations, was marked for

25                    identification.)

Page 99

1    BY MS. GRIFFIN GOODMAN:

2         Q    Is that your signature at the bottom?

3         A    Yes, ma'am.

4         Q    You say that while you were staying at The

5    Breakers you were sitting on a grass turf area

6    filming yourself reading while you were approached

7    by a security guard.  Is that true?

8         A    No, I don't think so.

9         Q    It says in paragraph five, "Before my

10   removal I was not warned or asked to stop filming,

11   to lower my volume or to refrain from any other

12   activity that violated a policy of the hotel."  Is

13   that true?

14        A    I think so.  I'm not 100 percent sure.

15        Q    You were told that The Breakers doesn't

16   allow tripods, weren't you?

17        A    Yes.

18        Q    And you kept using your tripod after the

19   security officer told you that?

20        A    Yes, ma'am.

21        Q    Paragraph six, you said, "I did not cause

22   any disturbance or violate any policy of the hotel."

23   Is that true?

24        A    Yes, ma'am.

25        Q    When you were screaming profanities into

Page 100

1    your camera, you don't think that's a disturbance?

2         A    Yes, ma'am.

3         Q    I'm sorry, was that a yes, you do think it

4    was a disturbance?

5         A    Yes.

6         Q    Did you look over this statement before

7    you signed it?

8         A    Yes, ma'am.

9         Q    And we're here in this proceeding because

10   the Florida Commission initially decided that there

11   was no cause to believe discrimination occurred; is

12   that your understanding?

13        A    Yes, ma'am.

14        Q    I'm going to scroll for your benefit and

15   for your counsel's benefit.  I'm putting on the

16   screen, the petition for relief that was filed.

17   Transmittal of petition that was filed by counsel on

18   behalf of Mr. James.  We're marking it as 12.

19                        (Defendant's Exhibit 12,

20                        Transmittal of petition, was

21                        marked for identification.)

22   BY MS. GRIFFIN GOODMAN:

23        Q    Mr. James, that your signature there as

24   well?

25        A    Yes, ma'am.

Page 101

1      Q     Thank you.

2            I think this was just likely an error, but

3      on page 4 here petitioner files this petition,

4      there's a checkbox that says discriminatory

5      employment practice.  You were never employed by The

6      Breakers; is that right?

7      A     Yes, ma'am.

8      Q     Okay.

9            So in this description of how the alleged

10     facts -- did it stop scrolling -- in the

11     discrimination -- in this paragraph six, description

12     of how the alleged facts relate to the Florida

13     Statute, you state that Mr. James was denied the

14     equal enjoyment of this facility strictly based on

15     his race.  This is evident by the fact that

16     Mr. James was trespassed and arrested from The

17     Breakers before any information about any alleged

18     disturbance had been communicated to Palm Beach

19     Police Department.  You were not arrested; is that

20     right?

21     A     Correct.

22     Q     What do you mean -- what do you mean that

23     the Palm Beach Police issued a trespass before

24     receiving information about a disturbance?

25     A     I don't know.

Page 102

```
 1          MR. WEIL:  Just to point out that this is
 2      a document created by an attorney, right?  So
 3      perhaps we could limit it to lay questions
 4      about what is contained there as opposed to
 5      legal terms.
 6          MS. GRIFFIN GOODMAN:  I asked what the
 7      exact language that is stated there means and
 8      how -- when it is that is being referred to.
 9      I'm entitled to ask questions of Mr. James
10      about the facts that he's relying on.
11          MR. WEIL:  Well, he's relying on the
12      statute that he's probably never read.  So,
13      anyway, I appreciate what you're attempting to
14      do, but let's try to confine it to a lay
15      witness not a lawyer.
16          MS. GRIFFIN GOODMAN:  I will ask the
17      questions that I deem appropriate and you can
18      make form objections should you deem
19      appropriate.
20          MR. WEIL:  You can deem what you like.
21      Deem away.  Let's go.
22          MS. GRIFFIN GOODMAN:  I will also ask
23      questions when I'm ready.
24          MR. WEIL:  Well, let's try to make it
25      within our lifetime.
```

Page 103

1    BY MS. GRIFFIN GOODMAN:

2         Q    You state here that, "Upon observing an

3    individual who did not look like the typical members

4    or guests at The Breakers that The Breakers' staff

5    requested the on call police officer to remove you

6    from the property."

7              How do you know that you were -- what is

8    your basis for making this statement?

9              MR. WEIL:  He didn't make this statement.

10        Object to the form.

11   BY MS. GRIFFIN GOODMAN:

12        Q    Mr. James?

13        A    I didn't make the statement.

14        Q    You signed off on the statement; is that

15   correct?

16        A    Yes, ma'am.

17        Q    It was submitted on your behalf?

18        A    Yes, ma'am.

19        Q    It is the basis upon which you are

20   bringing your claim against The Breakers?

21        A    Yes, ma'am.

22        Q    Okay.

23             MR. WEIL:  Form of the last question.

24        Actually, it's petition.

25

Page 104

BY MS. GRIFFIN GOODMAN:

    Q    So you do not -- you do not -- you do not
know what facts upon which the statement that The
Breakers had you removed because you did not look
like the typical members or guests, you don't know
what facts that is based on?

    A    No, ma'am.

    Q    Did you see other people at The Breakers
in workout clothes?

    A    I don't know.

    Q    The end of the first -- it hadn't caught
up yet I don't think.  The screen is still scrolling
but in your statement -- you say that at 9:34 a.m.
Officer Jonathan Rosenberg of the Palm Beach Police
Department, quote, self initiated, end quote, a
trespass call regarding Mr. James.

         How do you know what time the officer
initiated a trespass call?

         MR. WEIL:  Objection to form.  You can
         answer if you know.

    A    I don't know.

BY MS. GRIFFIN GOODMAN:

    Q    How do you know that he classified it as a
trespass call?

         MR. WEIL:  Same objection.  If you know

Page 105

```
 1        you can answer.

 2   BY MS. GRIFFIN GOODMAN:

 3        Q    I might not have heard your answer.

 4        A    I don't know.

 5        Q    You go on to say that Officer Rosenburg

 6   made contact with Mr. James at 9:35 a.m.  How do you

 7   know what time Mr. -- I think it was Officer

 8   Rosenburg made contact with you?

 9        A    I don't know.

10        Q    In the second paragraph here on the screen

11   the narrative describes The Breakers' position as

12   stated in its position statement and says, "However,

13   the evidence in this matter shows that the decision

14   to have Mr. James removed from The Breakers took

15   place before any of this information was relayed to

16   Officer Rosenburg."

17             What is your factual basis or do you have

18   any facts to support that statement?

19        A    No, ma'am.

20        Q    Do you know when the security officer who

21   interacted with you initially contacted his

22   supervisor?

23        A    No, ma'am.

24        Q    Do you know what the security officer told

25   his supervisor?
```

Page 106

1          A     No, ma'am.

2          Q     Do you know who made contact with Officer

3     Rothenburg (sic)?

4          A     No, ma'am.

5          Q     Do you know where Officer Rothenburg was

6     located when the call was made?

7          A     No, ma'am.

8          Q     The end of the petition, the statement

9     says, "The evidence shows that The Breakers' staff

10    made the decision to remove Mr. James from The

11    Breakers property before any investigation into the

12    circumstances of his presence there had been

13    completed."

14              What facts do you have to support that

15    statement?

16         A     I don't know, ma'am.

17         Q     Have you ever filed any other lawsuits,

18    Mr. James?

19         A     No, ma'am.

20         Q     Let's talk about your damages.

21              How much do you contend that you're

22    entitled to in damages in this case?

23              MR. WEIL:  Object to the form.  Don't

24         answer the question.  It's going to be up to

25         the administrative judge in what we as

Page 107

1          attorneys present.  He's not making any

2          monetary demand based upon his lack of

3          experience in all of that.  You can certainly

4          ask him what the categories of the things that

5          he's dealt with, but he's not going to give you

6          a number today.  That's a preposterous.  I've

7          never heard of a lawyer asking that question,

8          but, you know, you can go ahead and press that

9          if you'd like with the administrative judge.  I

10         want you to have a free hand to ask any kind of

11         question about the damages economic or

12         otherwise that you suffered, but the amount is

13         silly and you know that.

14              MS. GRIFFIN GOODMAN:  Actually, the

15         administrative law judge has already ordered

16         him to answer that question and you failed to

17         do so.  The interrogatories that were served

18         you objected to.  The objection was overruled.

19         The administrative law judge ordered an answer

20         and one has not been served and so I was

21         attempting to avoid bringing that back to the

22         judge by getting an answer here today.

23              MR. WEIL:  You will get it in writing.  Go

24         ahead.

25              MS. GRIFFIN GOODMAN:  Madam Court

Page 108

1          Reporter, can we certify that there was a

2          question to which counsel instructed his client

3          not to answer.

4     BY MS. GRIFFIN GOODMAN:

5          Q     Mr. James, how have you been damaged in

6     this case?

7          A     Emotionally, mentally.

8          Q     How have you been emotionally damaged?

9          A     Having to relive it.

10          Q     What has the impact been on you?

11          A     Severe.

12          Q     How so?

13          A     Nightmares, intrucious (sic) thoughts,

14     anxiety, depression.

15          Q     What kind of nightmares?

16          A     Scary ones.

17          Q     What happened in the nightmares?

18          A     I get killed.

19          Q     Where are you located in these nightmares?

20          A     Jail or laying by a beach or standing on

21     the lawn.

22          Q     When did they start?

23          A     They've been there, they just changed as

24     things happened.

25          Q     How long have they been there?

Page 109

1      A    A couple of years.

2      Q    Since before the incident at The Breakers?

3      A    Not the ones I'm speaking about, no.

4  Since The Breakers, these ones have been there since

5  The Breakers.

6      Q    But you had nightmares before The

7  Breakers?

8      A    We all have nightmares.

9      Q    So you did have nightmares?

10     A    Yes.

11     Q    But they were of a different subject

12 before the incident at The Breakers?

13     A    Yes, ma'am.

14     Q    Did you ever have nightmares about being

15 killed in jail before the incident at The Breakers?

16     A    No, ma'am.

17     Q    How often do you have nightmares?

18     A    Every day.

19     Q    Do they wake you up at night?

20     A    They barely let me go to sleep.

21     Q    Did you have trouble sleeping before the

22 incident at The Breakers?

23     A    No, ma'am.

24     Q    But you had been having nightmares before

25 that?

Page 110

1        A     Yes, ma'am.

2        Q     Did you have intrusive thoughts before the

3   incident at The Breakers?

4        A     Yes, ma'am.

5        Q     For how long?

6        A     All my life.

7        Q     How are the intrusive thoughts related to

8   what happened at The Breakers?

9        A     The thoughts I had before were just

10  thoughts.  The ones I had at The Breakers were real.

11       Q     What you mean by that?

12       A     I had thoughts of being approached by

13  racist people doing racist things.

14       Q     Now out of the thoughts how do the

15  intrusive thoughts differ now from the ones that you

16  had before the incident at The Breakers?

17       A     Now, I have the thoughts from the

18  situations that I went through at The Breakers.

19       Q     How often?

20       A     Right now.

21       Q     We're talking about it right now.  Outside

22  of this moment, how often do you have these

23  thoughts?

24       A     Every day.

25       Q     How do they affect you?

```
                                            Page 111

 1        A     Well, badly.  They affect me badly.  I
 2     don't know how to explain it.
 3        Q     Did you have anxiety before the incident
 4     at The Breakers?
 5        A     Yes, ma'am.
 6        Q     How long have you had anxiety?
 7        A     Since about 18.
 8        Q     How has it changed after the incident at
 9     The Breakers if at all?
10        A     It went up.
11        Q     How so?
12        A     I don't know how you can explain anxiety
13     from a scale.
14        Q     Is it more frequent?
15        A     Yes.
16        Q     How do you feel physically when you have
17     anxiety?
18        A     Cold, numb, frozen, jittery, heart race,
19     sweating, fear.
20        Q     How often do you get these feelings now?
21        A     Every day.
22        Q     How often did you get them before the
23     incident at The Breakers?
24        A     Every now and then.
25        Q     Did you have depression before the
```

Page 112

1      incident at The Breakers?

2          A    No.

3          Q    Have you been diagnosed with depression?

4          A    No.

5          Q    So what do you mean when you say

6      depression?

7          A    It's new.  I don't know.

8          Q    Were you diagnosed with anxiety?

9          A    Not diagnosed, no.

10         Q    So with the depression you used the word

11     depression, what were you trying to describe?

12         A    OCD, which is going to be a form of

13     depression and anxiety, it's mixed in between.

14         Q    Are you diagnosed with OCD?

15         A    Yes, ma'am.

16         Q    When were you diagnosed with OCD?

17         A    Maybe the beginning of the year.

18         Q    Of 2024?

19         A    Somewhere around there.

20         Q    Who diagnosed you?

21         A    I don't know but a therapist, a

22     psychologist I think.

23         Q    Do you see them regularly?

24         A    Now I do.  I didn't until a couple of

25     weeks ago.

Page 113

```
 1        Q    Have you been prescribed any medications?

 2        A    No, ma'am.

 3        Q    For the anxiety and depression?

 4        A    No, ma'am.

 5        Q    Have you been prescribed any medications

 6   for the OCD?

 7        A    No, ma'am.

 8        Q    Did you have OCD symptoms before the

 9   incident at The Breakers?

10        A    Yes, ma'am.

11        Q    Why do you think that the increased

12   anxiety is related to the incident at The Breakers?

13        A    Trauma response.  It's traumatizing.

14        Q    Has it affected your work as a social

15   media influencer?

16        A    Yes, ma'am.

17        Q    How so?

18        A    It's hard to do the job with a clear mind.

19        Q    Are you still posting as frequently as you

20   were before?

21        A    No, ma'am.

22        Q    How has it changed?

23        A    Sometimes I can barely get out of the bed

24   so it's affecting my actual personality and the way

25   that I look on my day-to-day life.
```

Page 114

```
 1        Q    How often do you post on social media?
 2        A    I try to do it every day.
 3        Q    How often did you post on social media
 4   before The Breakers incident?
 5        A    Two to three times a day.
 6        Q    Are you still getting public speaking
 7   engagements?
 8        A    Not as much as I used to.
 9        Q    How often did you used to get public
10   speaking engagements?
11        A    Three to four a month.
12        Q    How many are you getting now?
13        A    I'm not getting any now.
14        Q    When were you getting three to four a
15   month?
16        A    October of 2022 since then all of the way
17   until the incident at The Breakers.
18        Q    When was your last public speaking
19   engagement?
20        A    I don't know exactly.
21        Q    Two months ago, six months ago?
22        A    I'm not sure when the last speaking
23   engagement was.  I'd say four months, four or five
24   months ago.  I don't know.
25        Q    So you did have public speaking
```

Page 115

1    engagements after the incident with The Breakers?

2         A    Yes, ma'am.

3         Q    How many doctors do you see for your

4    depression and anxiety?

5         A    One.

6         Q    Is that the same one who diagnosed you

7    with OCD?

8         A    No, ma'am.

9         Q    What kind of doctor?

10        A    Therapist.

11        Q    Where are they located?

12        A    California.

13        Q    What is the doctor's name?

14        A    I think her name is Kathryn.

15        Q    Is that with a C or a K?

16        A    K.

17        Q    Do you know her last name?

18        A    No, ma'am.

19        Q    How often do you see Kathryn?

20        A    Maybe once a week.  This -- I've only seen

21   her three times.

22        Q    Had you ever seen a therapist before The

23   Breakers incident?

24        A    Yes, ma'am.

25        Q    How often?

Page 116

1      A    One time maybe.

2      Q    Do you see Kathryn for the OCD?

3      A    Yes, ma'am.

4      Q    Who is the doctor who diagnosed you with

5  OCD?

6      A    I don't remember his name.

7      Q    Are you seeking reimbursement for any

8  medical expenses in connection with the incident at

9  The Breakers?

10      A    Yes.

11           MR. WEIL:  Objection.

12  BY MS. GRIFFIN GOODMAN:

13      Q    Do you have documents relating to the

14  medical expenses that you are going to be seeking

15  reimbursement for?

16      A    No, ma'am.

17      Q    So then what are the medical expenses?

18      A    A lifetime of depression, anxiety and

19  intrusive thoughts that I didn't have before.

20      Q    But no specific reimbursement of expenses?

21      A    It's ongoing so there is nothing yet.

22  It's still happening.

23           MS. GRIFFIN GOODMAN:  It's been about

24       another hour and a half.  Do we want to take a

25       ten minute break?  I'll go back through my

Page 117

1      notes so I can narrow down any remaining items

2      to finish up here?

3              MR. WEIL:  Whatever suits you.

4              MS. GRIFFIN GOODMAN:  All right.

5              MR. WEIL:  You need ten minutes, go take

6      ten minutes.

7              THE VIDEOGRAPHER:  Going off the video

8      it's 2:21 p.m.

9                      (Thereupon, a break was taken)

10             THE VIDEOGRAPHER:  We're back on the

11     record it's 2:39 p.m.

12  BY MS. GRIFFIN GOODMAN:

13      Q    Mr. James, other than Kathryn and the

14  doctor who diagnosed you with OCD, have you treated

15  with any other medical provider in the last five

16  years regarding OCD, anxiety or depression?

17      A    Yes.

18      Q    Who else did you treat with?

19      A    I don't know.

20      Q    When?

21      A    On and off just different people.

22      Q    Was this before The Breakers incident?

23      A    Yes, ma'am.

24      Q    How often?

25      A    Not much, maybe once or twice a year.

Page 118

1      Q    You testified earlier that you have had

2   fewer speaking engagements this year.  What has been

3   the financial impact in the decrease of speaking

4   engagements?

5      A    There's no income.

6      Q    And how much did you make from speaking

7   engagements in 2023?

8      A    I don't know.

9      Q    And you -- is it more than $10,000?

10     A    Yes, ma'am.

11     Q    Was it more than $20,000?

12     A    I don't know.

13     Q    How much have you made in 2024 from

14   speaking engagements?

15     A    I don't know.

16     Q    Is it more than $10,000?

17     A    Yes, ma'am.

18     Q    Are you still receiving tips from

19   followers on TikTok?

20     A    Yes, ma'am.

21     Q    How much have you received from followers

22   in tips in 2023?

23     A    I don't know.

24     Q    Has there been a decrease in tips?

25     A    Yes, ma'am.

Page 119

1      Q    How much has been the decrease?

2      A    There is nothing there right now.

3      Q    Sorry, did you say there is nothing coming

4  in from the tips?

5      A    Yeah, I probably make a couple of bucks

6  compared to a couple thousand.

7      Q    So you still receive them but you're

8  receiving less?

9      A    Less.

10      Q    Was that a couple thousand dollars a year

11  or per tip?

12      A    A year.

13      Q    So in 2023 you don't recall how much you

14  earned in tips but would you say it's more than

15  $2,000?

16      A    Yes, ma'am.

17      Q    More than $5,000?

18      A    I don't know.  I have to look up that and

19  see it.

20      Q    What about 2022, in 2022 did you make

21  tips?

22      A    No, ma'am.

23      Q    And in 2024 have you made more than $1,000

24  in tips?

25      A    No, ma'am.

Page 120

1      Q    How much of the tips in 2023 came in
2   November of 2023 after The Breakers incident?
3      A    I don't know.
4      Q    Did you see an increase in tips in 2023
5   after The Breakers incident?
6      A    No, decline.
7      Q    What about Venmo or Cash App did you
8   receive direct payments from viewers during The
9   Breakers incident?
10      A    I don't think so.
11      Q    Had you received payments from Venmo or
12   Cash App prior to The Breakers incident?
13      A    Yes.
14      Q    How often?
15      A    I don't know.
16      Q    Were you aware that in November of 2023
17   The Breakers sent a letter instructing you to
18   preserve all videos, text messages, emails and other
19   evidence in this case?
20      A    Yes, ma'am.
21      Q    What steps did you take to preserve
22   evidence?
23      A    I got help from my partner and we sent
24   over everything that was in the phone.
25      Q    Did you take any steps to restore any

Page 121

1    videos that you might have deleted?

2        A    Yes, ma'am.

3        Q    What videos did you restore from deleted

4    files?

5        A    I don't know.  I don't know what they are,

6    but whatever I sent.

7        Q    How many videos did you restore?

8        A    Maybe one.

9        Q    Were there any other videos that you did

10   not restore?

11       A    I don't know.

12       Q    What about text messages did you look for

13   any text message string that you had deleted?

14       A    Yeah.

15       Q    Did you find any deleted text messages?

16       A    No, ma'am.

17       Q    So you only received text messages from

18   three people about The Breakers incident?

19       A    I don't know.

20       Q    Are there any other facts other than what

21   we discussed today that leads you to believe that

22   you were approached by Breakers security because of

23   your race?

24       A    Yes.  When I was at the front desk one of

25   the women that you described about, I called her

Page 122

1    racist, when she found out I was staying at The

2    Breakers, she said this is going to be a big problem

3    so she was aware it was an issue and decided to

4    change it.

5         Q    Did you hear that conversation?

6         A    Yes.

7         Q    When did she say that?

8         A    At the front desk.

9         Q    And so after you had -- is this after you

10   had already been asked to leave the property?

11        A    Yes.

12        Q    So why do you think that supports that you

13   were approached because of your race?

14        A    Because I believe she decided to change

15   her thought process when she realized that I was

16   more than what she believed I was.  When it was just

17   my race there wasn't a problem, but when she found

18   out that I was staying there and I was somebody more

19   than she believed that's when it became a problem,

20   that's when my race didn't no longer have an issue.

21   It's kind of just like if Oprah Winfrey was staying

22   there, it wouldn't be a problem but it was just some

23   regular Joe Schmo it would be a problem.

24        Q    So you think that because she learned that

25   you were, in fact, a guest and thought maybe we

Page 123

1    shouldn't remove him now that we've identified him,

2    that that supports that she had racially profiled

3    you?

4         A    Yes, ma'am.

5         Q    Ultimately she didn't change the decision

6    to remove you from the property, did she?

7         A    No, ma'am.

8         Q    Who did you hear her say this to?

9         A    I don't know.

10        Q    Did you hear this yourself personally?

11        A    Yes, ma'am.

12        Q    At the time that it occurred?

13        A    Yes, ma'am.

14        Q    Did it get captured on any of your live

15   feed?

16        A    I think so, yes.

17        Q    Okay.

18             MR. WEIL:  For counsel's reference it's

19        also on the cop's feed.

20             MS. GRIFFIN GOODMAN:  I don't think I

21        asked a question about that.  Thanks, Ron.

22             MR. WEIL:  You're welcome, Smily.

23             MS. GRIFFIN GOODMAN:  What did you call

24        me?

25             MR. WEIL:  Smily.  You were smiling.

Page 124

1    BY MS. GRIFFIN GOODMAN:

2        Q    Mr. James, are there any other facts other

3    than what we have discussed today that leads you to

4    believe that you were removed from the property

5    because of your race?

6        A    No, ma'am.

7             MS. GRIFFIN GOODMAN:  Give me one second.

8             That's all of the questions that I have

9        for today.

10            MR. WEIL:  Okay.

11                      CROSS EXAMINATION

12   BY MR. WEIL:

13       Q    Mr. James, I only have a couple really.

14   At the Starbucks did I understand correctly that the

15   officer that you were with contacted the hotel to

16   determine whether or not they would agree that they

17   had made a mistake in evicting you?

18            MS. GRIFFIN GOODMAN:  Object to the form;

19        misstates the testimony.

20            MR. WEIL:  Just form, Counsel.  Go ahead.

21       A    Yes.

22   BY MR. WEIL:

23       Q    And did he, in fact, make that call?

24            MS. GRIFFIN GOODMAN:  Object to the form.

25            MR. WEIL:  You can answer.

Page 125

1          MS. GRIFFIN GOODMAN:  If you know.

2     A    I'm not sure.

3  BY MR. WEIL:

4     Q    Did he come back and tell you that he had

5  contacted them?

6     A    Yes.

7     Q    And what did he say?

8     A    He said that it was out of his hands.

9     Q    Did you form the impression that he agreed

10 as well with the knowledge that you were a hotel

11 guest that you had been singled out to leave and be

12 evicted from the hotel, did you form the impression

13 that he agreed that this was not an appropriate

14 manner or appropriate conduct towards you?

15          MS. GRIFFIN GOODMAN:  Object to form.

16    A    Yes, sir.

17 BY MR. WEIL:

18    Q    How long did you and the officer spend

19 talking to each other at the Starbucks?

20          MS. GRIFFIN GOODMAN:  Object to the form.

21          MR. WEIL:  What's wrong with the form?

22          MS. GRIFFIN GOODMAN:  Asked and answered.

23     I asked him the same question.

24          MR. WEIL:  It must have been a good

25     question.

```
                                              Page 126

 1   BY MR. WEIL:

 2        Q    Can you answer the question?

 3        A    Yes, sir.

 4        Q    How long was it?

 5        A    About 10 to 15 minutes.

 6        Q    And when you were at the front desk

 7   revealing and telling the front desk that you were a

 8   guest, you showed them your room key, correct?

 9        A    I believe so, yes.

10        Q    Okay.  And the front desk that I think a

11   gentleman at the front desk leaned over to talk with

12   the security guard and confirmed in your presence

13   that you were a hotel guest; is that right?

14        A    Yes, sir.

15             MS. GRIFFIN GOODMAN:  Object to form.

16   BY MR. WEIL:

17        Q    Is that when the security guard turned

18   slightly away and said this is going to be a big

19   issue?

20             MS. GRIFFIN GOODMAN:  Object to form.

21        A    Yes, sir.

22   BY MR. WEIL:

23        Q    Did they also learn while you were at the

24   front desk that you were scheduled to be a speaker

25   at the Barbara Bush Foundation?
```

Page 127

1          MS. GRIFFIN GOODMAN:  Object to form.

2     BY MR. WEIL:

3          Q    You can answer.  Did you also hear them

4     say that you were going to be a speaker at the

5     Barbara Bush Foundation that day or the next day?

6          A    Yes, sir.

7          Q    While you were being escorted up to the

8     front desk, were you violent or threatening or did

9     you raise your voice?

10         A    No, sir.

11         Q    Did you raise your voice or were you

12    threatening or violent at the front desk?

13         A    No, sir.

14         Q    How about when you were escorted to your

15    hotel room, were you violent or threatening or loud?

16         A    No, sir.

17         Q    How about when you -- by the way, were you

18    escorted in a police vehicle?

19         A    No, sir, in a golf cart.

20         Q    Did the officer explain why he had taken a

21    golf cart to escort you?

22         A    Yes.

23         Q    What did he say?

24         A    He didn't believe that I should be leaving

25    in a police car so people don't get the assumption

Page 128

1    that I was doing something wrong.

2         Q    Right.  So just to go back to the pool

3    incident when you were first approached, did you see

4    anybody at the pool?

5         A    I seen one person.

6              MS. GRIFFIN GOODMAN:  Object to form.

7    BY MR. WEIL:

8         Q    Just one?

9         A    Yes, sir.

10        Q    Do you believe that you were talking in

11   such a manner that individual could hear you?

12        A    No, sir.

13        Q    Okay.  When the police officer -- when the

14   security guard approached you and said there had

15   been a disturbance at the pool, are we quite clear

16   that you were never at the pool?

17             MS. GRIFFIN GOODMAN:  Object to the form.

18        A    Yes, sir.

19   BY MR. WEIL:

20        Q    Did you go there at any point during that

21   morning before the incident occurred?

22        A    No, sir.

23        Q    And did the individual, the security guard

24   who approached you did they identify whether the

25   individual who had reported that there was a

Page 129

```
 1    disturbance at the pool, did they identify whether
 2    it was a man or a woman, a child?
 3         A    No, sir.
 4         Q    Did you ask them, who reported this?  Did
 5    you ask the security guard who at the pool said
 6    there was a disturbance?
 7         A    I don't know.  I might have.
 8         Q    Well, did the security guard volunteer
 9    whether this a man or woman or what the disturbance
10    was?
11         A    No, sir.
12         Q    Were you disturbing anybody when you were
13    filming yourself?
14              MS. GRIFFIN GOODMAN:  Object to form.
15    BY MR. WEIL:
16         Q    You can answer.
17         A    No, sir.
18         Q    I assume that when you're talking into the
19    camera you don't need to shout, the camera is right
20    there, correct?
21              MS. GRIFFIN GOODMAN:  Object to form.
22         A    Yes.
23    BY MR. WEIL:
24         Q    And you weren't filming any other people,
25    were you?
```

Page 130

```
 1        A     No, sir.  That's why I picked that spot so
 2    no one could be...
 3        Q     Right.  Because you didn't want to violate
 4    whatever privacy they might have had, right?
 5             MS. GRIFFIN GOODMAN:  Object to form.
 6        A     Yes, sir.
 7    BY MR. WEIL:
 8        Q     Typically when people go on vacation they
 9    take films of each other on their phones, they take
10    snapshots, they use their phones.  Did you see
11    anybody at the hotel using their phones to take
12    snapshots or videos during your stay?
13             MS. GRIFFIN GOODMAN:  Object to form.
14    BY MR. WEIL:
15        Q     Or the night before?
16        A     Yes, sir, many people.
17        Q     Yeah.  Were any of those -- were any of
18    those people black?
19        A     No, sir.
20        Q     Those were all white people filming each
21    other or their families or friends; is that correct?
22        A     Yes, sir.
23        Q     And to be clear no one approached them and
24    said, stop, this is -- you're violating other
25    people's privacy nearby?
```

```
 1            MS. GRIFFIN GOODMAN:  Object to form.
 2     BY MR. WEIL:
 3          Q     is that correct?
 4          A     Yes, sir.  No one approached them.
 5          Q     So when you were singled out by the
 6     security guard, I think you made it quite clear you
 7     felt targeted I think you used the word, correct?
 8          A     Yes, sir.
 9          Q     Is it fair to say that that summoned up a
10     good deal of fear and even anger about why you were
11     being approached?
12          A     Yes.
13          Q     And it has a certain humiliation to it as
14     well that you're not behaving appropriately or
15     acting out of the ordinary, is that what you were
16     feeling at the time?
17          A     That's exactly what I was feeling, being
18     approached by a police officer or any type of
19     security guard.  No one knows the situation, all
20     they do is see a black guy talking to a police
21     officer or a security guard so you immediately
22     assume that I'm a problem from a distance.
23          Q     And we know the security guards felt
24     equally maybe anxious about the idea that they were
25     going to be filmed or at least singled out for what
```

Page 132

1    you believed was their bad behavior, right?

2              MS. GRIFFIN GOODMAN:   Object to form.

3    BY MR. WEIL:

4         Q    That's why you wanted to photograph them

5    and video them because you caught them being

6    racially discriminatory towards you, correct?

7              MS. GRIFFIN GOODMAN:   Object to form.

8         A    Yes, sir.

9    BY MR. WEIL:

10        Q    So when counsel asked you did you

11   understand their need for privacy, we were well

12   beyond worrying about their privacy, they had

13   essentially in your mind anyway singled you out

14   because of your race, correct?

15        A    Yes, sir.  They asserted themselves into

16   my privacy.

17        Q    And that's why you wanted to film them

18   because this was conduct that we don't allow in the

19   United States, correct?

20              MS. GRIFFIN GOODMAN:   Object to form.

21        A    Yes, sir.

22   BY MR. WEIL:

23        Q    This is the very conduct the statute that

24   we filed your claim on behalf of, this is the very

25   conduct that we're trying to stop, correct?

Page 133

1              MS. GRIFFIN GOODMAN:  Object to form.

2          A    Yes, sir.

3     BY MR. WEIL:

4          Q    Were you aware that The Breakers has had a

5     history of evicting people of color from their

6     hotel?

7              MS. GRIFFIN GOODMAN:  Object to form.

8          A    No, sir.

9     BY MR. WEIL:

10         Q    Counsel asked you whether or not you knew

11    of other circumstances.  We've asked them to produce

12    any documentation and to answer questions about

13    anyone who has also been the victim of racial

14    profiling or discrimination and they've objected.

15    So the only one we know about is the one that is on

16    the internet that you can find, a nice couple who

17    was evicted from the hotel.

18             Do you know of any others besides the one

19    that appears, I believe I might have shared with

20    you?

21             MS. GRIFFIN GOODMAN:  Object to form.

22        Misstates my line of questioning.

23    BY MR. WEIL:

24         Q    Do you know of any other individuals who

25    have been racially profiled at The Breakers Hotel in

Page 134

1    Palm Beach?

2              MS. GRIFFIN GOODMAN:  Object to form.

3         A    No, sir.

4              MR. WEIL:  I don't have anything else.

5                   REDIRECT EXAMINATION

6    BY MS. GRIFFIN GOODMAN:

7         Q    A few additional questions raised by your

8    counsel's cross.

9              Mr. James, do you know The Breakers policy

10   on photos and videos on its premises?

11             MR. WEIL:  You haven't produced it so we

12        don't know it.  Go ahead and answer though if

13        you know.  Why don't you produce it by the way,

14        Counsel, instead of objecting that way we don't

15        have to move to compel it?

16             MS. GRIFFIN GOODMAN:  We have produced

17        documents in this case as we agreed that we

18        would and this is the time or the place to make

19        such an inappropriate statement so I'm going to

20        reiterate the question.  I'm going to ask Madam

21        Court Reporter can you please ask Mr. James the

22        question again.

23             MR. WEIL:  It's not a filibuster.  You can

24        ask the question any which way but you

25        objected.  Go ahead.

```
                                              Page 135

 1                    (Court stenographer read back

 2                    requested portion.)

 3        A    No, ma'am.

 4   BY MS. GRIFFIN GOODMAN:

 5        Q    And when you go into restaurants do they

 6   have a whole list of posted policies of things that

 7   you're prohibited from doing in a restaurant?

 8             MR. WEIL:  McDonald's has a big sign up.

 9             MS. GRIFFIN GOODMAN:  Counsel, can you

10        please stop coaching your witness?

11             MR. WEIL:  Go ahead and ask.  I'm sure

12        that's the first thing we all look at when we

13        go to a restaurant.  And I apologize.  I take

14        that back.  Just ask your questions.  I'm

15        sorry.

16        A    No, ma'am.

17   BY MS. GRIFFIN GOODMAN:

18        Q    And just because a restaurant doesn't say

19   that you can't in writing, that you can't walk in

20   and take your shoes off and put them up on the table

21   doesn't mean that that wouldn't violate a restaurant

22   policy; isn't that right?

23        A    I don't know.

24        Q    Just because it's not in writing doesn't

25   mean it's not the business's policy.  The business
```

Page 136

1   can have non-written policies or standards; isn't

2   that right?

3        A    I think that would be -- I don't know.

4   That would be according to the individual.

5        Q    You testified that you saw other

6   individuals in the hotel that were recording one

7   another.  How did you know they were recording?

8        A    Because they were on their phones doing

9   the exact same thing as me.

10        Q    Did they have a tripod?

11        A    Not that I know of.

12        Q    Did you see anyone else recording with a

13   tripod while you were at The Breakers?

14        A    No, ma'am.

15        Q    And you were told that The Breakers

16   doesn't allow tripods; isn't that right?

17        A    At the incident, not at check-in when I

18   had my tripod.

19        Q    You also told Mr. Weil that you -- that

20   the individuals that you saw recording were not

21   approached by security.  How do you know that they

22   were not approached by security?

23        A    I don't.

24        Q    Okay.

25             MS. GRIFFIN GOODMAN:  I don't have any

Page 137

1          other questions.  Mr. Weil, would you like to
2          explain the read or waive process to your
3          client?
4               MR. WEIL:  I'd like to ask one more
5          question in response to what you asked.
6                    RECROSS EXAMINATION
7     BY MR. WEIL:
8          Q    Did you fold up your tripod when you were
9     asked?
10         A    Yes.
11         Q    So did anyone explain to you that the
12    reason that you were being kicked out of the hotel
13    is because you had a tripod?
14         A    No.
15              MS. GRIFFIN GOODMAN:  Object to form.
16    BY MR. WEIL:
17         Q    That you had a tripod that you had folded
18    up and put away, did anybody explain to you that
19    that was the reason that you got kicked out?
20              MS. GRIFFIN GOODMAN:  Object to form.
21         A    No.
22              MR. WEIL:  It will be interesting if
23          that's their current position now.
24              Mr. James, you have the right --
25              MS. GRIFFIN GOODMAN:  Sorry, you've raised

Page 138

1    additional questions for me now.

2         MR. WEIL:  You don't have to smile about

3    it.  Ask.

4                    REDIRECT EXAMINATION

5    BY MS. GRIFFIN GOODMAN:

6         Q    So, Mr. James, you're saying that you

7    folded up your tripod when you were asked.  But did

8    you take down your tripod after you were told you

9    were not allowed to have a tripod?

10        A    No, ma'am.

11        Q    You continued to use your tripod; is that

12   right?

13        A    Yes, ma'am.

14             MS. GRIFFIN GOODMAN:  Okay.  Now I'm done

15        Mr. Weil.

16                    RECROSS EXAMINATION

17   BY MR. WEIL:

18        Q    How long were you continuing to use your

19   tripod after being asked to take it down?

20        A    When the police came I used it so I can

21   record the police.

22        Q    By my reckoning the first approach was at

23   like 9:25 or 26 in the morning of November 13, the

24   cops arrived around, I believe 9:31.  I'm not sure

25   that's correct, but it's approximately right.

Page 139

```
 1            Is it correct that it was a matter of
 2     minutes between the time you were first approached
 3     by the security guard and told that you couldn't use
 4     the tripod and the cop arriving, is it a couple of
 5     minutes; is that right?
 6            MS. GRIFFIN GOODMAN:  Object to form.
 7       A    Yes, yes, sir.
 8     BY MR. WEIL:
 9       Q    Did you understand the position of the
10     hotel to be that because you didn't -- because you
11     kept your tripod in the fully extended position that
12     that is why they were kicking you out of the hotel?
13            MS. GRIFFIN GOODMAN:  Object to form.
14       A    No.
15            MR. WEIL:  Okay.  I don't have anything
16            else.  You have the right to read and sign this
17            deposition and I'm going to tell you that we're
18            not waiving. I'd like a copy if it's ordered.
19            MS. GRIFFIN GOODMAN:  We will be ordering
20            a copy of this deposition.
21            MR. WEIL:  I'd like a copy as well.
22            Everyone have a good day.  Mr. James, I will
23            give you a call.
24            THE VIDEOGRAPHER:  This concludes the
25            deposition of Oliver James.  The time is
```

Page 140

1      3:07 p.m.

2                    (Concluded at 3:07 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 141

1                   CERTIFICATE OF OATH

2    I, Tracey A. Slye, a Notary Public for the State of Florida at

3    Large, do hereby certify that the foregoing deposition of

4    OLIVER JAMES was duly sworn by me at the time and place set

5    out in the caption hereto.

6         Signed this 28th day of October, 2024

7

8

9    ***Driver's license provided

10

11

12

13

14

15         Tracey Slye, Court Stenographer

16         Notary Commission #HH62830

17         Notary ID #737145

18         Expiration date 11/12/2024

19

20

21

22

23

24

25

Page 142

1                    CERTIFICATE OF REPORTER

2      STATE OF FLORIDA

3      COUNTY OF ST. LUCIE

4

5                I, TRACEY SLYE, certify that I was authorized to

6      and did stenographically report the deposition of OLIVER

7      JAMES; that a review of the transcript was requested; and that

8      the transcript is a true record of my stenographic notes.

9

10               I FURTHER CERTIFY that I am not a relative,

11     employee, attorney, or counsel of any of the parties, nor am I

12     a relative or employee of any of the parties' attorney or

13     counsel connected with the action, nor am I financially

14     interested in the action

15          DATED this 28th day of October, 2024

16

17

18                    TRACEY SLYE

19

20

21

22

23

24

25

Page 143

1    RONALD WEIL, ESQ.

2    rweil@weillawfirm.net

3    RE: Oliver James vs. The Breakers

4    DEPO OF: OLIVER JAMES, October 24, 2024 CS 6974724

5         The above-referenced transcript is available for review.

6    The witness should read the testimony to verify its accuracy.

7    If there are any changes, the witness should note those with

8    the reason on the attached Errata Sheet.

9         The witness should, please, date and sign the Errata

10   Sheet and email to the deposing attorney as well as to

11   Veritext at erratas-cs@veritext.com and copies will be

12   emailed to all ordering parties.

13        It is suggested that the completed errata be returned 30

14   days from receipt of testimony, as considered reasonable under

15   Federal rules*, however, there is no Florida statute in this

16   regard.

17        If the witness fails to do so, the transcript may be

18   used as if signed.

19

20             Yours,

21             Veritext Legal Solutions

22

23

24

25

Page 144

1  James, Oliver v. The Breakers Palm Beach, Inc.

2  10/24/2024, Oliver James (#6974724)

3                E R R A T A   S H E E T

4  PAGE_____ LINE_____ CHANGE_____

5  _____

6  REASON_____

7  PAGE_____ LINE_____ CHANGE_____

8  _____

9  REASON_____

10 PAGE_____ LINE_____ CHANGE_____

11 _____

12 REASON_____

13 PAGE_____ LINE_____ CHANGE_____

14 _____

15 REASON_____

16 PAGE_____ LINE_____ CHANGE_____

17 _____

18 REASON_____

19

20 Under penalties of perjury, I declare that I have
   read the foregoing document and that the facts
21 stated in it are true.

22

23 _____    _____

        (WITNESS NAME)                    DATE

24

25

[0029 - 70]

| 0 |
|---|
| **0029**   51:20 |
| **1** |

**1**  3:7 30:9,12
**1,000**   14:10
  119:23
**1,200**   29:2
**1,500**   17:13
**10**   3:16 16:14
  16:16,19 96:23
  96:24 126:5
**10,000**   118:9,16
**10/24/2024**
  144:2
**100**   3:19 15:1,7
  20:19 33:2
  42:16 68:16
  72:10 86:9
  96:18 98:6
  99:14
**105**   4:3
**10:10**   1:12
**10:14**   6:21
**11**   3:17 98:19
  98:21
**11/12/2024**
  141:18
**11:25**   53:14
**11:37**   53:17
**12**   3:19 100:18
  100:19
**124**   2:22
**12:06**   67:7
**12:07**   67:25
  68:6

**12:45**   68:1,3
**12:50**   68:9
**13**   3:8 35:25
  36:4 37:9 46:5
  53:21 54:15,24
  55:7,14,20
  56:14,18
  138:23
**134**   2:23
**137**   2:24
**138**   2:25 3:1
**13th**   27:3 49:9
**14th**   27:18
**15**   3:9 36:25,25
  37:3,10 51:20
  93:5 126:5
**16**   3:10 38:5,7
**18**   111:7
**1:32**   91:8
**1:34**   91:11

| 2 |
|---|

**2**   3:8 36:1,3
  37:6,6,9,10
**2,000**   119:15
**20**   93:5
**20,000**   118:11
**20-22**   4:3
**201**   2:4
**2022**   114:16
  119:20,20
**2023**   14:16
  27:17 54:15
  55:7,14 118:7
  118:22 119:13
  120:1,2,4,16

**2024**   1:11 6:21
  112:18 118:13
  119:23 141:6
  142:15 143:4
**20th**   27:1
**24**   1:11 6:21
  27:17 143:4
**24-2523**   7:10
**2471**   141:14
  142:17
**250**   17:13
**26**   138:23
**273,000**   15:9
**28th**   141:6
  142:15
**29**   3:11 47:18
  47:21
**2:21**   117:8
**2:39**   117:11
**2nd**   28:24

| 3 |
|---|

**3**   3:9 16:16
  37:1,2,11 65:9
**30**   3:7 16:19
  67:21 94:4
  143:13
**300**   29:5
**300,000**   14:18
**301**   93:18
**33131**   2:4
**33401-6121**   2:8
**36**   3:8
**37**   3:9
**38**   3:10

**3:07**   140:1,2

| 4 |
|---|

**4**   3:10 38:5,6
  39:4,6 101:3
**40**   65:9 67:21
**400,000**   14:14
**401**   3:13 69:15
  69:17
**42**   61:25
**47**   3:11

| 5 |
|---|

**5**   3:11 16:14,14
  16:16,18 47:19
  47:20 51:21
**5,000**   119:17
**500e**   2:8
**538-4770**   93:18
  94:4
**561**   97:3
**59**   3:12

| 6 |
|---|

**6**   3:12 16:16
  58:22,23 61:25
  65:8
**60**   17:4
**629-4715**   97:3
**69**   3:13
**6974724**   143:4
  144:2

| 7 |
|---|

**7**   2:21 3:13
  69:15,16
**70**   17:4

**[703 - answer]**

**703**  96:3
**737145**  141:17
**777**  2:8

**8**

**8**  3:14 93:8,8,9
 94:1,3
**869-6620**  96:3

**9**

**9**  3:15 95:6
 96:3,4
**93**  3:14
**96**  3:15
**97**  3:16
**99**  3:17
**9:25**  138:23
**9:31**  138:24
**9:34**  104:13
**9:35**  105:6

**a**

**a.m.**  1:12 6:21
 53:14,17 95:6
 104:13 105:6
 140:2
**ability**  11:1,5
 23:25
**able**  9:20 22:6
 22:7,14 27:4
 53:12 59:15
 82:22
**above**  143:5
**absolutely**  68:2
**acceptable**
 79:21

**accomplish**
 23:24
**account**  13:25
 14:1,2,2 16:10
 16:22 17:20
 18:1,3,8,11
 90:4
**accounts**  81:10
**accuracy**  143:6
**acknowledge**
 5:2,5 23:6
**acknowledged**
 79:3
**acknowledg...**
 15:17
**acting**  131:15
**action**  7:25
 19:3,9 142:13
 142:14
**actions**  19:3,24
**activity**  99:12
**actual**  113:24
**actually**  16:25
 37:5 60:16
 73:22 103:24
 107:14
**ad**  18:2
**added**  23:17
**additional**
 28:25 98:10
 134:7 138:1
**administered**
 5:6
**administrative**
 1:1 7:9 106:25

107:9,15,19
**admiring**  48:11
 49:13
**adult**  75:1,2,3
**advance**  29:5
**advising**  27:3
**affect**  110:25
 111:1
**affected**  113:14
**affecting**
 113:24
**affirmations**
 44:20 48:15
 49:13 50:5
 51:14
**african**  74:1
**age**  14:7,10
**agencies**  89:11
 89:25
**ago**  25:24 58:7
 112:25 114:21
 114:21,24
**agree**  5:15,18
 7:3 23:18 54:6
 82:16 124:16
**agreed**  125:9
 125:13 134:17
**agreement**  5:11
 5:12 6:18
**ahead**  25:1,5
 39:17 53:2,5
 63:25 79:20,22
 81:2,3,16,17,20
 107:8,24
 124:20 134:12

134:25 135:11
**airport**  29:10
**algorithm**
 86:24 87:3
**alj**  83:22
**alleged**  101:9
 101:12,17
**allow**  9:20
 57:19 82:7
 99:16 132:18
 136:16
**allowed**  138:9
**amateur**  84:2
**america**  28:11
**american**  74:1
**amount**  15:19
 22:5 32:14
 107:12
**anger**  131:10
**ann**  26:16,21
 29:19 41:18
 88:17 89:23
 97:18 98:6
**answer**  8:24
 9:17 10:9,13
 10:14 11:1
 19:5 33:23
 39:18 45:9
 49:22,25 50:10
 51:16 55:16
 57:9 61:3,13
 61:22 62:7,14
 62:19,23 63:1
 63:20,24,25
 64:10 66:21

77:5,17 78:15
78:17 79:24
81:3 84:5,6
91:3 104:20
105:1,3 106:24
107:16,19,22
108:3 124:25
126:2 127:3
129:16 133:12
134:12

**answered**
60:21 63:23
125:22

**answering** 19:6
33:3 94:24

**answers** 10:3

**anxiety** 108:14
111:3,6,12,17
112:8,13 113:3
113:12 115:4
116:18 117:16

**anxious** 131:24

**anybody** 14:7,9
128:4 129:12
130:11 137:18

**anyway** 102:13
132:13

**apartment**
92:24

**apologize** 31:9
37:7 135:13

**app** 56:1 120:7
120:12

**appear** 24:2

**appearance**
29:2

**appearances**
2:1

**appears** 133:19

**apple** 41:17,24
42:2

**apply** 78:4,6,25

**appreciate**
18:18 20:7
102:13

**approach**
138:22

**approached**
19:18 20:1
27:6 47:14
54:24 55:13,22
56:7,14 57:24
59:18 63:14
68:13 91:22
99:6 110:12
121:22 122:13
128:3,14,24
130:23 131:4
131:11,18
136:21,22
139:2

**appropriate**
25:4 102:17,19
125:13,14

**appropriately**
131:14

**approximately**
138:25

**area** 43:1,6,11
51:4,13,15
56:20,22 79:4
79:7,10 99:5

**arm** 54:5

**arrangement**
5:9

**arrested** 66:19
66:22,24
101:16,19

**arrived** 30:18
65:25 66:3
138:24

**arriving** 139:4

**article** 14:19,24
15:8

**ashley** 2:12
7:11

**asked** 26:8
33:11 45:12
46:25 47:10
56:15,24 57:1
57:12 58:6,11
58:17 59:19
60:9,10,20
61:18 63:7,23
64:17 68:15
69:4 71:1,1,9
71:15 75:20
77:24 78:10,25
82:12 99:10
102:6 122:10
123:21 125:22
125:23 132:10
133:10,11

137:5,9 138:7
138:19

**asking** 9:10
10:24 11:3
24:4,7,11
25:12 27:2
53:5 57:14
60:10 61:19
78:5 79:16,20
83:18 107:7

**asks** 64:4

**asserted** 132:15

**assume** 8:24
129:18 131:22

**assumed** 76:22

**assumption**
127:25

**assure** 42:14

**at&t** 41:21,23
41:25 42:1

**attached** 24:8
29:14 143:8

**attachments**
29:15

**attack** 78:1,3

**attempting**
102:13 107:21

**attend** 12:8

**attention** 83:22

**attorney** 7:24
102:2 142:11
142:12 143:10

**attorneys** 5:1
8:13 107:1

**audio** 7:2 64:9
70:20
**authorize**
86:16
**authorized**
142:5
**automatically**
17:1
**available** 27:2
143:5
**average** 16:12
**avoid** 107:21
**award** 20:25
21:1,2,9,13,17
21:20,21
**awards** 21:15
**aware** 120:16
122:3 133:4
**ayala** 23:1 30:1

**b**

**b** 3:3
**back** 29:22
36:12 40:24
43:1 53:16
58:13 68:3,8
68:11 77:8
78:20 80:1
81:24 82:2
90:21 91:10,16
93:2 107:21
116:25 117:10
125:4 128:2
135:1,14
**background**
12:2 49:16

50:12,13,16,19
84:25
**backwards**
37:22
**bad** 38:18
132:1
**badges** 17:23
**badly** 111:1,1
**bar** 33:10
**barbara** 20:12
20:15,18,23
21:1,9,12,21
27:7,15,25
28:19 30:23
85:15,19 88:2
88:4 94:13
95:14,20
126:25 127:5
**barely** 74:1
109:20 113:23
**based** 16:7
19:10 101:14
104:6 107:2
**basis** 103:8,19
105:17
**bates** 35:25
36:25,25 38:4
47:18 69:14
**beach** 1:6 2:8
5:18 7:7,25
21:3,23 27:3
28:5 29:6 30:2
30:18,19 68:13
97:23 101:18
101:23 104:14

108:20 134:1
144:1
**beat** 74:22 75:2
**beating** 81:15
**beautiful** 82:15
82:16
**beauty** 48:11
**bed** 113:23
**began** 10:19
**beginning**
36:13 70:9
112:17
**behalf** 5:14,17
100:18 103:17
132:24
**behaving**
131:14
**behavior** 132:1
**believe** 39:10
75:13 76:2
79:9 100:11
121:21 122:14
124:4 126:9
127:24 128:10
133:19 138:24
**believed** 39:3
76:23 92:17
122:16,19
132:1
**belongs** 93:18
94:9 96:15
**benefit** 26:17
100:14,15
**best** 9:8,20 16:2
22:12

**beyond** 132:12
**big** 93:13 122:2
126:18 135:8
**biscayne** 2:4
**bit** 8:18 12:2
37:22 48:5,17
67:8,20 95:9
**black** 62:12
130:18 131:20
**blast** 76:8,9
**blvd** 2:4
**booked** 28:19
32:15
**bottom** 25:7,11
51:24 52:19
54:10 99:2
**boy** 79:12
**branded** 17:10
**break** 9:11,13
9:18,19 52:8
53:3,15,19
67:5,9,14,16,18
68:7 91:9
116:25 117:9
**breaker** 38:5
**breakers** 1:6
3:8,9,10,11,12
3:13 5:17 7:7
7:25 15:6
18:22 19:2,4,9
19:13 20:3,11
27:20,22,24
28:7,10,14
31:5,19,24
32:2,22 35:25

[breakers - changed]                                                    Page 5

| | | | |
|---|---|---|---|
| 36:4,25,25 | 117:22 120:2,5 | **call** 21:15 36:1 | **cart** 127:19,21 |
| 37:3,9,10 38:7 | 120:9,12,17 | 37:1 62:21 | **case** 7:9 98:14 |
| 39:4,6 42:17 | 121:18,22 | 67:6 80:19 | 106:22 108:6 |
| 43:5,8 45:21 | 122:2 133:4,25 | 85:7 88:8 | 120:19 134:17 |
| 45:25 46:5 | 134:9 136:13 | 89:15 94:15 | **cash** 16:20,21 |
| 47:6,18,21,25 | 136:15 143:3 | 103:5 104:16 | 29:5 120:7,12 |
| 51:20 54:15,23 | 144:1 | 104:18,24 | **catch** 44:10 |
| 56:14,17 57:6 | **breathe** 44:2 | 106:6 123:23 | 45:8 |
| 57:18,24 58:4 | **bring** 62:11 | 124:23 139:23 | **categories** |
| 58:14,21,24 | 83:22 | **called** 27:19 | 107:4 |
| 64:3,21 68:20 | **bringing** | 31:4,8,10 | **caught** 70:20 |
| 69:15,17 71:4 | 103:20 107:21 | 62:20,24 77:8 | 84:10,24 |
| 71:15 75:11,14 | **broke** 59:10,11 | 80:5,18 92:11 | 104:11 132:5 |
| 76:15 81:7,14 | **brought** 86:11 | 92:14 121:25 | **cause** 99:21 |
| 82:7,10,16 | **bucks** 119:5 | **camera** 6:24 | 100:11 |
| 83:6 85:8,11 | **builds** 87:3 | 35:4,21,23 | **cease** 82:12 |
| 85:13,16,18,22 | **bush** 20:12,15 | 42:22,25 43:20 | **cell** 40:11,17 |
| 86:11,13,16 | 20:18,23 21:1 | 50:19,21 51:24 | 41:20 49:3,5 |
| 88:2,10,22 | 21:9,12,21 | 65:13 66:6 | 54:6 98:11 |
| 89:6 90:1,6,13 | 27:7,15,25 | 75:24 76:1 | **cellphones** |
| 91:22 95:21 | 28:19 30:23 | 84:14,21 100:1 | 40:20 |
| 97:13,18,22,24 | 85:15,19 88:2 | 129:19,19 | **certain** 15:19 |
| 98:8,11 99:5 | 88:4 94:13 | **cancelling** | 131:13 |
| 99:15 101:6,17 | 95:14,20 | 46:14 | **certainly** 107:3 |
| 103:4,4,20 | 126:25 127:5 | **caption** 141:5 | **certificate** |
| 104:4,8 105:11 | **business** | **capture** 70:15 | 141:1 142:1 |
| 105:14 106:9 | 135:25 | **captured** | **certified** 4:1 |
| 106:11 109:2,4 | **business's** | 123:14 | **certify** 108:1 |
| 109:5,7,12,15 | 135:25 | **car** 31:12,13,14 | 141:3 142:5,10 |
| 109:22 110:3,8 | **button** 56:2 | 31:16,20,23 | **change** 25:13 |
| 110:10,16,18 | | 127:25 | 122:4,14 123:5 |
| 111:4,9,23 | **c** | **card** 32:16 33:8 | 144:4,7,10,13 |
| 112:1 113:9,12 | **c** 115:15 | 33:12 | 144:16 |
| 114:4,17 115:1 | **california** | **carolina** 11:12 | **changed** |
| 115:23 116:9 | 115:12 | 11:13 | 108:23 111:8 |

**[changed - continued]**

113:22

**changes** 24:22
25:20 143:7

**charge** 33:9
98:18

**check** 32:10,12
33:6 95:23
136:17

**checkbox** 101:4

**checked** 34:2

**checking** 34:12

**child** 129:2

**chocolate** 34:9

**choose** 43:3

**circumstances**
106:12 133:11

**claim** 18:22
19:1 24:12
103:20 132:24

**claimant** 5:14

**claims** 8:2,3

**clarify** 9:9
38:19,25 47:12
94:20

**classified**
104:23

**clear** 38:22
47:2 94:22
113:18 128:15
130:23 131:6

**clerk** 32:20

**client** 108:2
137:3

**clip** 70:9

**clips** 35:18

**clock** 79:19

**close** 13:15
14:13,17

**closely** 28:22

**closets** 74:22

**clothes** 104:9

**coaching**
135:10

**cold** 111:18

**color** 133:5

**colors** 76:10,12

**come** 16:5
20:17 68:3
81:12 82:22
83:6,7 86:8
125:4

**comes** 92:23

**comfort** 9:14

**coming** 65:22
119:3

**commentary**
25:4 81:23

**comments** 89:7
89:8

**commission**
3:18 98:14,23
100:10 141:16

**communicate**
90:20,22

**communicated**
101:18

**communicati...**
89:25 90:12
98:8

**companies**
17:17

**compared**
119:6

**compel** 134:15

**complain** 85:8

**complaint** 3:17
61:8 98:13,22

**completed**
106:13 143:13

**completely**
68:23 69:1
89:14

**completion**
79:15

**complied** 68:24

**complying** 69:2
69:3

**composite** 30:9

**concerned**
23:20

**concluded**
140:2

**concludes**
139:24

**conduct** 125:14
132:18,23,25

**conducted** 6:22

**confidential**
30:10

**confine** 102:14

**confirmed**
27:14 126:12

**confirming**
12:1

**confusing**
10:15

**connected**
20:11 142:13

**connection**
6:24 27:7
116:8

**connell** 2:12
7:11

**consent** 5:9

**consider** 28:13

**considered**
143:14

**contact** 15:22
17:7 20:17,20
21:3 89:23
105:6,8 106:2

**contacted** 21:6
21:22,24 89:21
89:22 105:21
124:15 125:5

**contacts** 41:3

**contained**
102:4

**contend** 106:21

**content** 17:10
39:24 41:10
42:19 49:3

**context** 23:17
86:24

**continue** 7:2
85:5

**continued**
138:11

**[continuing - defendant's]**

**continuing**
138:18
**continuous**
35:16
**convenient**
52:8
**conversation**
45:19 64:20
69:8 72:3
91:14 93:4
122:5
**convicted**
12:16,20 13:3
**cop** 139:4
**cop's** 123:19
**copies** 143:11
**cops** 138:24
**copy** 139:18,20
139:21
**correct** 12:24
51:4 71:18
82:8 95:4
101:21 103:15
126:8 129:20
130:21 131:3,7
132:6,14,19,25
138:25 139:1
**correctly** 16:17
124:14
**cost** 83:4
**counsel** 2:1,5,9
3:21 5:9 7:6
26:4 96:2,22
98:4 100:17
108:2 124:20

132:10 133:10
134:14 135:9
142:11,13
**counsel's**
100:15 123:18
134:8
**count** 56:5
**county** 21:3,23
142:3
**couple** 10:1
20:21 40:18
56:5 70:3
109:1 112:24
119:5,6,10
124:13 133:16
139:4
**court** 1:22 7:12
8:13 9:23
78:20 80:1
81:19,24 82:2
84:4,6 107:25
134:21 135:1
141:15
**cover** 27:4
32:14
**covered** 60:11
**created** 102:2
**creating** 25:14
**creator** 39:24
**credit** 33:8,12
**crime** 12:17
**crimes** 13:1,4
**cross** 2:22
124:11 134:8

**cs** 143:4,11
**cs6974724** 1:25
**current** 137:23
**currently** 11:10
**cut** 64:9
**cycle** 16:24

**d**

**damaged** 108:5
108:8
**damages**
106:20,22
107:11
**dance** 44:1
**dancing** 43:16
44:4 48:17
55:2
**dark** 31:21
**date** 14:25 15:2
83:18 94:22
141:18 143:9
144:23
**dated** 27:1,17
142:15
**day** 20:14 21:3
27:8 30:21
34:20,22,23
39:13 40:3
42:21 109:18
110:24 111:21
113:25,25
114:2,5 127:5
127:5 139:22
141:6 142:15
**days** 143:14

**deal** 131:10
**dealing** 12:21
**dealt** 90:13
107:5
**december** 15:3
**decide** 41:10
43:12 55:19
56:6 92:23
**decided** 21:13
21:16 50:24
100:10 122:3
122:14
**decides** 92:18
**decision** 105:13
106:10 123:5
**deck** 56:23,25
57:2,17 58:6
60:10 61:9
79:1
**declaration**
5:23
**declare** 5:7,25
6:1,5,8 144:20
**declared** 6:16
**decline** 120:6
**decrease** 118:3
118:24 119:1
**deem** 102:17,18
102:20,21
**deep** 12:3 79:13
**defendant** 1:7
2:9
**defendant's** 3:4
30:12 36:3
37:2 38:6

**[defendant's - doing]**

47:20 58:23
69:16 93:9
96:4,24 98:21
100:19
**define** 44:17
**delay** 52:2 56:3
79:15
**delete** 23:2,6,18
23:23 24:1,20
39:15,25 41:9
55:5 97:16
**deleted** 24:9
39:7,8,11,17
121:1,3,13,15
**demand** 107:2
**denied** 101:13
**department**
101:19 104:15
**depends** 6:23
73:20
**depo** 6:22
143:4
**deposed** 8:8,11
**deposing**
143:10
**deposition** 1:10
7:5,16 8:14,20
24:8,11 25:15
36:1 47:19
64:13 83:21,24
90:1 139:17,20
139:25 141:3
142:6
**depression**
108:14 111:25

112:3,6,10,11
112:13 113:3
115:4 116:18
117:16
**describe**
112:11
**described**
121:25
**describes**
105:11
**describing**
29:21 33:5
**description** 3:5
30:1 101:9,11
**desk** 32:14,19
32:20 71:14,19
71:22 72:19,24
73:6,8,12 85:3
121:24 122:8
126:6,7,10,11
126:24 127:8
127:12
**details** 20:8
28:25 29:14
**determine**
124:16
**device** 11:21
**diagnosed**
112:3,8,9,14,16
112:20 115:6
116:4 117:14
**differ** 110:15
**different** 50:16
73:24,25 74:2
74:11,17

109:11 117:21
**difficult** 25:8
**difficulties** 8:23
**direct** 2:21 7:19
77:25 89:4,9
90:4,9 120:8
**directions**
66:17
**directly** 30:4
**disclosed** 12:20
71:16
**discovery**
23:22 83:23
**discriminated**
18:23
**discrimination**
3:17 19:14
98:13,18,22
100:11 101:11
133:14
**discriminatory**
19:25 74:7
101:4 132:6
**discuss** 93:1
**discussed**
121:21 124:3
**discussing**
91:14
**discussion** 20:7
23:12 60:4
**disgusting**
80:12,18,19
**distance** 131:22
**disturb** 84:23

**disturbance**
57:16 61:9
99:22 100:1,4
101:18,24
128:15 129:1,6
129:9
**disturbing**
129:12
**dive** 12:3
**divergent** 74:2
**division** 1:1 7:8
**doctor** 115:9
116:4 117:14
**doctor's** 115:13
**doctors** 115:3
**document**
22:14,25 23:5
102:2 144:20
**documentation**
133:12
**documents**
11:18,23 22:7
23:19 24:4,13
24:18,20,23
25:13,20 26:5
26:8,9,12,22,25
29:20 116:13
134:17
**doing** 6:3 48:9
48:23 49:11
54:3,19,22
62:12 67:12
87:3 110:13
128:1 135:7
136:8

**dollars** 119:10
**donated** 85:18
**door** 32:13
**dr** 2:8
**driver** 31:14,23
  32:1,5,9
**driver's** 141:9
**driving** 32:6
**dropped** 32:9
**drove** 31:16
**due** 40:23
  73:16 74:4
**duly** 141:4

**e**

**e** 2:18 3:3 5:21
  5:21 27:1
  144:3,3,3
**earlier** 7:23
  9:12 29:25
  79:3 82:14
  118:1
**earned** 119:14
**economic**
  107:11
**edge** 51:3 53:25
**edges** 81:16
**education**
  13:14 74:21
**educational**
  12:4
**either** 9:8 10:6
  15:15 31:4
**elementary**
  12:10,11 74:20

**email** 21:18
  23:9 26:2
  27:17 28:24
  29:1,12,20
  30:1,3 89:23
  143:10
**emailed** 28:25
  143:12
**emails** 3:7
  23:14,16,16
  26:3 28:3
  29:16,17,21
  30:9,12 89:24
  95:19 120:18
**emergency**
  91:3
**emotional** 70:6
**emotionally**
  108:7,8
**emphasize** 9:3
**employed**
  101:5
**employee**
  142:11,12
**employees**
  75:20 76:14
**employment**
  101:5
**encourage** 85:7
  86:21
**engagement**
  21:22 22:1
  27:5 114:19,23
**engagements**
  15:23 114:7,10

  115:1 118:2,4
  118:7,14
**english** 24:6
**enjoying** 82:15
**enjoyment**
  101:14
**enter** 32:2
**entitled** 3:12
  58:24 83:24
  102:9 106:22
**entrance** 31:24
**equal** 101:14
**equally** 131:24
**errata** 143:8,9
  143:13
**erratas** 143:11
**error** 101:2
**escort** 127:21
**escorted** 71:20
  85:4 86:20
  127:7,14,18
**escorting** 72:7
**esq** 2:3,7 143:1
**essentially**
  132:13
**event** 20:14
  21:4 22:4 27:3
  27:8,18 30:2
  84:2 95:6,11
  97:7
**events** 18:25
**eventually** 67:1
**everybody**
  29:23

**evicted** 81:11
  125:12 133:17
**evicting** 124:17
  133:5
**evidence**
  105:13 106:9
  120:19,22
**evident** 101:15
**exact** 22:5 46:9
  102:7 136:9
**exactly** 14:13
  14:17,25 56:19
  114:20 131:17
**examination**
  2:21,22,23,24
  2:25 3:1 7:19
  124:11 134:5
  137:6 138:4,16
**example** 74:19
**examples** 44:13
  74:25
**exception**
  33:19
**exchange** 22:25
  23:13 30:1
  95:2
**excited** 27:11
  27:11 45:13
  69:8 82:18
**excuse** 22:21
**exercise** 44:1
**exhibit** 3:5,7,8
  3:9,10,11,12,13
  3:14,15,16,17
  3:19 24:2 30:7

30:9,12 36:1,3
37:1,2,6,9,10
37:11 38:5,6
39:4,6 47:19
47:20 51:21
58:22,23 61:25
65:8 69:15,16
93:8,9 94:1,2
96:3,4,23,24
98:19,21
100:19
**exhibits** 3:21
25:15
**expenses** 116:8
116:14,17,20
**experience**
107:3
**experienced**
74:15
**expiration**
141:18
**explain** 16:2
32:6 54:19
55:23 61:11,17
61:20 62:4
69:11,25 71:5
71:8 111:2,12
127:20 137:2
137:11,18
**explained**
63:21
**explore** 34:17
**extended** 48:21
139:11

**extent** 93:22

**f**

**facility** 101:14
**facing** 36:18,18
38:13
**fact** 101:15
122:25 124:23
**facts** 8:3
101:10,12
102:10 104:3,6
105:18 106:14
121:20 124:2
144:20
**factual** 105:17
**failed** 107:16
**fails** 143:17
**fair** 9:1 131:9
**families** 130:21
**family** 56:10
**far** 97:22
**fast** 28:23
89:21
**fear** 111:19
131:10
**federal** 143:15
**feed** 123:15,19
**feel** 19:7,18
63:21 78:2,24
111:16
**feeling** 131:16
131:17
**feelings** 111:20
**felon** 12:22
**felt** 74:16 131:7
131:23

**female** 71:8
76:15
**fewer** 118:2
**figure** 76:21
95:7
**figured** 32:17
**file** 32:16
**filed** 7:8 8:1
18:22 98:13
100:16,17
106:17 132:24
**files** 101:3
121:4
**filibuster**
134:23
**fill** 98:17
**film** 35:1 42:24
43:12 46:16
49:2 55:9
86:14,17
132:17
**filmed** 55:6
131:25
**filming** 42:18
46:20 47:3,10
47:13 50:6
63:8,10 65:1
82:12 99:6,10
129:13,24
130:20
**films** 130:9
**financial** 118:3
**financially**
142:13

**find** 9:20 17:14
29:14 35:1
42:21 53:3
72:19,24 76:4
76:10,11,13
80:8,16 81:1
89:25 121:15
133:16
**fine** 6:7
**finger** 51:24
52:18
**finish** 10:12
81:3,16 117:2
**finished** 25:23
**firearm** 12:22
12:22
**firearms** 12:21
**firm** 2:3 23:1
**first** 10:2,19
15:24 20:11,14
20:17,19 23:4
26:2,24 29:13
30:18 34:13,17
35:9 48:19
57:24 59:18
64:13 71:12
78:9 91:24
92:3,7 104:11
128:3 135:12
138:22 139:2
**fisher** 94:12
**five** 23:14 99:9
114:23 117:15
**fl** 2:4,8

**[flagler - go]** Page 11

| | | | |
|---|---|---|---|
| **flagler** 2:8 | 72:2 77:4,16 | **francis** 94:12 | 51:14 79:12 |
| **flight** 30:25 | 78:13 98:17 | **free** 107:10 | 89:15 107:22 |
| **florida** 1:1 3:18 | 102:18 103:10 | **frequent** | 114:6,12,13,14 |
| 7:8 98:14,23 | 103:23 104:19 | 111:14 | **gift** 15:25 16:21 |
| 100:10 101:12 | 106:23 112:12 | **frequently** | **gifts** 15:15,16 |
| 141:2 142:2 | 124:18,20,24 | 113:19 | 15:25 16:5 |
| 143:15 | 125:9,12,15,20 | **friendly** 32:20 | 86:8 |
| **fold** 137:8 | 125:21 126:15 | **friends** 130:21 | **give** 10:2,9 |
| **folded** 137:17 | 126:20 127:1 | **front** 11:19 | 21:13 33:12 |
| 138:7 | 128:6,17 | 22:20 25:20 | 44:13 61:20 |
| **follow** 10:1 | 129:14,21 | 32:13,14,19,20 | 67:20 73:12 |
| 76:1 84:17 | 130:5,13 131:1 | 53:25 71:14,19 | 74:19 78:13 |
| **followed** 84:21 | 132:2,7,20 | 71:21 72:19,24 | 85:22 91:3 |
| **follower** 16:21 | 133:1,7,21 | 73:5,8,12,15 | 107:5 124:7 |
| **followers** 14:10 | 134:2 137:15 | 85:2 121:24 | 139:23 |
| 14:11,15 15:10 | 137:20 139:6 | 122:8 126:6,7 | **gives** 10:13 |
| 16:5 17:16 | 139:13 | 126:10,11,24 | 16:21 |
| 58:17 76:3 | **formal** 8:14 | 127:8,12 | **go** 7:3,14 8:17 |
| 80:8,11 90:5,8 | **format** 25:16 | **frozen** 54:21 | 12:5 18:24 |
| 118:19,21 | **forward** 23:10 | 111:18 | 20:9 21:19 |
| **following** 5:23 | **forwards** 23:12 | **full** 8:5 93:22 | 25:1,4 33:6 |
| **follows** 7:18 | **found** 122:1,17 | **fully** 19:5 | 34:2 35:9 |
| **food** 29:6 | **foundation** | 139:11 | 36:12 37:21 |
| **footage** 79:2,5 | 20:12,15,18,23 | **further** 5:5 | 39:17 41:22 |
| 79:8,14 84:10 | 21:1,9,13,22 | 87:7,7 142:10 | 53:2,5 55:10 |
| **foregoing** | 27:7,15,25 | | 55:19,24,25 |
| 141:3 144:20 | 28:19 30:24 | **g** | 56:1,2,3,6 |
| **forget** 53:10 | 85:16,19 88:3 | **gate** 31:17,20 | 63:25 71:19,21 |
| **form** 33:21,22 | 88:5 94:14 | 31:22 | 73:2 79:20,21 |
| 45:1,6,15 46:7 | 95:11,14,21 | **general** 45:11 | 81:2,3,16,17,20 |
| 49:21,23 50:9 | 126:25 127:5 | **generally** 45:3 | 83:9,10 87:19 |
| 51:16 55:15 | **four** 114:11,14 | **gentleman** | 91:5 102:21 |
| 60:18 61:13,21 | 114:23,23 | 126:11 | 105:5 107:8,23 |
| 62:7 63:23 | **frame** 20:6 | **getting** 21:18 | 109:20 116:25 |
| 64:6 66:18,20 | | 25:9 43:13 | 117:5 124:20 |
| | | 46:17,21 47:4 | |

| | | | |
|---|---|---|---|
| 128:2,20 130:8 | 25:22 35:1 | 103:1,11 104:1 | 23:8 24:3,10 |
| 134:12,25 | 50:12 68:4 | 104:22 105:2 | 24:16 25:3,11 |
| 135:5,11,13 | 73:22 125:24 | 107:14,25 | 26:1 30:8,16 |
| **god** 92:20 | 131:10 139:22 | 108:4 116:12 | 34:1 36:6 37:7 |
| **goes** 16:22 | **goodman** 2:7 | 116:23 117:4 | 37:13 38:9,25 |
| **going** 6:5 8:24 | 2:21,23,25 | 117:12 123:20 | 39:1,21 45:4,7 |
| 9:24 10:11,24 | 5:16,17 7:15 | 123:23 124:1,7 | 45:17 46:8 |
| 14:4,4 20:7 | 7:20,24 22:23 | 124:18,24 | 47:23 50:3,14 |
| 22:6 24:16,22 | 23:8 24:3,10 | 125:1,15,20,22 | 51:18 52:10,14 |
| 25:1,4,10,13,15 | 24:16 25:3,11 | 126:15,20 | 53:2,18 55:18 |
| 25:19 27:16 | 26:1 30:8,16 | 127:1 128:6,17 | 59:2,14 60:2,5 |
| 30:15 35:24 | 34:1 36:6 37:7 | 129:14,21 | 60:14,22 61:1 |
| 36:12,24 37:8 | 37:13 38:9,25 | 130:5,13 131:1 | 61:16,24 62:3 |
| 44:8 47:1,17 | 39:1,21 45:4,7 | 132:2,7,20 | 62:8 64:2,8 |
| 48:4 51:19 | 45:17 46:8 | 133:1,7,21 | 65:11 66:23 |
| 52:7,15 53:8 | 47:23 50:3,14 | 134:2,6,16 | 67:7,19 68:2 |
| 53:13,20 54:8 | 51:18 52:10,14 | 135:4,9,17 | 68:10 69:19,24 |
| 54:18 55:23 | 53:2,18 55:18 | 136:25 137:15 | 72:6 77:7,19 |
| 59:8 60:14,16 | 59:2,14 60:2,5 | 137:20,25 | 78:16,23 79:23 |
| 60:19 62:14,17 | 60:14,22 61:1 | 138:5,14 139:6 | 80:4 81:18,21 |
| 62:18,20 67:15 | 61:16,24 62:3 | 139:13,19 | 82:5 83:20 |
| 69:12,20 70:1 | 62:8 64:2,8 | **gotten** 89:16 | 84:3,8 91:5,12 |
| 79:18 81:14 | 65:11 66:23 | **graduated** | 92:22 93:12,23 |
| 83:18,21 84:2 | 67:7,19 68:2 | 12:12,14 | 94:2,7,8,23 |
| 88:13 91:7 | 68:10 69:19,24 | **grass** 52:6,22 | 96:7 97:2 99:1 |
| 93:7 100:14 | 72:6 77:7,19 | 99:5 | 100:22 102:6 |
| 106:24 107:5 | 78:16,23 79:23 | **grassy** 51:4,13 | 102:16,22 |
| 112:12 116:14 | 80:4 81:18,21 | **great** 10:19 | 103:1,11 104:1 |
| 117:7 122:2 | 82:5 83:20 | 67:24 83:16 | 104:22 105:2 |
| 126:18 127:4 | 84:3,8 91:5,12 | **green** 51:3 | 107:14,25 |
| 131:25 134:19 | 92:22 93:12,23 | 79:10 | 108:4 116:12 |
| 134:20 139:17 | 94:2,7,8,23 | **griffin** 2:7,21 | 116:23 117:4 |
| **golf** 127:19,21 | 96:7 97:2 99:1 | 2:23,25 5:16 | 117:12 123:20 |
| **good** 5:13,16 | 100:22 102:6 | 5:17 7:15,20 | 123:23 124:1,7 |
| 7:14,21,22 | 102:16,22 | 7:24 22:23 | 124:18,24 |

**[griffin - hundreds]**

125:1,15,20,22
126:15,20
127:1 128:6,17
129:14,21
130:5,13 131:1
132:2,7,20
133:1,7,21
134:2,6,16
135:4,9,17
136:25 137:15
137:20,25
138:5,14 139:6
139:13,19
**ground** 8:17
**group** 30:9
**growing** 12:9
**guard** 31:17,20
57:6,23 58:4
59:18 61:11,17
61:19 62:9
91:21 99:7
126:12,17
128:14,23
129:5,8 131:6
131:19,21
139:3
**guards** 131:23
**guessing** 76:7
**guest** 59:19
64:4 65:15,19
68:15,17 71:13
71:17 72:4
78:6,11 80:22
81:6 122:25
125:11 126:8

126:13
**guests** 81:8
84:9 103:4
104:5
**gunster** 2:7
**guy** 131:20
**guys** 7:14

**h**

**h** 3:3 144:3
**half** 25:24
116:24
**hallway** 37:16
**hand** 53:25
107:10
**hands** 125:8
**happen** 62:17
66:16
**happened** 15:4
30:17 56:13,15
59:25 64:23
65:25 66:2
73:5 85:2
86:19 88:22
108:17,24
110:8
**happening**
116:22
**happily** 25:19
**happy** 23:17
24:19
**hard** 25:1,2
113:18
**head** 10:4,4,7
28:18 43:23
95:6

**headphones**
46:2,3,4,10,12
**hear** 8:22 59:9
59:9,15,21
61:3 66:8,11
66:14 74:23
122:5 123:8,10
127:3 128:11
**heard** 7:1 8:25
27:24 105:3
107:7
**hearings** 1:1
7:9
**heart** 13:15
111:18
**help** 8:17 9:25
20:6 22:16
87:6 95:7
96:14 97:8
120:23
**helped** 29:19
**helping** 26:7,11
26:22
**hereto** 141:5
**hh62830**
141:16
**high** 12:12,14
**hilton** 87:23,24
**hire** 15:22
**history** 12:4
133:5
**hit** 51:19 54:8
54:18 59:8
**hold** 36:15
38:21

**holding** 38:13
**holly** 2:7 5:16
7:23 22:21
91:2
**home** 11:13
**honorarium**
29:1 95:24
**hope** 83:17
84:1,1
**hotel** 11:15
27:19 28:20
32:10 33:6,8
33:10 57:7,25
58:5,9,18
59:20,23 71:13
78:6,11 82:25
87:20,21 88:13
99:12,22
124:15 125:10
125:12 126:13
127:15 130:11
133:6,17,25
136:6 137:12
139:10,12
**hour** 84:2
87:15 116:24
**hours** 87:15
**house** 92:24
**human** 3:18
80:24 81:5
98:14,23
**humiliation**
131:13
**hundreds**
87:12

| | | | |
|---|---|---|---|
| **hype**  43:23,25 44:19 | **inappropriate** 81:23 83:23 134:19 | **individual** 103:3 128:11 128:23,25 136:4 | **instructing** 120:17 |
| **hyping**  44:7 45:18,24 48:14 | **incident**  34:21 45:2,10 46:23 | **individuals** 82:11 97:12 | **insurance**  42:7 42:9 |
| **i** | 47:7 87:10 | 133:24 136:6 | **intended**  55:4 |
| **icloud**  40:25 | 89:6 90:1,6,14 | 136:20 | **interact**  90:8 |
| **idea**  131:24 | 90:23 92:7 | **influence**  17:16 | **interacted** 105:21 |
| **identification** 3:4 30:13 36:5 | 97:11,13,19,24 98:8 109:2,12 | **influencer**  13:9 13:17 18:13 | **interacting** 64:5 68:12 75:10 |
| 37:4 38:8 47:22 58:25 | 109:15,22 110:3,16 111:3 | 35:4 113:15 | **interaction** 58:14 65:16 |
| 64:15 69:18 93:11 96:6 | 111:8,23 112:1 113:9,12 114:4 | **influencing** 18:18 | 70:11 77:9 91:21 |
| 97:1 98:25 100:21 | 114:17 115:1 115:23 116:8 | **information** 9:5,9 12:2 24:12 27:15 | **interested** 142:14 |
| **identified** 123:1 | 117:22 120:2,5 120:9,12 | 40:24 41:3 101:17,24 | **interesting** 137:22 |
| **identify**  64:18 77:3,13,21 | 121:18 128:3 128:21 136:17 | 105:15 | **internet**  6:24 133:16 |
| 81:9 128:24 129:1 | **incidentals** 33:8 | **initial**  30:1 91:21 | **interrogatories** 107:17 |
| **ignored**  66:17 | **incidents**  74:12 | **initially**  20:23 100:10 105:21 | **interrupted** 70:3 |
| **immediately** 131:21 | **including**  29:9 | **initiated** 104:15,18 | **interrupting** 62:5 |
| **impact**  10:25 11:4 108:10 | **income**  17:6 18:14 118:5 | **insensitive** 64:12 | **interruptions** 83:25 |
| 118:3 | **incorporated** 7:7 | **inside**  83:2 | **interview**  14:23 15:5 |
| **important**  10:6 | **increase**  120:4 | **instagram** 13:22,23 17:19 | **interviewed** 97:6 |
| **impression** 125:9,12 | **increased** 113:11 | 17:20,24,25 | **intrucious** 108:13 |
| **improperly** 19:7 | **indicate**  5:11 96:14 | **instantly**  16:23 | |
| **inadvertently** 23:3 | **indicated**  39:2 | **instructed** 108:2 | |

[intrusive - know]

Page 15

| | | | |
|---|---|---|---|
| **intrusive** 10:23 | 38:10 39:2,10 | **judge** 106:25 | **knoll** 51:4 |
| 110:2,7,15 | 45:8 46:2 48:1 | 107:9,15,19,22 | **know** 8:10,15 |
| 116:19 | 48:4,7 49:21 | **julio** 23:1 29:25 | 8:22 9:11,15 |
| **investigation** | 51:6 52:16,20 | **justify** 83:17 | 9:19 10:10,11 |
| 106:11 | 53:19 58:13 | **k** | 11:2 14:12,25 |
| **iphone** 11:22 | 59:4,16 61:3 | | 16:25 17:1,21 |
| 40:3,5,13 | 64:10,12 65:12 | **k** 115:15,16 | 19:3 21:8,12 |
| 41:17 | 66:3 67:12,20 | **kathryn** 115:14 | 21:16 22:9 |
| **issue** 73:17 | 68:11 78:18 | 115:19 116:2 | 26:19 29:16,18 |
| 74:5 75:8 | 79:24 81:4,23 | 117:13 | 31:1,6,7,10,21 |
| 122:3,20 | 84:4 91:13 | **keep** 25:10 | 33:2,13 37:20 |
| 126:19 | 93:15 94:10,24 | 60:15 63:23 | 37:25 39:7,14 |
| **issued** 101:23 | 96:9 97:4 | 65:1 67:15 | 40:7,13,19 |
| **issues** 73:16,19 | 100:18,23 | 79:18 81:15 | 41:1,14,15,18 |
| 73:20,23 74:3 | 101:13,16 | 83:18 84:2 | 41:19 42:9,13 |
| 74:4 75:7 | 102:9 103:12 | **kept** 62:5 99:18 | 43:17 46:9 |
| **items** 117:1 | 104:16 105:6 | 139:11 | 47:8,16 48:16 |
| **itinerary** 29:15 | 105:14 106:10 | **key** 72:11 73:1 | 48:23 49:1 |
| **j** | 106:18 108:5 | 126:8 | 50:7,11,18 |
| | 117:13 124:2 | **kicked** 19:7,8 | 51:6 54:4,9,13 |
| **j** 5:21 | 124:13 134:9 | 88:10 137:12 | 54:16,17 55:8 |
| **jacuzzi** 51:10 | 134:21 137:24 | 137:19 | 57:4 58:19 |
| 51:15 | 138:6 139:22 | **kicking** 139:12 | 59:8,24 61:10 |
| **jade** 97:4 | 139:25 141:4 | **killed** 108:18 | 62:6 63:4,9,13 |
| **jail** 108:20 | 142:7 143:3,4 | 109:15 | 63:18 64:3 |
| 109:15 | 144:1,2 | **kind** 10:23 12:9 | 65:21 66:1 |
| **jamaica** 28:15 | **jittery** 111:18 | 17:9 40:13 | 68:23 69:1,6 |
| 83:9 | **job** 1:25 25:12 | 44:6,18 46:12 | 71:6,10,25 |
| **james** 1:3,10 | 62:12 69:6,6 | 56:8 70:10 | 72:4,10,13,17 |
| 2:20 5:14,21 | 113:18 | 107:10 108:15 | 72:22 73:11 |
| 7:5,7,17,21 8:7 | **joe** 122:23 | 115:9 122:21 | 76:5 77:6,8 |
| 8:8 13:8 22:15 | **jonathan** | **kinds** 75:5 | 80:23,25 81:7 |
| 22:19 23:1 | 104:14 | **knew** 13:6 | 81:12 82:4,10 |
| 26:2 29:24,25 | **journey** 43:18 | 21:20 62:23 | 82:13,24 83:3 |
| 30:17 33:22 | | 69:13 133:10 | 83:8 85:12,15 |
| 36:8 37:14 | | | |

85:18,23 86:1
86:2,12 87:1,5
87:8,11,12
88:16 89:1,3
89:10,14,22
90:17 91:15
92:1,4,8,14,21
93:17 94:5,9
94:25 95:15,22
95:25 96:8,19
97:4,5,15,20,25
101:25 103:7
104:3,5,10,17
104:20,21,23
104:25 105:4,7
105:9,20,24
106:2,5,16
107:8,13 111:2
111:12 112:7
112:21 114:20
114:24 115:17
117:19 118:8
118:12,15,23
119:18 120:3
120:15 121:5,5
121:11,19
123:9 125:1
129:7 131:23
133:15,18,24
134:9,12,13
135:23 136:3,7
136:11,21
**knowledge**
125:10

**known** 12:22
**knows** 81:15
131:19
**kristy** 2:13

**l**

**l** 5:21 28:24,24
**lack** 107:2
**laid** 10:17
**language** 102:7
**large** 141:3
**lauren** 28:24
**law** 2:3 107:15
107:19
**lawn** 43:6,11
45:25 46:23
47:6,25 48:1,7
48:10 49:8
50:5,20,25
53:21 54:14,23
55:6 57:24
58:15 79:3
87:10 90:14
108:21
**lawsuit** 12:20
**lawsuits** 106:17
**lawyer** 25:7
26:25 29:24
93:7 102:15
107:7
**lay** 102:3,14
**laying** 108:20
**layout** 48:11
49:14
**leads** 15:21
17:6,15 121:21

124:3
**leaned** 126:11
**learn** 126:23
**learned** 44:16
122:24
**learning** 43:18
**leave** 68:20
69:4,7 71:2,9
71:16 73:4
122:10 125:11
**leaving** 127:24
**left** 35:6,9
68:12,23 85:2
86:19 95:21
**legal** 14:7,10
102:5 143:21
**letter** 120:17
**license** 12:21
141:9
**lieu** 5:5 6:4
**life** 75:1,2
110:6 113:25
**lifetime** 102:25
116:18
**likely** 39:11
55:12 101:2
**limit** 102:3
**line** 25:7,11
54:25 133:22
144:4,7,10,13
144:16
**lines** 4:3
**links** 97:7
**list** 135:6

**listen** 44:2
**listening** 44:3
**literacy** 13:13
20:14,25 21:3
27:8 95:10
97:7
**little** 8:18 12:2
22:19 28:23
37:22 48:5,17
67:8,20 95:9
**live** 3:12 35:22
46:17,22 47:5
55:10,19,21,24
55:25 56:1,2,2
56:4,6 58:21
58:24 60:7
70:11,19 85:25
86:4 87:9,16
88:14,25 90:11
123:14
**lives** 17:25 28:4
97:21
**livestream** 14:8
43:14 44:8
62:10 85:5
86:5 97:14
**lobby** 95:6
**located** 11:10
106:6 108:19
115:11
**location** 35:1
43:3
**lock** 74:22
**lodging** 29:9

**long**  64:20 87:14 93:4 108:25 110:5 111:6 125:18 126:4 138:18
**longer**  67:9 122:20
**look**  22:7 28:22 47:25 48:6 50:19 51:6 52:3 89:24 90:3 100:6 103:3 104:4 113:25 119:18 121:12 135:12
**looked**  51:23 79:2
**looking**  12:13 36:19 50:12 59:6 60:2
**looks**  22:24,25 36:13 48:19 49:16 51:10 52:18 54:1,5 54:10
**lose**  42:4
**losing**  40:23
**lost**  41:12
**lot**  82:21
**loud**  44:4 127:15
**louder**  44:23
**loudly**  45:13
**love**  44:15

**lower**  99:11
**lucie**  142:3
**luckily**  25:22
**lunch**  67:18
**lyft**  31:4,6

**m**

**m**  2:18 5:21 27:1
**ma'am**  12:18 12:25 13:2,5 14:22 17:11,22 18:6,9,16 19:12,16,20,23 20:5,16 21:5,7 21:14,25 22:2 22:17 26:6,10 26:20,23 27:9 27:13,23 28:2 28:6,8,21 29:4 29:7,11,18 30:20,22 32:11 32:23,25 33:2 33:17,20 34:4 34:7,11,16,24 35:5,8,14,17,20 36:9,17,20,23 37:15,17,24 38:11,15,17 40:4,12,15,21 41:1,8,11,14,19 42:3,8,20,23 43:7,10,21,24 44:5,25 45:5,9 45:22 46:1,6 46:11,15,19,24

47:11 48:2,8 48:18,22 49:4 49:6,10 50:17 51:2,5,12 54:2 54:7,12 55:11 55:17 57:22 58:1 59:5,17 61:4 62:22,25 63:12,15 64:11 64:16,19 65:3 65:5,14,18 66:7,10,15,25 67:3 70:5,8,13 70:22,25 74:18 78:22 82:9,17 82:20 83:5,11 83:13,19 84:7 84:12,15,19,22 85:1,6 86:18 87:18,25 89:12 90:19 91:19,23 93:19 96:10 98:3,9,12,20 99:3,20,24 100:2,8,13,25 101:7 103:16 103:18,21 104:7 105:19 105:23 106:1,4 106:7,16,19 109:13,16,23 110:1,4 111:5 112:15 113:2,4 113:7,10,16,21 115:2,8,18,24

116:3,16 117:23 118:10 118:17,20,25 119:16,22,25 120:20 121:2 121:16 123:4,7 123:11,13 124:6 135:3,16 136:14 138:10 138:13
**madam**  81:19 84:4 107:25 134:20
**made**  33:19 105:6,8 106:2 106:6,10 118:13 119:23 124:17 131:6
**magazine** 14:19,24 15:5 15:8
**mail**  26:24
**main**  15:20
**make**  8:17 13:6 15:12,16,18,20 17:2,6,12,20 18:2 24:17,22 25:19 28:22 33:7 60:16 102:18,24 103:9,13 118:6 119:5,20 124:23 134:18
**making**  25:8 44:20 103:8

[making - moved]                                    Page 18

107:1
**male** 74:1
**man** 62:12
129:2,9
**manner** 5:10
125:14 128:11
**mark** 30:6,8,10
37:5,8 38:5
47:18 58:22
62:1 65:9
69:15 93:7
96:23 98:19
**marked** 3:4
30:13 35:25
36:4 37:3 38:7
47:17,21 58:25
69:17 93:10
96:3,5,25
98:24 100:21
**marking**
100:18
**matter** 5:8 6:9
6:10,16 7:6
105:13 139:1
**mcdonald's**
135:8
**mean** 10:23
19:18,21 33:11
39:22 55:1
73:25 76:6,7,9
76:11 80:21
86:21 87:4,7
88:2 92:13
101:22,22
110:11 112:5

135:21,25
**means** 21:10
33:23 102:7
**media** 7:4 13:9
13:17,18,21,24
18:13,14,18
20:13 34:14
35:4 86:25
89:5 90:4,9
113:15 114:1,3
**medical** 116:8
116:14,17
117:15
**medication**
11:2
**medications**
10:25 11:4
113:1,5
**meet** 95:5
**member** 59:19
78:11
**members** 56:10
103:3 104:5
**memory** 11:1,4
25:23 94:5
97:8
**mental** 74:2,3
**mentally** 75:3
108:7
**mentioned** 7:23
15:24 17:19
18:1 29:19
64:14
**message** 3:14
3:15,16 89:2

93:10,20 95:2
96:5,25 98:5
121:13
**messages** 89:4
89:7,9 90:4,9
93:6 94:10
95:7,17,20
96:1,22 97:16
98:7 120:18
121:12,15,17
**mexico** 28:15
83:10
**miami** 2:4
**middle** 12:12
49:8,8 50:4,20
50:25
**mind** 113:18
132:13
**minibar** 33:9
**minute** 25:24
65:9 67:5 91:3
116:25
**minutes** 51:20
52:9 53:6 65:9
67:9,21,21
93:5 117:5,6
126:5 139:2,5
**miscommuni...**
90:25 91:17
92:6,10
**misstates**
124:19 133:22
**mistake** 124:17
**mixed** 112:13

**model** 40:14
**moment** 58:7
91:6 110:22
**monetary**
107:2
**money** 15:12
15:16,18,20,21
16:3 17:20
85:24 86:5
**month** 16:24
17:2 114:11,15
**months** 16:11
16:16 20:21
114:21,21,23
114:24
**morning** 5:13
5:16 7:21,22
34:23 42:18
45:20,24 46:5
46:22 47:6,14
48:21 53:21
54:15,24 55:6
55:13,20 56:18
128:21 138:23
**motion** 81:22
**motivational**
13:10,11
**move** 25:5 50:8
50:24 51:7
52:19 75:23
79:13,17 81:18
84:21 134:15
**moved** 50:11
50:15 51:3,22

**movement**
43:15,16 52:24
**multiple** 13:19
13:20 75:17
**music** 44:2,3
**mute** 53:11

**n**

**n** 2:18,18 27:1
**name** 5:12,20
7:11,23 8:6
26:14,18,21
31:14 42:13
72:21,24 75:15
75:18,21 76:4
87:22 95:15
115:13,14,17
116:6 144:23
**names** 28:16
75:12
**narrative**
105:11
**narrow** 96:14
117:1
**natural** 10:3
**nature** 8:2 19:1
**near** 28:4 51:15
56:24
**nearby** 65:16
130:25
**need** 9:11,13
10:1,2 11:2
30:14 33:23
52:7 67:4
78:14 79:15
81:24 91:2

117:5 129:19
132:11
**needed** 32:16
71:25 72:9
76:4
**needs** 9:14 25:8
**nervous** 43:20
**neuro** 74:2
**never** 76:21
101:5 102:12
107:7 128:16
**new** 40:17,18
40:22 41:2
112:7
**news** 81:10
89:11,25
**nice** 82:25 83:1
133:16
**night** 34:13,17
34:18 109:19
130:15
**nightmares**
108:13,15,17
108:19 109:6,8
109:9,14,17,24
**nights** 27:19
**nod** 10:4
**noise** 46:14
**nominated**
21:8
**nominations**
21:16
**non** 136:1
**north** 11:12,13

**notary** 141:2
141:16,17
**note** 6:22 34:9
34:10 143:7
**noted** 60:23
61:8
**notes** 11:18
60:3 117:1
142:8
**noticing** 23:4
**noting** 60:24
**november**
14:16 15:3
27:3,18 28:24
40:17 41:13
46:5 49:9
53:21 54:15,24
55:7,14,20
56:14,18 120:2
120:16 138:23
**numb** 111:18
**number** 7:9
12:23 17:16
72:16,19 73:13
89:17,19 93:17
94:3 96:3,8,13
96:15 97:3
107:6

**o**

**o** 2:18 5:21
27:1 28:24
**oath** 5:6 10:20
10:21 141:1
**object** 33:21,22
39:16 45:6,15

46:7 49:23
50:9 55:15
60:17 61:13
66:20 77:16
78:13,14
103:10 106:23
124:18,24
125:15,20
126:15,20
127:1 128:6,17
129:14,21
130:5,13 131:1
132:2,7,20
133:1,7,21
134:2 137:15
137:20 139:6
139:13
**objected**
107:18 133:14
134:25
**objecting** 79:14
134:14
**objection** 39:16
50:1 60:22
66:18 104:19
104:25 107:18
116:11
**objections** 5:10
60:15,17
102:18
**obliterated**
12:23
**observing**
103:2

**obvious**   79:16
79:19
**obviously**
18:21 23:2
**occur**   29:10
**occurred**
100:11 123:12
128:21
**ocd**   112:12,14
112:16 113:6,8
115:7 116:2,5
117:14,16
**ocean**   46:23
47:6 49:8 50:5
50:20,25 53:21
54:14,23 55:6
57:24 58:15
87:10 90:14
**october**   1:11
6:21 27:1,17
114:16 141:6
142:15 143:4
**offer**   27:19
**office**   11:15
23:9,18 24:1,5
24:14,17,19,24
**office's**   25:12
**officer**   58:15
60:6 61:5,7
62:13 63:13
64:23 65:2
66:5,9,14
68:14,19 69:11
69:25 76:15,25
77:10 78:5

82:6 91:20,25
92:3,5 93:2
99:19 103:5
104:14,17
105:5,7,16,20
105:24 106:2,5
124:15 125:18
127:20 128:13
131:18,21
**officer's**   66:17
**officers**   67:2
68:13 70:15,20
84:20 90:13,18
91:15
**officially**   6:21
**oh**   41:10 79:12
92:20
**okay**   6:7 8:16
9:3,21,22
10:19 11:15,18
11:23 12:16
13:3,21,23
16:5 21:15
24:10,16 25:9
26:21,24 27:10
31:19 33:18
44:23 47:9
49:7,11,25
50:2 52:5
53:22 54:3,8
54:22 59:11
61:5 67:6,9,11
67:17 68:1,4
69:3 81:15
83:3,14 91:20

101:8 103:22
123:17 124:10
126:10 128:13
136:24 138:14
139:15
**oliver**   1:3,10
2:20 5:14,21
7:5,6,17 8:7
29:25 67:22
139:25 141:4
142:6 143:3,4
144:1,2
**once**   9:18 16:10
42:6 58:11,16
115:20 117:25
**ones**   13:7
108:16 109:3,4
110:10,15
**ongoing**   116:21
**open**   11:23
43:1
**opportunity**
10:14 61:20
**opposed**   79:19
102:4
**oprah**   122:21
**ordered**   107:15
107:19 139:18
**ordering**
139:19 143:12
**ordinary**
131:15
**original**   29:17
**outlet**   13:18

**outlets**   13:21
**outside**   28:12
38:12 39:4
83:1 110:21
**outward**   38:13
**overcome**
44:17
**overhead**   47:24
**overruled**
107:18
**overwhelming**
9:12
**own**   82:19
**owns**   96:8

**p**

**p**   28:24
**p.a.**   2:3
**p.m.**   68:6,9
91:8,11 117:8
117:11 140:1
**page**   2:19 3:5
4:3 101:3
144:4,7,10,13
144:16
**pages**   96:12
**paid**   15:14 16:7
16:9,12 22:1,3
29:5 32:16
85:11,16
**palm**   1:6 2:8
5:17 7:7,25
21:3,23 27:3
28:5 29:6 30:2
30:18,19 68:13
97:22 101:18

101:23 104:14
134:1 144:1
**paperwork**
20:20
**paragraph**
29:13 99:9,21
101:11 105:10
**part** 27:4,14
35:3 38:18
46:16,21 47:3
48:5,14 61:25
83:1
**participants**
6:25
**participate**
27:12
**participating**
5:2
**parties** 5:8 6:17
7:3 142:11,12
143:12
**partner** 26:13
26:15 27:2
30:4 120:23
**partner's** 26:21
**passed** 31:20
**past** 31:16
44:16
**pause** 49:24
53:11 78:15
**pay** 16:16 29:1
29:8 33:15
85:13,14 87:24
**payments**
120:8,11

**paypal** 16:22
**peers** 56:10
**penalties**
144:20
**penalty** 5:8
6:11,13,17
**pending** 9:17
**people** 14:19,23
15:5,8,21 17:6
63:6,17 64:4
81:11 82:21
83:6,15 88:24
89:1,22 90:5
95:9 104:8
110:13 117:21
121:18 127:25
129:24 130:8
130:16,18,20
133:5
**people's** 130:25
**percent** 15:1,7
20:19 33:2
42:16 68:16
72:10 86:9
96:18 98:6
99:14
**perjury** 5:8
6:12,14,17
144:20
**person** 5:6
21:19 95:5
128:5
**person's** 75:18
75:21

**personal** 40:11
41:3
**personality**
113:24
**personally**
73:17,19 74:5
75:7 77:13
80:15 123:10
**personnel** 71:7
71:8
**petition** 3:19
100:16,17,20
101:3 103:24
106:8
**petitioner**
101:3
**phone** 22:8
36:14,16 37:23
38:13 40:8,11
40:17,22,25
41:2,12,16,20
41:22 42:4
48:20,24,24
49:3,5,7 52:17
52:19 54:1,6
54:11 67:6
70:10,14 88:8
88:19 89:15,16
89:19 93:17
94:3 96:3,8,15
97:3 98:11
120:24
**phones** 40:19
130:9,10,11
136:8

**phonetic** 26:16
**photograph**
132:4
**photography**
82:12
**photos** 41:6
50:22 82:23
134:10
**physical** 95:23
**physically** 5:3
11:11 75:4
111:16
**picked** 130:1
**picture** 53:11
**place** 7:3 42:22
48:19 105:15
134:18 141:4
**placed** 74:21
**placing** 81:22
**plaintiff** 1:4 2:5
7:6
**plan** 34:22,23
34:25 42:21
43:12
**platforms**
13:24
**play** 36:12 48:3
51:19 54:8,18
59:8
**played** 37:12
59:1,13 62:2
65:10 69:23
**plays** 52:23
**please** 5:11,19
5:23 6:22 8:5,5

| | | | |
|---|---|---|---|
| 8:21 9:14 10:9 | **policy** 99:12,22 | **posted** 135:6 | **prior** 120:12 |
| 19:2 23:7 | 134:9 135:22 | **posting** 113:19 | **privacy** 84:24 |
| 26:14 44:17 | 135:25 | **posts** 16:9,13 | 130:4,25 |
| 49:24 50:2 | **pool** 51:11,15 | 17:12 | 132:11,12,16 |
| 54:8 60:21 | 56:22,23,25 | **potentially** | **private** 92:19 |
| 61:15 78:19 | 57:2,17 58:6 | 42:19 | **privileged** |
| 79:24 91:4 | 60:9 61:9 79:1 | **pothias** 26:16 | 22:24 23:5 |
| 134:21 135:10 | 79:4,7,10 | **practice** 55:9 | 24:13 |
| 143:9 | 84:11 128:2,4 | 81:8 82:11 | **probably** 14:3 |
| **point** 9:20 | 128:15,16 | 101:5 | 39:9 58:19 |
| 54:14 72:8 | 129:1,5 | **premises** | 72:20 97:11 |
| 73:22 77:20 | **portion** 78:21 | 134:10 | 102:12 119:5 |
| 79:21 102:1 | 80:2 82:3 | **preposterous** | **problem** 122:2 |
| 128:20 | 135:2 | 107:6 | 122:17,19,22 |
| **police** 34:21 | **position** 70:14 | **prescribed** | 122:23 131:22 |
| 58:12 62:20,21 | 105:11,12 | 113:1,5 | **proceed** 6:19 |
| 62:24 64:25 | 137:23 139:9 | **presence** | 50:2 |
| 65:22,25 66:3 | 139:11 | 106:12 126:12 | **proceeding** 5:2 |
| 66:5,9,14,17 | **positioning** | **present** 2:11 | 5:3,4 100:9 |
| 67:2 68:13,14 | 70:10 | 5:3 91:20 | **process** 8:12 |
| 68:19 70:12,15 | **positive** 44:9 | 107:1 | 32:12 43:13 |
| 71:13,20,23,25 | 44:12,12,20 | **preserve** | 46:17,22 47:4 |
| 72:15,18,21,23 | 48:15 49:13 | 120:18,21 | 47:11 48:6,14 |
| 73:16 75:6,10 | 50:5 51:14 | **press** 52:18 | 122:15 137:2 |
| 77:21 84:20 | 55:2 | 56:3 107:8 | **produce** 23:19 |
| 85:10 87:2 | **possession** | **pressed** 51:23 | 25:17 133:11 |
| 91:15 92:5 | 12:22 | **pressly** 2:13 | 134:13 |
| 101:19,23 | **possibly** 39:14 | **pretend** 66:8 | **produced** 23:3 |
| 103:5 104:14 | 72:25 73:18 | 66:11 | 23:9,21 24:5 |
| 127:18,25 | 80:10,13 85:9 | **pretty** 21:20 | 24:13,21,23 |
| 128:13 131:18 | **post** 14:5 15:18 | 27:10 | 25:14,16 26:25 |
| 131:20 138:20 | 15:20,21,22 | **previously** | 38:23 58:21 |
| 138:21 | 16:8 17:9 | 61:18 | 134:11,16 |
| **policies** 81:14 | 114:1,3 | **primary** 13:18 | **profanities** |
| 135:6 136:1 | | 18:14 | 99:25 |

**profanity** 65:6
65:12
**profile** 76:20
**profiled** 76:19
123:2 133:25
**profiles** 89:5
**profiling**
133:14
**prohibited**
135:7
**prompt** 10:8
**property** 19:7
19:11 20:2
32:3,7 42:19
43:2 68:20
71:16 72:8
81:8 82:15,16
82:19,22 86:14
86:19 92:19
97:22 103:6
106:11 122:10
123:6 124:4
**provide** 10:13
26:14 73:10
75:15
**provided** 96:2
96:23 97:7
141:9
**provider** 41:20
117:15
**psychologist**
112:22
**public** 17:7
89:19 114:6,9
114:18,25

141:2
**published** 15:9
**pull** 22:6 29:21
47:17 58:20
69:14
**pulled** 22:15
36:2 48:20
**pulling** 93:6
**purporting**
38:23
**purpose** 33:19
56:11
**purposes** 24:11
**push** 56:1,2
**put** 22:20 26:7
26:22 49:5
62:9 76:4,6,7,9
89:19 135:20
137:18
**putting** 22:19
26:11 100:15

**q**

**quality** 6:23,24
**question** 4:1
8:24,25,25 9:9
9:17,18 10:11
10:14 19:6
33:23 38:18
45:1 49:22,23
57:12 60:20
61:15,21 73:23
77:4,25 78:19
79:25 80:17
81:25 103:23
106:24 107:7

107:11,16
108:2 123:21
125:23,25
126:2 134:20
134:22,24
137:5
**questioning**
133:22
**questions** 8:2
8:14 9:6 10:12
10:24 11:1
20:9 56:16,21
57:3 61:19
62:15,19,24
63:1,7,20
77:24 78:2,4
78:24 79:1,16
79:20 83:17,24
102:3,9,17,23
124:8 133:12
134:7 135:14
137:1 138:1
**quickly** 27:10
**quite** 73:7
128:15 131:6
**quote** 86:22
104:15,15

**r**

**r** 5:21 27:1
28:24 144:3,3
**race** 18:23 19:4
19:10,15,19,25
20:4 81:11
101:15 111:18
121:23 122:13

122:17,20
124:5 132:14
**racial** 133:13
**racially** 76:19
76:20 123:2
132:6 133:25
**racist** 76:13,13
76:16 77:12
80:6 110:13,13
122:1
**raise** 127:9,11
**raised** 134:7
137:25
**random** 88:24
**reach** 89:1,13
**reaching** 90:5
**read** 35:4 42:22
43:19 44:16
54:25 66:13
74:1 78:20
80:1 81:10,24
82:2 102:12
135:1 137:2
139:16 143:6
144:20
**reading** 35:2
42:25 43:20
66:6 93:3 94:6
95:11 99:6
**ready** 43:13
44:24 45:14
46:17,21 47:4
51:14 102:23
**real** 110:10

**realized** 122:15
**really** 10:3,5
    15:16 44:24
    45:13 79:12
    83:16,23
    124:13
**reason** 33:13
    79:9 80:15
    137:12,19
    143:8 144:6,9
    144:12,15,18
**reasonable**
    143:14
**reasons** 80:5
**recall** 14:15
    21:6,23 22:3
    23:10 24:15
    26:3 27:6,21
    30:19,21 31:12
    31:16 32:1,5
    34:10 35:6
    36:10,21 37:18
    38:14 40:16,18
    45:18,23 46:20
    47:13 48:15
    54:22 65:15,19
    66:2 71:7,10
    93:20 94:10,11
    95:2 98:5
    119:13
**recalled** 47:1
    47:10
**receipt** 143:14
**receive** 17:23
    18:5,7,10

21:19 29:15
89:4,8 119:7
120:8
**received** 26:24
    61:8 93:7
    118:21 120:11
    121:17
**receiving** 20:25
    86:5 93:20
    94:10,11
    101:24 118:18
    119:8
**recently** 41:15
**reckoning**
    138:22
**recognize** 59:4
**recognized**
    43:17
**record** 5:12,20
    5:24 6:18,20
    7:4 8:6 43:6,9
    48:1 51:15,21
    53:9,14,17
    56:2 60:4 68:5
    68:9 79:14
    81:22 91:6,8
    91:11,14
    117:11 138:21
    142:8
**recorded** 7:1,5
**recording** 6:23
    7:2 35:12
    36:10,22 37:18
    38:1,14,16
    39:3,6 49:18

54:13 55:12
56:4 136:6,7
136:12,20
**recross** 2:24
    3:1 137:6
    138:16
**redact** 24:4,12
**redactions**
    24:18
**redirect** 2:23
    2:25 134:5
    138:4
**reference**
    123:18
**referenced**
    143:5
**referred** 102:8
**referring** 73:20
    73:23 74:6
    75:6
**refrain** 99:11
**refresh** 97:8
**refund** 85:22
**refuse** 75:14
    76:24 81:9
    82:11
**refused** 59:22
    77:2,20
**refusing** 62:23
**regard** 143:16
**regarding**
    104:16 117:16
**regular** 55:9
    122:23

**regularly** 64:4
    112:23
**reimbursement**
    116:7,15,20
**reiterate**
    134:20
**relate** 101:12
**related** 110:7
    113:12
**relating** 116:13
**relations** 3:18
    98:15,24
**relative** 142:10
    142:12
**relax** 83:7,12
    83:14,15
**relayed** 105:15
**relief** 100:16
**relive** 108:9
**relying** 102:10
    102:11
**remaining**
    117:1
**remember** 15:4
    21:18 28:16
    31:15,25 32:4
    32:8 34:19
    36:11 38:2
    40:10 46:13
    49:20 50:23
    56:19,20 64:22
    68:18 69:1,3
    73:7 80:10
    87:22 89:10,14
    89:18 94:17,19

116:6

**remind** 10:8

**remotely** 5:5
8:20

**removal** 99:10

**remove** 81:8
82:11 84:17
103:5 106:10
123:1,6

**removed** 19:11
20:1 91:1
92:17 104:4
105:14 124:4

**repeat** 5:23 6:1
44:11 60:20
64:10 68:25
78:17,19

**repetitive**
79:16

**repetitively**
63:25

**rephrase** 9:8,9

**replace** 41:22

**replaced** 41:16

**replay** 52:15

**report** 142:6

**reported** 1:22
128:25 129:4

**reporter** 7:13
8:13 9:23
81:19,24 84:4
97:9 108:1
134:21 142:1

**reporting** 5:4
5:10

**represent** 7:24
23:8

**representing**
7:11

**reproduce**
23:19

**request** 23:22
26:4 29:20

**requested**
78:21 80:2
82:3 103:5
135:2 142:7

**requests** 26:9

**reserve** 24:18

**resort** 28:9

**resorts** 28:17
83:9

**respect** 84:13

**responded**
27:10

**respondent**
5:18

**response** 23:21
26:4,9 113:13
137:5

**restaurant**
135:7,13,18,21

**restaurants**
135:5

**restore** 41:10
120:25 121:3,7
121:10

**result** 62:24

**retained** 3:21

**return** 67:6

**returned** 90:21
91:16 93:2
143:13

**revealing** 126:7

**revenue** 18:2,5
18:7,11

**review** 142:7
143:5

**ride** 30:25 31:1
31:2,3,7 95:10
95:13

**right** 8:12,19
14:21 15:10
19:6 25:21
28:5 29:2 31:5
32:10 37:23
42:19 43:23
51:1,23 52:3
53:25 55:21
58:11 59:23
61:2 62:5 67:2
67:10 70:4,21
71:2 75:24
77:10,24 79:4
79:6,7,10
84:13,18 91:18
98:15 101:6,20
102:2 110:20
110:21 117:4
119:2 126:13
128:2 129:19
130:3,4 132:1
135:22 136:2
136:16 137:24

138:12,25
139:5,16

**romeyn** 27:1

**ron** 5:13 24:3
25:11 30:11
53:6 60:14
83:20 123:21

**ronald** 2:3
143:1

**room** 5:4 11:7
11:16,17 33:10
34:3,6,8,15,18
35:7,7,10 72:1
72:9,11,13,15
72:19 73:1,2
73:12 85:4,19
126:8 127:15

**rooms** 83:4

**rosenberg**
104:14

**rosenburg**
105:5,8,16

**rothenburg**
106:3,5

**ruby** 96:14,17
96:20

**rules** 8:17 10:1
10:17 143:15

**run** 86:22

**running** 79:19

**rweil** 143:2

| s |
| --- |

**s** 1:4,7 2:4,5,8,9
2:18 3:3 5:21
28:12,24 144:3

**safety** 56:12
70:18
**sale** 12:21
**sat** 8:13
**saved** 96:13
**saw** 28:3 70:10
136:5,20
**saying** 18:22
25:23 50:5
51:13 70:20
77:22 88:12
138:6
**says** 28:25
29:13 95:5
97:6 99:9
101:4 105:12
106:9
**scale** 111:13
**scared** 44:15
69:10
**scary** 108:16
**scenery** 50:12
50:18
**scheduled**
126:24
**schmo** 122:23
**school** 12:8,9
12:10,12,12,14
25:6 74:20
**scratch** 29:22
**screaming**
99:25
**screen** 7:1
11:24 36:7
38:10 51:8,11

51:24,25 52:3
52:19 53:11,22
53:25 59:3,4
94:1,3,7 96:12
98:1,4,18
100:16 104:12
105:10
**screens** 54:9
**scroll** 22:22
23:15 100:14
**scrolling** 28:23
101:10 104:12
**search** 98:7,10
**second** 22:21
22:22 38:21
56:5 62:1
78:14 91:4
105:10 124:7
**seconds** 50:1
51:20 65:9
**sections** 23:20
**security** 20:1
32:2,6 34:21
47:15 54:23
55:13,22 56:7
56:13,17 57:6
57:23 58:4,8
58:15 59:18
60:6 61:5,7,11
61:17,19 62:9
62:13,18 63:13
64:3,18,21,23
65:2,13,17,20
71:7,8 75:11
76:15,25 77:9

77:21,22 78:5
79:2,5,8 80:6
82:6 84:16
91:21,25 92:3
99:7,19 105:20
105:24 121:22
126:12,17
128:14,23
129:5,8 131:6
131:19,21,23
136:21,22
139:3
**see** 8:19 22:6
22:12,14,18
23:12,15 29:23
36:7 37:14
38:10 46:2
49:15 51:7,7
51:10,17,25
52:1,15,17,19
52:21,21,23,24
53:3,4,22,24
54:9,11 59:3,9
59:12 63:10
65:22 69:20
90:3 92:7
93:14,14 96:12
104:8 112:23
115:3,19 116:2
119:19 120:4
128:3 130:10
131:20 136:12
**seeing** 6:5
15:21 48:5

**seeking** 116:7
116:14
**seem** 55:3
**seemed** 27:11
**seen** 6:25 32:15
39:4,6 54:20
115:20,22
128:5
**segment** 52:16
**self** 104:15
**send** 15:15
29:20 30:2
95:23
**sending** 26:3
85:24
**sent** 15:17
120:17,23
121:6
**sentence** 29:13
**separate** 23:14
**serial** 12:23
**served** 13:1
107:17,20
**serves** 24:20
**service** 31:14
**set** 42:24 43:14
48:1 49:7,15
50:20 51:22
96:1,22 141:4
**severe** 108:11
**shake** 10:4
**shaking** 10:7
**share** 8:16 31:2
31:3,7 59:3

| | | | |
|---|---|---|---|
| **shared** 28:4 133:19 | **similar** 28:13 46:4 | **slightly** 126:18 | 78:17 81:2 |
| **sheet** 143:8,10 | **single** 23:16 | **slow** 53:1 | 94:20 100:3 |
| **shoes** 135:20 | 44:4 | **slye** 1:22 7:13 | 119:3 135:15 |
| **short** 67:4 | **singled** 125:11 | 9:24,24 10:20 | 137:25 |
| **shorter** 35:18 | 131:5,25 | 141:2,15 142:5 | **sort** 36:14,15 |
| **shot** 35:16 | 132:13 | 142:18 | **sound** 12:23 |
| 66:19,22 70:24 | **sir** 40:2 51:23 | **slye's** 26:17 | 14:4 15:10 |
| **shots** 49:15 | 62:5 125:16 | **smart** 44:14,15 | 29:2 |
| 98:1,4 | 126:3,14,21 | **smile** 138:2 | **sounds** 67:24 |
| **shout** 129:19 | 127:6,10,13,16 | **smiling** 123:25 | **source** 15:20 |
| **show** 29:22 | 127:19 128:9 | **smily** 123:22,25 | 18:14 |
| 32:2,24 33:1 | 128:12,18,22 | **smoother** 8:18 | **space** 43:23 |
| 35:24 36:24 | 129:3,11,17 | **snapshots** | **speak** 13:12 |
| 37:21 38:3 | 130:1,6,16,19 | 130:10,12 | 62:14 71:11 |
| 64:15 76:10 | 130:22 131:4,8 | **social** 13:9,17 | 88:4,7,14 |
| 86:5,8 | 132:8,15,21 | 13:18,21,24 | 89:11 |
| **showed** 98:1 | 133:2,8 134:3 | 18:13,14,17 | **speaker** 13:10 |
| 126:8 | 139:7 | 20:13 34:14 | 17:7 126:24 |
| **shows** 78:10 | **sister** 28:4 | 35:3 86:24 | 127:4 |
| 105:13 106:9 | 97:21 | 89:5 90:4,9 | **speaking** 13:11 |
| **shut** 53:10 | **site** 71:17 | 113:14 114:1,3 | 15:23 21:22 |
| **sic** 106:3 | **sitting** 81:20 | **solutions** | 22:1 24:6 27:5 |
| 108:13 | 99:5 | 143:21 | 60:15,17 61:12 |
| **sick** 28:23 | **situation** | **somebody** | 66:5,9 67:1 |
| **sign** 135:8 | 131:19 | 31:13 76:22 | 71:10 109:3 |
| 139:16 143:9 | **situations** | 122:18 | 114:6,10,18,22 |
| **signature** 99:2 | 110:18 | **someone's** | 114:25 118:2,3 |
| 100:23 141:14 | **six** 16:11,24 | 84:13,24 | 118:6,14 |
| 142:17 | 99:21 101:11 | **soon** 41:4 | **special** 74:21 |
| **signed** 100:7 | 114:21 | **sorry** 6:3 8:11 | **specific** 94:22 |
| 103:14 141:6 | **skips** 52:25 | 12:6 21:11 | 116:20 |
| 143:18 | **sleep** 109:20 | 26:19 38:22 | **specifically** |
| **silly** 14:4 | **sleeping** 109:21 | 44:10 45:5,8 | 70:23 |
| 107:13 | | 64:9 66:20 | **spell** 5:20 26:17 |
| | | 68:25 74:23 | 26:19 |

[spend - sure]                                                     Page 28

| | | | |
|---|---|---|---|
| **spend**  125:18 | **started**  47:5 | 122:1,18,21 | **strictly**  101:14 |
| **spoke**  91:24 | 64:13 | **ste**  2:8 | **strike**  15:4 61:6 |
| 92:2 95:1 | **starting**  65:9 | **stenographer** | 81:18,22 |
| 96:19 97:10 | **starts**  56:4 | 1:22 5:1,19,22 | **string**  26:3 |
| **sponsor**  17:17 | **state**  1:1 5:19 | 5:25 6:4,9,11 | 93:14 98:5 |
| **sponsored**  17:9 | 7:8 8:5 10:20 | 6:15 78:20 | 121:13 |
| 17:12 | 70:7 101:13 | 80:1 82:2 84:6 | **subject**  56:20 |
| **sponsors**  17:14 | 103:2 141:2 | 135:1 141:15 | 109:11 |
| **spot**  130:1 | 142:2 | **stenographic** | **submitted** |
| **sproull**  28:24 | **stated**  6:18 8:4 | 142:8 | 103:17 |
| 29:13 | 102:7 105:12 | **stenographic...** | **substantive** |
| **st**  142:3 | 144:21 | 142:6 | 23:11 |
| **staff**  103:4 | **statement** | **step**  55:24,25 | **substitute** |
| 106:9 | 79:17 100:6 | **steps**  53:1 | 25:18 |
| **stalled**  59:25 | 103:8,9,13,14 | 120:21,25 | **suffered**  107:12 |
| **stamp**  36:25 | 104:3,13 | **stick**  37:23 | **suffers**  74:2 |
| **stamped**  35:25 | 105:12,18 | 38:13 48:20 | **suggested** |
| 47:18 69:14 | 106:8,15 | **stop**  82:11 | 71:21 143:13 |
| **stand**  36:14,15 | 134:19 | 83:21 99:10 | **suit**  24:25 |
| **standards** | **states**  132:19 | 101:10 130:24 | **suits**  117:3 |
| 136:1 | **stating**  5:11 | 132:25 135:10 | **summoned** |
| **standing**  52:17 | **statute**  101:13 | **stopped**  31:23 | 131:9 |
| 53:25 65:16 | 102:12 132:23 | 48:20 88:14 | **supervisor** |
| 79:4,11 108:20 | 143:15 | 90:11 | 77:23 80:6 |
| **starbucks** | **stay**  32:15,15 | **stopping**  9:20 | 84:16 105:22 |
| 86:20 87:14,19 | 32:18 33:16 | **stops**  52:24 | 105:25 |
| 88:15,23,24 | 83:4 85:16 | **straight**  73:2 | **support**  105:18 |
| 90:21 91:16 | 87:14 92:18 | **stream**  87:10 | 106:14 |
| 93:2 124:14 | 130:12 | **streaming** | **supports** |
| 125:19 | **stayed**  34:18 | 35:22 46:18,22 | 122:12 123:2 |
| **start**  7:16 8:23 | **staying**  27:22 | 47:5 60:7 | **sure**  13:6 15:1 |
| 10:12,15,24 | 28:1 57:7,25 | 70:11,19 85:25 | 15:7 20:19 |
| 14:3 19:2 | 58:5,8,18 | 86:4 87:16 | 22:5,23 24:3 |
| 46:17 67:1 | 59:23 71:17 | 88:15 90:11 | 33:3,7 39:14 |
| 108:22 | 78:11 99:4 | | 42:10,11,12,16 |

52:10 56:15
67:7 68:16
71:18 72:10,22
86:3,9 89:18
89:23 96:18
97:20 98:3,6
99:14 114:22
125:2 135:11
138:24
**surveillance**
47:24 53:20
**sweating**
111:19
**swore** 10:21
**sworn** 141:4
**symptoms**
113:8
**system** 24:21

**t**

**t** 2:18 3:3 144:3
144:3
**table** 135:20
**take** 7:3 9:18
9:19 12:3 33:9
35:18 38:24
39:24,25 50:22
52:7 53:3 55:3
67:4,8,14,16
78:14 82:22
91:2 116:24
117:5 120:21
120:25 130:9,9
130:11 135:13
135:20 138:8
138:19

**taken** 7:5 53:15
68:7 91:9
117:9 127:20
**talk** 10:15
20:10 30:17
34:20 44:1
45:12 88:17,19
88:21 106:20
126:11
**talked** 93:3
94:17,19,20,21
95:3,9
**talking** 8:21
10:3 20:23
29:23,25 44:6
45:2,2,10,11
48:12,13 55:2
58:11 63:17,18
63:22 110:21
125:19 128:10
129:18 131:20
**tanya** 27:1
**targeted** 19:16
19:17,22 74:11
131:7
**taught** 56:8,9
**teachers** 74:21
**technical** 8:23
23:25
**telephone** 88:8
**tell** 9:7 10:21
12:8,11 13:11
14:5 15:24
22:9 32:12
35:15 43:5

57:4,11,18,23
59:22 60:6
62:13 63:24
68:17,18,19
72:18,23 73:16
76:3,14,24
77:1,9 80:8,11
85:10,21 86:10
92:9 125:4
139:17
**telling** 27:21
47:12 126:7
**ten** 52:8 53:6
116:25 117:5,6
**terms** 102:5
**test** 49:15
**testified** 7:18
61:18 118:1
136:5
**testify** 11:5
**testimony** 5:7
6:1,2,6,8,16
124:19 143:6
143:14
**text** 3:14,15,16
89:2 93:6,9,14
93:20 95:2,16
95:19 96:1,4
96:22,24 97:16
97:18,23 98:5
98:7 120:18
121:12,13,15
121:17
**texted** 97:13

**thank** 7:14 12:1
18:17 20:6
25:24 30:5
38:19 53:7
60:21,24 68:4
68:11 78:15
81:19 84:3
101:1
**thanks** 123:21
**therapist**
112:21 115:10
115:22
**thing** 9:16
10:10 20:14
23:25 84:20
135:12 136:9
**things** 44:7,9
71:24 72:1,5,9
73:3,17 74:5,6
74:7 75:5,8
107:4 108:24
110:13 135:6
**think** 7:13,15
8:4,10,18 9:13
10:11 14:7,9
14:13 16:1
19:3,10,14,24
20:3,13 22:11
23:14 25:3
28:3 31:18,19
33:4,5,13,14
38:2 39:7,8
42:10,12 46:15
52:12 55:21
56:23 57:4,8

58:16 60:8,11
61:23 62:17
63:16 65:7
66:16 68:15
69:5,5,13,13
70:16 71:3,14
71:18,23 73:9
73:22 75:19
79:13,18 82:21
83:3,7,15
84:23 87:22
88:8 92:11
93:8 94:13,16
95:1,16 96:16
97:9 98:16
99:8,14 100:1
100:3 101:2
104:12 105:7
112:22 113:11
115:14 120:10
122:12,24
123:16,20
126:10 131:6,7
136:3
**third** 17:5
**thought** 37:8
77:12 78:25
82:25 83:1
90:25 91:17
92:6,10,15,16
122:15,25
**thoughts**
108:13 110:2,7
110:9,10,12,14
110:15,17,23

116:19
**thousand** 87:13
119:6,10
**thousands**
87:12
**threads** 14:1
18:10,11
**threatening**
127:8,12,15
**three** 16:10,24
50:1 97:12
114:5,11,14
115:21 121:18
**tighten** 53:4
**tik** 14:5 18:14
**tiktok** 13:22,24
14:3,6 15:12
15:14,25 16:9
16:13 17:3,6,7
17:10,15 43:18
49:2 55:24
89:5 118:19
**time** 7:15 8:5
8:22 9:11,13
13:1,13 15:3,9
16:17 23:4
30:21 33:1
35:6,22 36:13
41:12 47:2
52:16 53:20
54:19 58:10
59:12 67:20
70:7 71:5,12
71:15 96:19,21
97:10 104:17

105:7 116:1
123:12 131:16
134:18 139:2
139:25 141:4
**timeline** 18:24
**times** 49:22
70:3,14 74:15
75:17 114:5
115:21
**tip** 16:1,2
119:11
**tips** 16:20 17:3
118:18,22,24
119:4,14,21,24
120:1,4
**titled** 58:21
**today** 8:1,17
9:23 10:21
11:8 18:21,24
20:9 40:6,9,17
46:3 90:1 97:6
107:6,22
121:21 124:3,9
**together** 22:20
26:8,12,22
44:16
**tok** 14:5 18:15
**told** 21:19
27:17,25 58:7
58:17 62:18
63:14 71:12
72:4,5,8 75:6
77:2,15,22
82:6 87:2
91:17 92:5

99:15,19
105:24 136:15
136:19 138:8
139:3
**tomorrow** 95:6
**took** 19:4,9
30:25 31:5
39:5,9 53:19
98:1,11 105:14
**top** 23:15 28:18
51:8
**topic** 13:12
**topics** 13:15
**total** 16:15
24:15
**touched** 54:10
**towards** 54:5
65:22 73:15
125:14 132:6
**tracey** 1:22
7:13 9:24 10:5
10:13 141:2,15
142:5,18
**transcript**
142:7,8 143:5
143:17
**transfer** 16:23
41:6
**transmittal**
3:19 100:17,20
**transportation**
29:9
**trauma** 113:13
**traumatizing**
113:13

**travel** 27:4 29:8
40:23
**traveling** 42:5
**treat** 81:5
117:18
**treated** 63:2,5
74:9,16 80:20
80:22 117:14
**trespass** 101:23
104:16,18,24
**trespassed**
101:16
**trial** 81:12
**trick** 9:4
**tried** 69:22
75:23 76:21
84:16,17
**triggering**
64:14,17
**tripod** 48:21,25
49:5,8,12 50:8
50:25 51:22
54:1 57:21
63:11 65:1
86:17 99:18
136:10,13,18
137:8,13,17
138:7,8,9,11,19
139:4,11
**tripods** 57:19
82:7 99:16
136:16
**trouble** 109:21
**true** 64:15
76:10,11 99:7

99:13,23 142:8
144:21
**truth** 6:6 10:21
22:9 57:5
**truthfully** 11:2
11:5
**try** 9:8 22:10
22:11,12,15,18
59:11 66:5
69:11,21,25
70:15 71:4
75:17 80:15
81:1 82:18
84:20 89:1,24
102:14,24
114:2
**trying** 9:4
10:15 44:19
47:12 62:4
71:8,11 81:13
112:11 132:25
**turf** 43:1 99:5
**turn** 41:4
**turned** 126:17
**twice** 117:25
**two** 27:19
49:25 51:20
87:15 96:12
114:5,21
**type** 31:1 43:15
43:16 46:4
131:18
**typical** 103:3
104:5

**typically** 33:6
130:8

**u**

**u** 28:12,24
**uber** 31:4,6
**ultimately**
50:24 123:5
**under** 5:8 6:11
6:13,17 14:7
14:10 143:14
144:20
**understand** 9:5
9:7 10:16,16
10:20 19:1,5
21:10 33:24
61:14 80:17
81:13 84:9
124:14 132:11
139:9
**understanding**
12:19 16:17
100:12
**understood**
8:25
**unfairly** 74:9
74:16
**unit** 7:4
**united** 132:19
**upset** 65:4
**urging** 79:17
**use** 24:19 25:16
25:18 39:19,22
39:25 48:21
49:3 52:12
57:19 67:17

82:7 130:10
138:11,18
139:3
**used** 25:9 50:21
80:14 112:10
114:8,9 131:7
138:20 143:18
**using** 11:21
40:2,5,6,9
57:21 65:6,12
99:18 130:11
**usually** 43:15

**v**

**v** 5:21 144:1
**vacation** 83:7
83:10,12,15
130:8
**vehicle** 127:18
**venmo** 120:7
120:11
**verbal** 10:2,9
**verbally** 5:7
10:6 75:4
**verify** 143:6
**veritext** 7:12,13
143:11,21
**veritext.com**
143:11
**versions** 23:18
24:19 25:18
**victim** 133:13
**video** 3:8,9,10
3:11,12,13 7:2
7:4 35:21,23
35:24 36:3,7

| | | | |
|---|---|---|---|
| 36:24 37:2,6 | 87:9 120:8 | **walking**  18:18 | 53:4 75:3 |
| 37:12,14 38:6 | **views**  15:19 | 36:19 37:16 | 79:21 80:20 |
| 38:20,21,22 | 16:8,9 86:23 | 38:12 39:3 | 113:24 114:16 |
| 39:5,11,15,20 | **violate**  99:22 | 42:17 48:7,10 | 127:17 134:13 |
| 39:23,24 41:9 | 130:3 135:21 | 52:4,25 71:23 | 134:14,24 |
| 47:17,20,24 | **violated**  99:12 | 72:4 73:15 | **ways**  74:17 |
| 48:3 50:16 | **violating** | 82:14 84:11 | **we've**  53:16 |
| 52:23 53:9,14 | 130:24 | **walkway**  65:23 | 60:11 81:10 |
| 53:16,20 54:20 | **violent**  127:8 | **walls**  36:19 | 123:1 133:11 |
| 58:20,23 59:1 | 127:12,15 | **want**  8:16 9:3 | **wearing**  46:2,3 |
| 59:9,13 62:2 | **virtual**  16:2 | 12:1 17:17 | **websites**  89:20 |
| 65:10 68:5,8 | **virtually**  6:23 | 18:24 24:12 | **week**  115:20 |
| 69:16,23 70:19 | **visible**  79:6 | 30:25 41:10 | **weeks**  112:25 |
| 70:24 78:10 | **voice**  127:9,11 | 58:20 62:11,21 | **weil**  2:3,3,22,24 |
| 82:19,23 84:10 | **volume**  45:23 | 63:20 64:12 | 3:1 5:13,13 6:3 |
| 84:25 91:8 | 99:11 | 67:8 73:4 | 6:7 22:21,24 |
| 117:7 132:5 | **volunteer** | 82:22 83:12,14 | 23:23 24:6,15 |
| **videographer** | 129:8 | 83:15 84:10 | 24:25 25:6,22 |
| 2:12 6:20 7:12 | **vs**  1:5 7:7 143:3 | 107:10 116:24 | 30:6,14 33:21 |
| 53:8,13,16 | | 130:3 | 37:5 38:21 |
| 68:5,8 91:7,10 | **w** | **wanted**  13:6 | 39:16 45:1,6 |
| 117:7,10 | | 38:19 63:2 | 45:15 46:7 |
| 139:24 | **wait**  16:24 | 66:13 70:23 | 49:21 50:9 |
| **videos**  35:15 | 49:25 | 132:4,17 | 51:16 52:7,12 |
| 41:6 43:18 | **waiting**  31:13 | **warming**  54:25 | 53:7,10 55:15 |
| 55:5 58:14 | 31:14 34:5 | 55:1,10 | 59:25 60:11,19 |
| 69:21 98:10 | **waive**  5:10 | **warned**  99:10 | 60:24 61:13,21 |
| 120:18 121:1,3 | 137:2 | **watch**  52:17 | 62:7 63:23 |
| 121:7,9 130:12 | **waiving**  139:18 | 54:9 | 64:6 66:18,20 |
| 134:10 | **wake**  109:19 | **watched**  58:13 | 67:4,11,14,17 |
| **view**  70:15 | **walk**  43:12 | **watching**  87:9 | 67:22,25 68:4 |
| 75:23 | 48:4 49:12 | 88:25 | 72:2 77:4,16 |
| **viewers**  17:24 | 55:24 135:19 | **way**  15:18 16:1 | 78:13 79:12 |
| 85:7,10,21,24 | **walked**  32:13 | 16:2 17:5 25:1 | 81:10,20 83:16 |
| 86:6,10,22 | 32:19 35:11,12 | 25:2 32:17 | 84:1 91:2 |
| | 35:19 64:24 | | |
| | 65:2,13,20 | | |

92:20 93:21,25
94:5,20 102:1
102:11,20,24
103:9,23
104:19,25
106:23 107:23
116:11 117:3,5
123:18,22,25
124:10,12,20
124:22,25
125:3,17,21,24
126:1,16,22
127:2 128:7,19
129:15,23
130:7,14 131:2
132:3,9,22
133:3,9,23
134:4,11,23
135:8,11
136:19 137:1,4
137:7,16,22
138:2,15,17
139:8,15,21
143:1
**weillawfirm....**
143:2
**welcome** 18:20
32:22 60:17
68:11 123:22
**went** 6:20
12:10,11,11,14
32:13 34:18
41:24 55:21
73:5 75:2
91:13 110:18

111:10
**west** 2:8
**whispering**
44:21
**white** 130:20
**winfrey** 122:21
**witness** 2:19
5:6,19,21,22
6:8,10,13,15,25
52:12 78:22
80:3 82:4
83:19 102:15
135:10 143:6,7
143:9,17
144:23
**woke** 34:22
**woman** 129:2,9
**women** 121:25
**word** 112:10
131:7
**words** 44:12
80:14
**work** 13:8
30:15 67:23
69:21 113:14
**worked** 34:14
**working** 43:16
55:4
**workout** 104:9
**works** 14:5
22:12 59:3,12
69:20 94:13
95:14
**world** 18:17

**worrying**
132:12
**wpbf** 97:4
**writing** 107:23
135:19,24
**written** 136:1
**wrong** 78:12
125:21 128:1

| x |
|---|

**x** 2:18 3:3 14:2
18:7

| y |
|---|

**y** 27:1
**yeah** 16:18
24:6,7 31:3
42:13 51:17
56:5 57:1
58:19 60:11
77:1,11,14
80:13 86:9
94:11 119:5
121:14 130:17
**year** 14:20 15:1
42:6 112:17
117:25 118:2
119:10,12
**years** 109:1
117:16
**yelling** 65:15
65:19
**yep** 45:16
**youtube** 14:1
18:1,2,5

| z |
|---|

**zoom** 8:20,21
22:15,18

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is
transcribed, the transcript shall be furnished to
the witness for examination and shall be read to or
by the witness unless the examination and reading
are waived by the witness and by the parties. Any
changes in form or substance that the witness wants
to make shall be listed in writing by the officer
with a statement of the reasons given by the
witness for making the changes. The changes shall
be attached to the transcript. It shall then be
signed by the witness unless the parties waived the
signing or the witness is ill, cannot be found, or
refuses to sign. If the transcript is not signed by
the witness within a reasonable time after it is
furnished to the witness, the officer shall sign
the transcript and state on the transcript the
waiver, illness, absence of the witness, or refusal
to sign with any reasons given therefor. The
deposition may then be used as fully as though
signed unless the court holds that the reasons
given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under

rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

2019.  PLEASE REFER TO THE APPLICABLE STATE RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.